Pro Se 1 (Rev, 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

District of COLUMBIA

Division CIVIL

RICHARD ARJUN KAUL, MD
+
ARNOLD ERWIN FELDMAN, MD

Case No. _____

*(to be filled in by the Clerk's Office)*

_____
*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

Jury Trial: *(check one)*  ☒ Yes  ☐ No

-v-

FEDERATION OF STATE MEDICAL
BOARDS, ET AL. (Plaik see
attached sheet.)

_____
*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

RECEIVED
Mail Room

OCT - 3 2019

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## COMPLAINT FOR A CIVIL CASE

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

Name                 RICHARD ARJUN KAUL, MD
Street Address       440c SOMERSET DRIVE
City and County      PEARL RIVER
State and Zip Code    NY 10965
Telephone Number     201-989-2299
E-mail Address       drrichardkaul@gmail.com
(Plaie see attached sheet for Plaintiff Feldman)

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1
    Name
    Job or Title *(if known)*
    Street Address
    City and County
    State and Zip Code
    Telephone Number
    E-mail Address *(if known)*



Please see attached sheet

Defendant No. 2
    Name
    Job or Title *(if known)*
    Street Address
    City and County
    State and Zip Code
    Telephone Number
    E-mail Address *(if known)*



Please see attached sheet

Defendant No. 3
    Name
    Job or Title *(if known)*
    Street Address
    City and County
    State and Zip Code
    Telephone Number
    E-mail Address *(if known)*

Please see attached sheet

Defendant No. 4
    Name
    Job or Title *(if known)*
    Street Address
    City and County
    State and Zip Code
    Telephone Number
    E-mail Address *(if known)*

Please see attached sheet

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?  *(check all that apply)*

☑ Federal question              ☑ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

1. RICO
2. Anti trust
3. 1983
4. Commerce Clause
5. Eight Amendment

### B.    If the Basis for Jurisdiction Is Diversity of Citizenship

1.    The Plaintiff(s)

a.    If the plaintiff is an individual

The plaintiff, *(name)* RICHARD ARJUN KAUL, MD , is a citizen of the State of *(name)* NEW YORK . + ARNOLD EDWIN FELDMAN, MD IS A CITIZEN OF STATE OF MISSISSIPPI

b.    If the plaintiff is a corporation

The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____,

and has its principal place of business in the State of *(name)* _____

_____.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

a.    If the defendant is an individual

The defendant, *(name)* _____ Please see attached , is a citizen of the State of *(name)* _____ sheet . Or is a citizen of *(foreign nation)* _____

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

b.    If the defendant is a corporation

The defendant, *(name)* _____ , is incorporated under

the laws of the State of *(name)* _____ , and has its

principal place of business in the State of *(name)* _____ .

Or is incorporated under the laws of *(foreign nation)* _____ ,

and has its principal place of business in *(name)* _____ .

*(If more than one defendant is named in the complaint, attach an additional page providing the
same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at
stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

The reputational and economic damages caused to the medical careers of Plaintiffs Kaul & Kaufman exceed $75,000 because of their gross incomes in excess of $500,000 at the time of the alleged crimes committed by defendants

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the
facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was
involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including
the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and
write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

The evidence in support of each element of each claim is listed from page 12 to page 18 of the complaint. The defendants' roles in the commission of the violations are stated from page 26 to 60. The injuries caused by the defendants' violations are detailed from page 12 to 18.

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal
arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include
the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any
punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or
punitive money damages.

The relief is listed on pages 177 + 178.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

V.    **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

A.    **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    *September 29, 2019*

Signature of Plaintiff

Printed Name of Plaintiff    *RICHARD ARJUN KAL, MD*

B.    **For Attorneys**

Date of signing:    _____

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

# Kaul v Federation et al.
## Defendants

Louisiana State Board of Medical Examiners
630 Camp Street
New Orleans, LA  70130
Attention: Vincent Culotta
504-568-6820
Vcullota@lsbme.la.gov

Mississippi State Board of Medical Licensure
1867 Crane Ridge Road, Suite 200-B
Jackson, MS 39216
Attention:  Executive Director, Kenneth Cleveland, MD
601-987-3079

Medical Board of California
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815
Attention:  Kimberly Kirchmeyer
916-263-2389

Mr. Richard Stanley
Stanley, Reuter, Ross Thornton & Alford
909 Poydras Street
Suite 2500
New Orleans, LA. 70112
504-523-1580
rcs@stanleyreuter.com



RECEIVED
Mail Room

OCT - 3 2019

Angela D. Caesar, Clerk of Court
U.S. District Court, Distric. of Columbia

Cecilia Mouton
Louisiana State Board of Medical Examiners
630 Camp Street
New Orleans, LA  70130
Attention: Vincent Culotta
504-568-6820
Vcullota@lsbme.la.gov

The New Jersey Board of Medical Examiners
140 East Front Street
Trenton, NJ. 08625
609-826-7100
bme@dca.lps.nj.us

The Pennsylvania Medical Board

One Penn Center
2601 N. 3rd Street
Harrisburg, PA. 17110
717-783-1400
ST-MEDICINE@PA.GOV

Federation of State Medical Board
1300 Connecticut Ave, NE
Suite 500
Washington, DC. 200036
202-463-4000
Humayun Chaucer, D.O., President and CEO
Patricia A. King, MD, PhD, Chairman of the Board

Andrew Greg Kaufman, MD
90 Bergen Street, Suite 3400
Newark, NJ. 07103
973-972-2085

Allstate Insurance Company
482 NJ 28
Bridgewater Township, NJ 08807
800-255-2878
Thomas J. Wilson, CEO

GEICO Indemnity
One Geico Plaza
Washington, DC 20047-0001
 301-986-3000
William Mitchell, Manager

GEICO General Insurance Company
1345 Perimeter Pkwy
Virginia Beach, VA 23454
Eve Bogolia, Branch Manager
 757- 222-3400

GEICO Casualty Company
 5260 Western Ave
Chevy Chase, MD 20815
301-986-3000

Robert Francis Heary, MD
Neurological Institute Of NJ
150 Bergen St ACC G1640
Newark, NJ 07103
973- 972 - 2550

Marc A. Cohen, MD
The Spine Institute
221 Madison Ave
Morristown, NJ 07960
973- 538-4444

North Jersey Media Group, Inc
1 Garret Mountain Plaza
Woodland Park, NJ 07424-047
973-569-7000
Nancy A. Meyer, President
Letters@northjersey.com

Lindy Washburn
USA Today Editor
7950 Jones Branch Dr.
McLean, Virginia   22102
753-854-3400

Lewis Stein, Esquire
Nusbaum, Stein, Goldstein, Bronstein & Kron
66 Sunset Strip, Suite 205
Town Centre Building
Succasunna, NJ, 07876
973-584-1400

Hackensack University Medical Center
30 Prospect Avenue
Hackensack, NJ 07601
551-996-2000

Christopher J Christie
47 Corey Ln
Mendham, NJ 07945

John Burdine MD
5408 Flanders Dr
Baton Rouge, LA 70808
225-769-5554 (ph.)
225 -769-5502(Fax)

Steven Lomazow Md
50 Newark Ave
Ste 104
Belleville, NJ 07109
(973) 751-5643(ph.)

J. Howard Solomon

Newark Office
Office of Administrative Law
33 Washington Street
Newark, New Jersey 07102


Peter Staats Md
150 Chambers Bridge Rd #201,
 Brick Township, NJ 08723

Gregory Przybylski Md
65 James Street, Edison, NJ 08820

Atlantic Health Systems
Executive Office
475 South St, Morristown, NJ 07960

Congress of Neurological Surgeons
10 North Martingale Road, Suite 190
Schaumburg, IL 60173
Phone: 847-240-2500
Fax: 847-240-0804
Toll Free: 877-517-1CNS

American Society of Interventional Pain Physicians
81 Lakeview Dr, Paducah, KY 42001
Phone 270.554.9412
Fax 270.554.5394
E-mail: asipp@asipp.org

Doreen Haffner Esq.
State of New Jersey,
Office of the Attorney General
124 Halsey Street
Newark, NJ 07101
TD Bank
Corporate office
1701 Marlton Pike E, Cherry Hill NJ 08034

Daniel Stoltz 110 Allen Rd., Ste. 304,
Basking Ridge, New Jersey 07920
Phone: 973.467.2700
Fax: 973.467.8126
Phone: 973.346.7600
Fax: 973.467.8126
Email: dstolz@wjslaw.com

Hon. Brian Martinotti
United States District Court
District of New Jersey
Clarkson S. Fisher Building
& U.S. Courthouse
402 East State Street
Room 2020
Trenton, NJ 08608
609-989-2065

John Di Iorio Esq.
Continental Plaza II
411 Hackensack Ave
Hackensack, NJ 07601
M-F 8am-730pm
Tel: (201) 897-2411
Fax: (201) 488-9481
info@shapiro-croland.com

Richard C Christ
Chairman of the Board of Trustees
2400 Chew Street
Ailentown, Pa 18104
484-664-3100

Eric Kanefsky Esq
One Newark Center
1085 Raymond Blvd.,
14th floor, Newark New Jersey 07102
Scott E Metzger, M.D.
145 Wyckoff Road
Suite 303
Eatontown, NJ  07724
Phone: (848) 208-2748
Website: www.premierpain.co

Robert Garrett
CEO HUMC
30 Prospect Avenue
Hackensack, NJ 07601
551 996 2000

RICHARD ARJUN KAUL, MD

440c SOMERSET DRIVE

PEARL RIVER, NY 10965

201 989 2299


ARNOLD ERWIN FELDMAN, MD

1860 BEACH BOULEVARD

BILOXI, MS 39531

225 939 1252


## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA


RICHARD ARJUN KAUL, MD + ARNOLD ERWIN FELDMAN, MD

Plaintiffs

v.

Case: **1:19-cv-03050**
Assigned To : **Unassigned**
Assign. Date : **10/1/2019**
Description: **Pro Se General Civil (F-DECK)**

FEDERATION OF STATE MEDICAL BOARDS; THE NEW JERSEY
BOARD OF MEDICAL EXAMINERS; THE CALIFORNIA MEDICAL
BOARD; THE LOUISIANA MEDICAL BOARD; THE PENNSYLVANIA
MEDICAL BOARD; THE MISSISSIPPI MEDICAL BOARD; JOHN
BURDINE, MD (in his official and individual capacity); CECELIA
MOUTON, MD (in her official and individual capacity); RICHARD
STANLEY, ESQ (in his official and individual capacity);
CHRISTOPHER J. CHRISTIE, ESQ (in his official and individual
capacity) ESQ; JAY HOWARD SOLOMON, ESQ (in his individual
and official capacity); STEVEN LOMAZOW, MD; ANDREW
KAUFMAN, MD (in his individual capacity + official capacity),
PETER STAATS, MD; GREGORY PRZYBYLSKI, MD (in his individual
capacity + official capacity); ALLSTATE NEW JERSEY INSURANCE
COMPANY; GEICO; GEICO INDEMNITY; GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY; ROBERT HEARY,
MD; MARC COHEN, MD; NORTH JERSEY MEDIA GROUP, INC;
LINDY WASHBURN; LEWIS STEIN, ESQ; HACKENSACK
UNIVERSITY MEDICAL CENTER; ROBERT GARRETT; ATLANTIC

RECEIVED
Mail Room

OCT   1 2019

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

| | |
|---|---|
| HEALTH SYSTEM; CONGRESS OF NEUROLOGICAL SURGEONS; AMERICAN SOCIETY OF INTERVENTIONAL PAIN PHYSICIANS; DOREEN HAFNER, ESQ; TD BANK, NA; DANIEL STOLZ, ESQ; JOHN DIIORIO, ESQ; RICHARD CRIST; ERIC KANEFSKY, ESQ; BRIAN R. MARTINOTTI, ESQ (in his official and individual capacity); SCOTT METZGER, MD (in his official and individual capacity);  JOHN ROE 1-50, JOHN DOE 1-50, ABC CORP. 1-50, AND/OR XYZ, P.C. 1-50 <br><br> Defendants. | |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICHARD ARJUN KAUL, MD + ARNOLD ERWIN FELDMAN, MD <br><br> Plaintiff, <br><br> CHRISTOPHER J. CHRISTIE, ESQ, et al., <br><br> Defendants. | Civil Action: <br><br><br> **CERTIFICATION OF PLAINTIFFS** |

Richard Arjun Kaul, MD + Arnold Erwin Feldman, MD, of full age, certify and say:

**We are the Propria Persona Plaintiffs (hereinafter "Plaintiffs").**

We make this Certification in support of this Complaint, which is filed partly on the basis of new evidence and new law that constitute a "**new racketeering injury**", and substantiate the submission of a new claim, and on the basis of never before presented claims/evidence pertaining to the illegal, unconstitutional and anti-competitive configuration of both the mechanism of physician regulation in the United States, and the intrinsic structure and function of state medical boards.

We certify that the foregoing statements made by us are true to the best of our knowledge. We am aware that if any of the foregoing statements made by us are willfully false, we are subject to punishment

2

Dated: September 27, 2019

_____        _____
Richard Arjun Kaul, MD                        Arnold Erwin Feldman, MD

# Contents

1.     Preface + Overview of Plaintiff's Legal Claims: Page 10

2.     Jurisdiction and Venue: Page 11

3.     Evidence in support of claims: Page 12

4.     The Illegal Interstate Agreement of Defendant Federation of State Medical Boards: Page 14

5.     The current internal procedures of state medical boards violate the separation of prosecutorial and adjudicative protections enshrined in the due process clauses of the United States Constitution. The external reciprocal disciplinary relations with other medical boards and Defendant Federation, are illegal, and violate the due process clauses of the United States Constitution and the anti-trust statutes of the Sherman and Clayton Acts: Page 15

6.     Parties: Page 19

7.     Overview of Plaintiffs' Legal Claims: Page 25

8.     Statement of Fact Common to Kaul and Feldman: Page 26

9.     Statement of Fact Specific to Kaul: Page 28

    A.     Defendant Allstate and GEICO have corrupted the New Jersey Superior Court, Union County into using the IFPA (N.J.S.A. 17:33A-1 et seq.) to violate the Constitutional due process rights of members of the medical community: Page 28.

    B.     Defendants Solomon, Przybylski and Kaufman collectively committed two hundred and seventy-eight (278) separate instances of perjury, misrepresentation, evidential omission and gross mischaracterization in the proceeding in the New Jersey Office of Administrative Law (April 9, 2013 – June

28, 2013) + The Defendants committed bribery in quid pro quo schemes with Defendant Christie, in order to have the Plaintiff's medical license revoked: Page 29.

C.     The Plaintiff has consistently been denied substantive justice in administrative, state and federal courts in New Jersey: Page 30.

D.     The Plaintiff's medical license was revoked because of Political Corruption at the New Jersey Board of Medical Examiners and because the Mechanism of Physician Regulation in New Jersey is illegally Configured: Page 40.

E.     The Plaintiff's pioneering work in the field of minimally invasive spine surgery caused professional jealousy amongst his business and professional competitors: Page 41.

F.     The Defendants conspired to eliminate the Plaintiff from the practice of medicine by encouraging patients to file complaints with Defendant New Jersey Board of Medical Examiners: Page 44.

G.     The Defendants conspired to engage in media censorship and suppress the Plaintiff's First Amendment Right to Free Speech: Page 45.

H.     The Plaintiff's medical license was revoked because of the massive fraud as detailed in, 'The Solomon Critique': Page 46.

I.     Defendants Allstate + GEICO propagated knowing falsehoods that Kaul had committed insurance fraud + Defendant TD negligently failed to perform any due diligence before acting on Defendants Allstate and GEICO's patent falsehoods + Defendants Stolz + DiOrio conspired with Defendants Allstate + GEICO to commit fraud against Kaul + Creditors of the Bankruptcy Estate: Page 47.

J.     Kaul is Qualified, Educated, Credentialed and Trained to perform Minimally Invasive Spine Surgery, contrary to the Defendants' false allegations. Kaul has performed eight hundred (800) cases with good to very good outcomes in 90-95% of cases: Page 49.

K.     Kaul has sustained a new and independent injury consequent to the defendants' "pattern of racketeering": Page 51.

L.     The defendants have, through a series of quid pro quo schemes, corrupted the United States District Court for the District of New Jersey, including Judge Martinotti, to obstruct Kaul's prosecution of K1, K2 and K3, in order to conceal the crimes committed in the administrative board proceedings that caused the

revocation of Kaul's license. Thus the court, or any of its judges are prohibited from any further involvement in any cases to which Kaul is a party: <u>Page 51</u>.

M.   Defendants NJBME and Metzger in August 2019, committed a "new racketeering injury" against Kaul, by denying his application for reinstatement of his license, based on non-payment of an illegal 'fine', that Defendant NJBME knows is a consequence of the illegal revocation of Kaul's license in 2014: <u>Page 53.</u>

N.   The defendants, in May 2019, engaged in the felony of Witness Tampering by attempting to bribe Kaul's witness, John Zerbini, into not providing testimony in support of Kaul: <u>Page 53</u>.

## 10. Statement of Fact Specific Plaintiff Feldman: <u>Page 55</u>.

O.   The Plaintiff has consistently been denied substantive justice in administrative, state and federal courts in Louisiana: <u>Page 55</u>.

P.   Defendants Mouton, Burdine and Stanley conspired to and did conceal exculpatory evidence from Plaintiff Feldman: <u>Page 55</u>.

Q.   Defendants Mouton, Burdine and Stanley denied and deprived Plaintiff Feldman the right to present evidence in support of his administrative licensing case: <u>Page 55</u>.

R.   Defendants Mouton, Burdine and Stanley destroyed exculpatory evidence, that proved Plaintiff Feldman was innocent of the charges upon which his license was suspended: <u>Page 56</u>.

S.   Defendant Stanley, in collusion and conspiracy with defendants Mouton and Burdine bribed the administrative law judge, to order the suspension of Plaintiff Feldman's medical license: <u>Page 56</u>.

T.   Defendant LMB denied Plaintiff Feldman the right to present evidence in support of his case, and withheld exculpatory evidence from his lawyer: <u>Page 57.</u>

U.   Defendant LMB conducted the administrative board proceeding in secrecy, and under intense security, in which the public were denied access, and from which his wife was prevented attending: <u>Page 57</u>.

V.   Defendant LMB consisted of Plaintiff Feldman's market competitors, such as Burdine, who abused the power of Defendant LMB to eliminate the

competition that Plaintiff Feldman presented in the minimally invasive spine surgery market in Louisiana: Page 57.

W.    Defendant LMB, in collusion and conspiracy with defendants Mouton and Burdine encouraged its experts to commit perjury against Plaintiff Feldman: Page 58.

X.    Defendants LMB, Burdine, Mouton and Stanley disseminated knowingly fraudulent information to Defendant Federation of State Medical Boards and all state medical boards, using the US mail and wires, regarding the illegal suspension of Plaintiff Feldman's license: Page 58.

Y.    Defendants LMB, Mouton, Burdine and Stanley used the mail and wires to disseminate to every state and federal healthcare agency, including Defendant California Medical Board, in furtherance of their scheme to destroy Plaintiff Feldman's reputation and livelihood, knowingly fraudulent information regarding the illegal suspension of Plaintiff Feldman's medical license: Page 59.

Z.    Defendants Federation, LMB, CMB, Burdine, Stanley and Mouton conspired and committed to conspire to destroy Plaintiff Feldman's medical career, because of the economic threat he posed to Defendant Burdine: Page 59

AA.   Defendant Stanley bribed Louisiana Appellate Court Judge, Roland Belsom, in approximately October 2018, in order to influence the outcome of Plaintiff Feldman's appeal to the Fourth Circuit Court of Appeals: Page 61.

BB.   Defendants MMB, LMB, Burdine, Stanley and Mouton conspired and colluded to prevent Plaintiff Feldman from presenting evidence in support of his defense to maintain his license in the State of Mississippi: Page 61.

## 11. Claims for Relief: Page 61

COUNT ONE
VIOLATIONS OF 18 U.S.C. § 1962(c)-(d)
THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ
(By Plaintiff Feldman against Defendants Federation + LMB + CMB + MMB + Mouton + Stanley + Burdine)
The FMB Association-In-Fact-Enterprise: Page 61

COUNT TWO: VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ:
(By Plaintiff against Defendants Christie + Kaufman + Przybylski + Heary + Staats + Lomazow + Hafner + Cohen + CNS + ASIPP): The CHC RICO Association-In -Fact-Enterprise: Page 64

CC.    Description of the CHC RICO Enterprise: Page 65

DD.    The CHC RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues: Page 67

EE.    Predicate Acts: Mail Fraud + Wire Fraud + Bribery + Obstruction of justice: Page 69.


COUNT THREE: VIOLATIONS OF 18 U.S.C. § 1962(C)-(D) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ: (By Plaintiff against Defendants Christie + GEICO + Allstate + TD + Stolz + DiOrio + Crist + Solomon + Hafner + Martinotti) : The CAD RICO Association-In -Fact-Enterprise: Page 83

FF.    Description of the CAD RICO Enterprise: Page 85

GG.    The CAD RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues: Page 88.

HH.    Predicate Acts: Mail and Wire Fraud: Page 91.


COUNT FOUR: VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ: (By Plaintiff against Defendants Christie + HUMC + AHS + Garrett + Hafner + Stein + NJBME + Kanefsky): The CAS RICO Association-In -Fact-Enterprise: Page 114

II.    Description of the CAS RICO Association-In-Fact Enterprise: Page 115

JJ.    The CAS RICO Enterprise Sought to Fraudulently Increase Defendants' Profits  and Revenues: Page 118.

KK.    Predicate Acts: Mail and Wire Fraud: Page 120.

COUNT FIVE: VIOLATIONS OF 18 U.S.C. § 1962(C)-(D) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ: (By Plaintiff against Defendants Christie + HUMC + Washburn + NJMG): The CHN RICO Association-In -Fact-Enterprise: Page 132

LL.  Description of the CHN RICO Enterprise: Page 133

MM.  The CHN RICO Enterprise Sought to Fraudulently Increase Defendants' Profits
     and Revenues: Page 136.

NN.  Predicate Acts: Mail and Wire Fraud: Page 138.

**12. Antitrust Impact: Page 145.**

**13. Definition of minimally invasive spine surgery market: Page 147.**

**14.    The Relevant Geographic Market: Page 149.**

COUNT SIX: For Declaratory and Injunctive Relief Under Section 16 of the Clayton Act
for Defendants' Violations of Sections 1 and 2 of the Sherman Act (By Plaintiff Against
Defendants Kaufman + Staats + Przybylski + CNS + Heary + Cohen + HUMC + AHS):
Page 149.

COUNT SEVEN: Deprivation of Right under Color of Law (By Plaintiff against Defendants
Christie (in his official capacity) + Kaufman (in his official capacity) + Przybylski (in his official
capacity) + Solomon (in his official capacity) + Hafner (in her official capacity) + Allstate +
GEICO + NJBME): Page 158.

COUNT EIGHT: Violation of Kaul's due process rights pursuant to the Excessive Fines
Clause of the Eight Amendment and due process Clause of the Fourteenth
Amendment (Against Defendant NJBME): Page 167.

COUNT NINE: Violation of Plaintiffs' due process right to apply for and maintain the
property right of medical licensure in other states, consequent to Defendant
Federation's illegal Compact Interstate Agreement and conspiracy with state medical
boards: Page 168.

**15.    Conclusion: Page 170.**

**16. Demand for Judgment: Page 171.**

**17. Jury Demand: Page 173.**

**18. Demand for Insurance: Page 174.**

# 1. <u>Preface + Overview of Plaintiff's Legal Claims</u>

2.      This case is about rampant corruption within American state medical boards, that has, over the last decade worsened in the most pernicious manner, unrecognized by either public, state or federal governments. <u>**The two main themes that define this complaint are: (1) Medical Board Corruption; (2) The Unconstitutional Configuration of the Mechanism of Physician Regulation.**</u> This corruption is the primary reason as to why over four hundred (400) American physicians, and an increasing number of chronic pain patients, deprived of life-saving care, commit suicide every year. Medical boards attempt to justify their existence with the slogan of "**we protect the public**", but there exists no evidence, that in the period from 1960 to 2019, they do or ever have protected or benefited the public in any manner. There are no epidemiological studies, no retrospectives clinical analyses or indeed any form of legitimate study to demonstrate or prove that medical boards do anything other than serve the economic and political interests of its members. Healthcare corporations, such as insurance and pharmaceutical companies, have since at least the late 1980s, bribed and corrupted American medical boards members, in order to advance their business and corporate agendas through the fatal exploitation of the American public and medical profession. These boards, today, in 2019, have become nothing but weapons used against physicians who threaten the economic standing of their business competitors and healthcare corporations with financial stakes in the annually worth, eighteen trillion dollar American healthcare sector. This case, the first of its kind, highlights the corrupt intersection between medicine, business, law and politics, that has resulted in the world's highest physician suicide rate, the world's highest number of physician disciplinary actions, and the world's highest revenue generating system for lawyers and bureaucrats. These individuals have insidiously parasitized a system, whose honest and noble beginnings have been converted into a cesspool of corruption, that is now the cause of the highest rate of physician suicide ever noted, and the tragic, but entirely avoidable, deaths of patients abandoned, because corrupt medical boards have, in the most arbitrary, capricious and illegal manner, revoked the licenses of their physicians, and deprived them of access to life-saving care. This case will result in what is now widely known as the "**Reformation of American Medical Boards**", and will bring to an end, the genocide of American physicians and patients, a genocide perpetrated through corrupt medical boards and engineered by criminally minded healthcare insurance executives and their for-profit corporations. "**Medical Boards Kill**", and do not protect the public. The plaintiffs and public intend have held criminally accountable, on manslaughter charges, the medical board members and insurance company executives, responsible for these crimes against humanity. This case will eradicate one malignant aspect of the American healthcare, that of the rampant corruption within state medical boards. It will save many lives to come, reduce the anguish and suffering that for many years has been intentionally hidden from the American public, and will expose and penalize the criminals who, for nothing more than greed, have wrecked-havoc on millions of tax-paying, law abiding and innocent American patients and physicians.

## 2. Jurisdiction and Venue

3.      U.S.C. § 1331 because Plaintiff's claims arise under federal law, and under 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1337 because this action alleges violations of an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies. And 15 U.S.C. § 4 and § 16 confer subject matter jurisdiction on this Court over claims brought under the Sherman Act. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), (5), because Plaintiffs are citizens of different states to certain Defendants and the aggregate amount in controversy exceeds seventy-thousand dollars.

4.      Personal Jurisdiction. The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at and have had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States including this District. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in the District of Columbia.

5.      Venue is appropriate in this District for Plaintiff's claims under 28 U.S.C. § 1391(b)(2), 18 U.S.C. § 1965(a) and 29 U.S.C. § 1132(e)(2), because defendants reside or may be found in the District of Columbia and the alleged breaches occurred in the District of Columbia.

### 3. <u>Evidence in support of claims</u>

6.      Constituting the proof of the below asserted claims is a body of conclusive evidence, that satisfies the necessary proof burden of all elements of each claim. The evidence is as follows and its location within the dockets of the related cases is identified:

a.      The Waldman E-mail: K1 – D.E. 299 Page ID 7072.

b.      The Zerbini Certification: K1 – D.E. 299 Page ID 7111

c.      The Sabo Certificaton: K1 – D.E. 299 Page ID 7107

d.      The Solomon Critique: K1 – D.E. 225 Page ID 4940

e.      The Solomon Critique 2: K1 – 299-18 Page ID 7202.

f.      The Calabrese Certification: K1 – D.E. 299-6 Page ID 7121

g.      The Przybylski Disciplinary Notice: K1 – D.E. 299-7 Page ID 7124

h.      The Feldman Certification: K1 - D.E. 299-9 Page ID 7138.

i.      The Yeung E-Mail: K1 – D.E. 299-10 Page ID 7155.

j.      The Federal Trade Commission Guidelines: K1 – D.E. 299-2 Page ID 7075

k.      The Open Board Minutes for Defendant NJBME re: Defendant Scott Metzger (business partner of K1/K2 defendant Peter Staats, MD) + Defendant Hafner + Ex-K1 defendant/Executive Director of Defendant NJBME, William Roeder: K1 – D.E. 299-8 Page ID 7132

7.      The following video links constitute evidence that prove the falsity of the claims asserted in April 2012 by Defendant NJBME that Kaul was not qualified to perform minimally invasive spine surgery. Although Judge McNulty arbitrarily refused to view the videos, as indicated in his opinion of February 22, 2019 (D.E. 300 Page ID 8184), Defendant Martinotti did, but only after Kaul submitted argument in '<u>The McNulty Analysis</u>' that furthered demonstrated Judge McNulty's corrupted state-of-mind (K1 – D.E. 313-1 Page ID 8397). The purpose was to nullify this point. The video links are:

a.      First outpatient minimally invasive correction of four-level degenerative spondylolisthesis. August 2011. Found at: https://www.youtube.com/watch?v=oxaV5IJuZ7c&t=4s

b.      Outpatient minimally invasive spine surgery correction of degenerated L4-5 disc. April 2011. Found at: https://www.youtube.com/watch?v=guwx5kuBiEg&t=125s

c.      First outpatient minimally invasive lumbar fusion. March 2005 (video posted 2011). Found at: https://www.youtube.com/watch?v=JX4bnRPPucI&t=40s

d.      The Spine Africa Project. November 2011. Found at: https://www.youtube.com/watch?v=Zu50ik2l2Sc

e.      Transforaminal epidural injection. March 2011. Found at: https://www.youtube.com/watch?v=9NjJV7XhBB0&t=132s

f.      Head of Defendant NJBME, Steven Lomazow interview.  January 2014. Found at: https://www.youtube.com/watch?v=sFtE8EvEMsU

8.      The following video shows the hearing conducted before the Louisiana House Committee on Health and Welfare regarding the introduction of Bill SB286 (<u>K2-D.E. 2-1 Page ID</u>

**392**), a bill purposed to afford physicians, subject to medical board investigation, the same due process rights afforded to all American citizens under the United States Constitution:

      a.   https://www.youtube.com/watch?v=rVQoDbWoyBY

9.      Contained within (**Exhibit 1**) are statements of admissions from every state medical board, that there exists no evidence, that in the period from 1960 to 2019, they ever have or do presently "**protect the public**". This is the false reason, that the state medical boards universally promote to the public to justify their existence. These lies constitute the felonies of mail fraud, wire fraud and consumer fraud. The state medical boards have known since at least 1960 that they do nothing to "**protect the public**", but have continued to propagate this massive and knowing falsehood, in order to continue their extortion of fees from physicians, and maintain the lawyer-industrial complex, that does nothing but satisfy the insatiable greed of politically connected lawyers and law firms, throughout the United States, through the exploitation of physicians.

10.      Following is a link to a petition signed by almost three thousand (3000) chronic pain patients whose lives have been destroyed by medical board corruption and its consequences of arbitrary physician suspensions and revocations: https://www.change.org/p/dr-arnold-feldman-medical-board-corruption-is-violating-your-constitutional-rights. The defendant insurance companies are largely responsible for this physician pogrom, because the fewer physicians that practice, the less money they must pay, and the more money they can pay their executives and shareholders. These corporations profit at the expense of the lives of the most vulnerable American citizens and patients, and will continue to 'rape' the public until the wider public stops them through the political process. American government has allowed itself to become a corporate puppet, and has turned its back on the people to whom it is meant to serve.

### 4.    The Illegal Interstate Compact Agreement of Defendant Federation of State Medical Boards

11. In approximately the early 1990s Defendant Federation, in concert and agreement with certain state medical boards, entered into an agreement, "**The Interstate Compact Agreement"**, that the parties recognized was illegal, and violated the Commerce Clause of the United States Constitution. In recognition of the illegality of the agreement, whose true purpose was, in collusion and conspiracy with the state medical boards, to control the regulatory apparatus of the entire American healthcare sector, the verbiage of the agreement was modified to deceptively communicate that the agreement existed for the purposes of facilitating reciprocity of interstate licensure. Subsequent to the introduction in 1986 of the Health Care Quality Improvement Act, Defendant Federation and the state medical boards, colluded and conspired to exploit this law for economic gain, by increasing the number of disciplinary actions against physicians. This racketeering scheme has generated enormous profits for Defendant Federation and state medical boards, through the imposition of excessively punitive and arbitrary monetary fines (Plaintiff Kaul – Defendant NJBME fined $475,000 + Plaintiff Feldman – Defendant LMB fined $500,000). The exponential increase in state board actions and the HCQI Act have not resulted in an improvement in clinical care. In fact, in the early 1990s the number of deaths in American hospitals from medical mistakes was approximately 250,000. That number in 2013, according to a study conducted by Johns Hopkins University and Hospital, was 400,000, and rising. The motivation for increased disciplinary actions is money and the increased revenues to state medical boards, and the politically connected law firms with which they are associated, and the facts prove that more physician discipline has in fact led to more patient deaths. This is partly explained by the fact that physicians, fearful of license loss and malpractice claims, order more clinically unindicated tests, which have increased the rate of false diagnostic positives and negatives, which cause sub-optimal care, a fact that has contributed to the increase in hospital related mortalities of 400,000 annually, the highest, corrected for population, of anywhere in the world. Simply put, "**Medical Boards Kill"**, both patients and doctors, four hundred (400) of whom now commit suicide every year, with the majority related to medical board action. Central to this secret genocide is Defendant Federation and its tentacles of state medical boards, whose only concern and motivation is monetary profit.

5.   <u>**The current internal procedures of state medical boards violate**</u>
<u>**the separation of prosecutorial and adjudicative protections**</u>
<u>**enshrined in the due process clauses of the United States**</u>
<u>**Constitution. The external reciprocal disciplinary relations with other**</u>
<u>**medical boards and Defendant Federation, are illegal, and violate the**</u>
<u>**due process clauses of the United States Constitution and the anti-**</u>
<u>**trust statutes of the Sherman and Clayton Acts.**</u>

12. Physicians in America, since at least 1960, have been universally deprived of their
constitutionally protected right to due process, with regard to the property right of their
medical licenses, and their right to a livelihood. The principal cause of these violations is
the profound corruption within state medical boards, that operate in secrecy, without
supervision or accountability to the state in which they function. State medical boards
have become vehicles of anti-trust misconduct, that are abused by physician members
to eliminate their competition from the healthcare market, thus artificially constricting
the healthcare market and depriving the public of their right to choose. State medical
boards have attempted to justify their existence by stating that they "**protect the
public**". This is false, as proven by the enclosed evidence, and the fact that the majority
of physician suicides are related to corrupt and fundamentally arbitrary medical board
actions. The continuing anti-trust violations committed by state medical boards
continue to contribute to a rise in price of healthcare services, without any
demonstrable increase in quality of care. This situation exists because state medical
boards have been wrongly permitted to abuse the defense of sovereign immunity. It is
anathema to proper regulation that state medical boards are controlled by individuals
that compete in the same markets, that they regulate, absent any form of government
oversight. The Supreme Court in <u>North Carolina State Board of Dental Examiners v. FTC</u>
defined what constitutes legitimate supervision, but yet not one medical board, as the
attached evidence proves, has complied with this law. State medical boards continue to
operate outside of anti-trust and constitutional law.

13. State medical boards are fundamentally self-dealing and self-regulating agencies that
operate under color of law, for which there exists no evidence that they "**protect the
public**". In <u>North Carolina State Board of Dental Examiners v FTC,</u> the Supreme Court
held, **"a state medical board on which a controlling number of decisionmakers are
active market participants in the occupation the board regulates"** must be actively
supervised by the state, or risk becoming subject to anti-trust claims, be they filed
privately or by governmental agencies. As per the enclosed evidence, no state medical
board has brought itself into compliance with the law.

14. The vice-president of Defendant NJBME is Defendant Metzger, who is a business partner
of Defendant Staats and one of Kaul's market competitors. Defendant Metzger holds a

controlling position on Defendant NJBME and was instrumental in denying Kaul's application for reinstatement of his New Jersey medical license. Defendant NJBME is **not actively supervised** by the state, and is thus in violation of the law, ergo, it is operating illegally. Defendant NJBME, an illegal entity, has direct rule making authority, an exceptional power that gives it the rule of law, without recourse to any other entities.

15. To ensure that Kaul's market competitors stay in control of Defendant NJBME, Defendant Metzger, in his capacity as vice-president, has ensured that certain positions remain vacant, with all of these positions being those assigned to lay persons, who have no competitive interest viz a viz Kaul. This furthers the anti-competitive nature of Defendant NJBME. Defendant NJBME, in the knowledge that it's adjudicative and prosecutorial functions are in violation of the separation of power doctrine of the United States Constitution, and the law pursuant to the North Carolina Dental Board case, has taken no remedial steps to correct these illegalities, and has in fact continued to suspend and revoke physicians' licenses, thus entrenching its illegal position and increasing the state's anti-trust liability. Because Defendant NJBME remains in violation of the law, it has **no immunity** to the within asserted claims, including the anti-trust charges.

16. The anti-competitive misconduct of Defendants NJBME and LMB in suspending/revoking Kaul (2012/2014) and Feldman's license (2016) resulted in the suppression of innovative outpatient minimally invasive spinal fusions, and intimidated other physicians from incorporating this technique into their practices. This permitted the defendant neurosurgeons and hospitals to artificially raise their prices, reduce the availability of service. One consequence of this has been the opiate epidemic, as patients with painful degenerative spines became unable to afford the procedure, were forced initially to resort to using prescription opiates, and then because of the widespread restrictions placed on the dispensation of prescription opiates, became obligated to purchase street grade heroin, that was and remains the primary cause of deaths from opiate overdoses. Anti-competitive conduct stymies innovation artificially constricts the market, and causes death. Corrupt state medical boards are the central cog in this "**Cog-Conspiracy**".

17. The failure of Defendant NJBME to comply with the supervisory requirements pursuant to the North Carolina Dental Board case, and the due process related separation of power functions of the Constitution, have deprived Defendant NJBME of its sovereign immunity. This lack of immunity exposes every board member to monetary damages, as if they were members of a cartel, which in all truth, they are. It also imposes injunctive relief, which in this case equates with Kaul's demand that his license be immediately reinstated. Defendant NJBME, although an agency of the state, consists of members, such as Defendant Metzger, and ex-member and Defendant Lomazow, who abused the power of Defendant NJBME to engage in self-dealing schemes, that involved receiving bribes and other non-tangible favors from Kaul's business competitors and defendants, Allstate and Geico. These defendants were motivated to encourage Defendant NJBME to engage in self-dealing, in order to eradicate the competitive threat of his business

and or eliminate the competition his practice presented them, in the minimally invasive spine surgery market. These facts, in addition to those stated above, deprive Defendant NJBME of any state-related immunity to any of the claims asserted by Kaul. Defendant NJBME's antitrust misconduct is to all intents and purposes that of an <u>unsupervised</u> private cartel, that is <u>controlled</u> by "<u>active market participants</u>". It is thus not a supervised public agency, and therefore it, and its members have <u>no immunity</u>.

18. Defendants NJBME, Lomazow, Heary and Metzger, in collusion and conspiracy with the other defendants, abused the regulatory powers of Defendant NJBME in 2012/2014/2019 to respectively suspend/revoke/deny Kaul's license and his application for reinstatement, the purpose of which was to artificially and illegally restrict the market for minimally invasive spine surgery. These rule of reason anti-competitive acts, conducted in the absence of any legitimate state supervision, other than the bribe induced order given by Defendant Christie in approximately 2010 to revoke Kaul's license, constitute anti-trust violations that expose the State of New Jersey to immense legal liability. Defendants NJBME/LMB/MMB/CMB are illegal rogue state agencies, that has and continues to knowingly violate Kaul/Feldman's right to due process, and the anti-trust protections afforded them pursuant to the law generated by the Supreme Court in North Carolina Dental Board v FTC. As a consequence of the defendants anti-trust and constitutional violations, the defendants have illegally monopolized the American minimally invasive spine surgery market, to the detriment of the American public, a consequence of which has been the opiate epidemic. "**Medical Boards Kill**". <u>**There is no state government that actively supervises the conduct of its medical board, as required by law.**</u> This lack of supervision has facilitated the clandestine expansion of the illegal and conspiratorial interstate agreement that exists between Defendant Federation and the state medical boards. These facts, and these defendants have converted the American healthcare sector into a massive racketeering enterprise, with which organized crime syndicates would be honored to be associated and keen to emulate. The regulation of American medicine, dictated in large part by defendant insurance companies, is a criminal enterprise, motivated by money, and one that operates under the cover of the slogan of "**we protect the public**". This is akin to the Mafia promoting itself, by claiming it kept neighbors safe. It did not, and neither do state boards "**protect the public**". There are 400,000 deaths annually in American hospitals from medical complications. This fact exposes the massive lie, the massive fraud perpetrated by state medical boards on the American public. This case will lead to the "**Reformation of American Medical Boards**", and hold civilly/criminally accountable those that have profited through "**patterns of racketeering**". State boards, for the first time in American history, are facing an existential crisis, in much the same way as did the English Star Chamber. It was tyranny then, and it is tyranny now. Revocation has replaced decapitation, and excessive fines have replaced the rack.

19. The simple and irrefutable facts about state medical boards, including all the defendants are: **(i)** they do not protect the public; **(ii)** they are anti-competitive in the US healthcare market and stymie innovation; **(iii)** their procedures of physician regulation violate the

due process clauses of the United States Constitution; **(iv)** they have no active state supervision; **(v)** neither the board nor its members have any immunity to any of the private section 1 treble damage Sherman claims asserted in K5; **(vi)** the anti-competitive, unconstitutional and unsupervised misconduct of state medical boards confers immense liability on the state; **(vii)** Defendant NJBME consists of unsupervised, "**active market participants**" that abuse the power of Defendant NJBME to engage in economic "**self-dealing**". The revocation and suspension respectively of the licenses of Plaintiffs Kaul and Feldman were a direct consequence of either some or all of these factors, and thus remain illegal acts, which have conferred liability on the defendants and deprived defendants NJBME + LMB + MMB + PMB + CMB of any immunity to suit.

20. It is important to note that the defendant hospitals, Allstate and Geico are market competitors of the plaintiffs, and are subject to the full force of anti-trust prosecution, in both the civil and criminal context. The obvious calculation for defendants Allstate and Geico is that the less money provided for the provision of healthcare services, the greater is their corporate profit. Kaul respectfully asserts that the only way to rectify the worsening malfeasance of American healthcare insurance corporations is to bring criminal fraud charges against a number of their chief executives.

# 6. Parties

Plaintiff Richard Arjun Kaul, MD and Arnold Erwin Feldman, MD brings this action against Defendants Christopher j. Christie, Esq **("Christie")**, Jay Howard Solomon, Esq **("Solomon")**, The New Jersey Board of Medical Examiners **("NJBME")**, Steven Lomazow, MD **("Lomazow")**,  Andrew Kaufman, MD **("Kaufman")**, Peter Staats, MD **("Staats")**, Marc Cohen, MD **("Cohen")**, Robert Heary, MD **("Heary")**, Gregory Przybylski, MD **("Przybylski")**, Allstate New Jersey Insurance Company **("ANJ")**, GEICO **("GEICO")**, Hackensack University Medical Center **("HUMC")**, Atlantic Health System **("AHS")**, Robert Garrett **("Garrett")**, North Jersey Media Group, Inc. **("NJMG")**, Lindy Washburn **("Washburn")**, Lewis Stein, Esq **("Stein")**, Doreen Hafner, Esq **("Hafner")**, Richard Crist **("Crist")**, John DiOrio, Esq **("DiOrio")**, Daniel Stolz, Esq **("Stolz")**, TD Bank, NA **("TD")**, American Society of Interventional Pain Physicians **("ASIPP")**, Congress of Neurological Surgeons **("CNS")**, Eric Kanfsky, Esq **("Kanefsky")** Brian R. Martinotti, Esq **("Martinotti")** (collectively, **"Defendants"**) to redress Plaintiffs' economic and reputational injuries due to the Defendants' scheme to permanently eliminate Plaintiffs from the practice of medicine anywhere in the world. Plaintiffs' allegations are based on their own experiences and personal knowledge, their research, publicly available articles, studies, reports and other sources, a reasonable inquiry under the circumstances, and on information and belief. Plaintiffs' allegations are likely to have further evidentiary support after a reasonable opportunity for further investigation and discovery.

21.    Plaintiff, **RICHARD ARJUN KAUL, MD,** ("Kaul") is a resident of the State of **New York** and was formerly a Medical Doctor licensed to practice medicine in the State of New Jersey. The CV of Plaintiff Kaul is (**Exhibit 2**).

22.    Plaintiff, **ARNOLD ERWIN FELDMAN, MD** ("Feldman") is a resident of the State of **Florida** and was formerly a Medical Doctor licensed to practice medicine in the states of Louisiana, Alabama, Mississippi and California. The CV of Plaintiff Feldman is (**Exhibit 3**).

23.    Defendant **FEDERATION OF STATE MEDICAL BOARDS** ("Federation") is a for-profit corporation that generates millions of dollars annually from physicians, through an illegal interstate agreement with state medical boards, that violates the Commerce Clause of the United States Constitution. Defendant Federation conducts its interstate business out of its offices in the **District of Columbia**. It manufactures this profit as a consequence of having arbitrarily involved itself in the process of physician licensing, credentialing and educational certification. From these illegal profits, Defendant Federation provides kickbacks to state medical boards, that condition physician licensure on services purchased by physicians from Defendant Federation. Its purported mission is to "**protect the public**". Defendants Federation and Defendants NJBME, LMB, CMB, MMB and PMB, amongst others, including healthcare insurance companies, have converted the American healthcare sector into a massive racketeering enterprise.

19

24. Defendant **LOUISIANA STATE BOARD OF MEDICAL EXAMINERS** ("LMB") is a state agency whose members are political appointees, and whose purported mission is to "**protect the public**". There exists no such evidence. Defendant LMB conducts its interstate business out of the State of **Louisiana**

25. Defendant **CALIFORNIA STATE BOARD OF MEDICAL EXAMINERS** ("CMB") is a state agency whose members are political appointees, and whose purported mission is to "**protect the public**". There exists no such evidence. Defendant CMB conducts its interstate business out of the State of **California.**

26. Defendant **PENNSYLVANIA STATE BOARD OF MEDICAL EXAMINERS** ("PMB") is a state agency whose members are political appointees, and whose purported mission is to "**protect the public**". These exists no such evidence. Defendant PMB conducts its interstate business out of the State of **Pennsylvania**

27. Defendant **MISSISSIPPI STATE BOARD OF MEDICAL EXAMINERS** ("MMB") is a state agency whose members are political appointees, and whose purported mission is to "**protect the public**". There exists no such evidence. Defendant PMB conducts its interstate business out of the State of **Pennsylvania.**

28. Defendant **NEW JERSEY BOARD OF MEDICAL EXAMINERS ("NJBME")** ("NJBME") is a state agency whose members are political appointees that serve at the pleasure of the Governor. The New Jersey Office of the Attorney General simultaneously prosecutes cases against physicians, while providing internal counsel to Defendant **NJBME**. The New Jersey Attorney General is appointed by the Governor. The purported mission of Defendant NJBM is to "**protect the public**". There exists no such evidence. Defendant NJBME conducts its interstate business out of the State of **New Jersey.**

29. Defendant **CHRISTOPHER J. CHRISTIE, ESQ,** ("Christie") was the Governor of the State of New Jersey from 2010 to 2018. He was the head of the Executive Branch of State Government and exercised control of Defendant **NEW JERSEY BOARD OF MEDICAL EXAMINERS**. Defendant Christie conducted his interstate business out of the State of **New Jersey.**

30. Defendant **JAY HOWARD SOLOMON, ESQ,** ("Solomon") was a New Jersey Administrative Law Judge, who was employed by the State of New Jersey in the Office of Administrative Law (OAL). The OAL, Defendant **NEW JERSEY BOARD OF MEDICAL EXAMINERS** and The New Jersey Office of the Attorney General are agencies under the sole control of the Executive Branch of State Government. Defendant Solomon conducted his interstate business out of the State of **New Jersey.**

31. Defendant **STEVEN LOMAZOW, MD**, ("Lomazow") is a neurologist who was a senior member of Defendant **NJBME** from 2008 to 2014, who engaged in healthcare related business with defendants, **HEARY, KAUFMAN, PRZYBYLSKI, ALLSTATE and**

GEICO. Defendant Lomzow conducted his interstate business out of the State of **New Jersey.**

32.    Defendant, **LEWIS STEIN, ESQ,** ("Stein") is a New Jersey, Morris County based medical malpractice attorney. Defendant Stein conducted his interstate business out of the State of **New Jersey.**

33.    Defendant, **ALLSTATE NEW JERSEY INSURANCE COMPANY** ("ANJ") is the New Jersey subsidiary of Allstate Insurance Company. Defendant Allstate conducts its interstate business out of the State of **Illinois.**

34.    Defendants, **GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY, GEICO GENERAL INSURANCE COMPANY** and **GEICO CASUALTY** ("GEICO") are the largest providers of auto insurance in New Jersey. Defendant GEICO conducts his interstate business out of the State of **Maryland.**

35.    Defendant, **ATLANTIC HEALTH SYSTEM** ("AHS"), is private healthcare company whose headquarters are in Morristown, New Jersey. It is the parent company for Morristown Memorial Hospital, Overlook Hospital, Chilton Memorial Hospital and Hackettstown Hospital. Its business covers Morris, Sussex and Passaic counties. Defendants, **COHEN, HEARY, LOMAZOW and KAUFMAN** engage in healthcare business with AHS. Defendant AHS conducts its interstate business out of the State of **New Jersey.**

36.    Defendant, **HACKENSACK UNIVERSITY MEDICAL CENTER** ("HUMC")**,** is 900-bed private hospital seven miles west of New York City. Defendant neurosurgeons, **PETERSON and HEARY,** engage in healthcare business with Defendant **HUMC.** Defendant HUMC conducts his interstate business out of the State of **New Jersey.**

37.    Defendant, **DR. ROBERT HEARY,** ("Heary") is the Director of the Neurological Institute of the New Jersey Spine Center and Neurosurgical Intensive Care Unit located in Newark, New Jersey. The latter is part of defendant Rutgers. The defendant is also an attending at **HUMC** and Overlook Hospital in Summit, New Jersey, which is part of Defendant **ATLANTIC HEALTH SYSTEM.** Defendant Heary conducts his interstate business out of the States of **New Jersey, Illinois and the District of Columbia.**

38.    Defendant, **DR. GREGORY PRZYBYLSKI,** ("Przybylski") is the director of neurosurgery at the New Jersey Neuroscience Institute at JFK Medical Center located in Edison, Middlesex County, New Jersey. He was also the 2011 President of the North American Spine Society and is a member of Defendant **CONGRESS OF NEUROLOGICAL SURGEONS.** Defendant Przybylski conductshis interstate business out of the States of **New Jersey, Illinois and the District of Columbia.**

39.      Defendant, **DR. PETER STAATS,** ("Staats") was the 2015 President of defendant **AMERICAN SOCIETY OF INTERVENTIONAL PAIN PHYSICIANS** and is the editor of Pain Medicine News. Defendant Staats conducts his interstate business out of the States of **New Jersey, New York and Maryland.**

40.      Defendant, **DR. MARC COHEN,** ("Cohen") is an orthopedic spine surgeon with a medical office at 221 Madison Avenue, Morristown, New Jersey 07960. He is a member of defendant NASS and engages in healthcare business with defendant **ATLANTIC HEALTH SYSTEM.** Defendant Cohen conducts his interstate business out of the State of **New Jersey.**

41.      Defendant, **DR. ANDREW KAUFMAN,** ("Kaufman") is an individual with a business located at 90 Bergen Street #3400, Newark, New Jersey 07103, and was paid by the State of New Jersey to provide testimony against the Plaintiff. Defendant Kaufman was a market competitor of the Plaintiff, and engaged in healthcare business with Defendants **HEARY, PRZYBYLSKI and HUMC.** Defendant Kaufman conducts his interstate business out of the States of **New Jersey and the District of Columbia.**

42.      Defendant, **LINDY WASHBURN,** ("Washburn") is an individual located at 1 Garret Mountain Plaza, Woodland Park, New Jersey 07424. Defendant, **NORTH JERSEY MEDIA, INC,** employs her as a journalist. Defendant Washburn conducts her interstate business out of the States of **New Jersey and Virginia.**

43.      Defendant, **NORTH JERSEY MEDIA, INC** ("NJMG") is a corporation located at 1 Garret Mountain Plaza, Woodland Park, New Jersey 07424. It publishes The Bergen Record and engages in business with Defendant **HUMC** and **AHS.** Defendant NJMG conducts its interstate business out of the States of **New Jersey and Virginia.**

44.      Defendant, **ROBERT GARRETT,** ("Garrett") is an individual located at 30 Prospect Avenue, Hackensack, New Jersey 07601. He is the president of Defendant **HUMC.** Defendant Garrett conducts his interstate business out of the States of **New Jersey and the District of Columbia.**

45.      Defendant **CONGRESS OF NEUROLOGICAL SURGEONS** ("CNS") is a professional medical society with a business located at 725 Fifteenth Street, NW, Suite 500, Washington, D.C. 20005. Defendants **HEARY** and **PRZYBYLSKI** are members. Defendant CNS conducts its interstate business out of the State of **New Jersey, Illinois and the District of Columbia.**

46.      Defendant **AMERICAN SOCIETY OF INTERVENTIONAL PAIN PHYSICIANS** ("ASIPP") is a professional medical society located at 2831 Lone Oak Road, Paducah, Kentucky, 42003. Defendant **STAATS** was the 2015 President and Defendant **KAUFMAN** is senior board member. Defendant ASIPP conducts its interstate business out of the States of **Kentucky and the District of Columbia.**

47.     Defendant **HAFNER** ("Hafner") is a Deputy Attorney General in the Office of the New Jersey Attorney General. Defendant Hafner conducts her interstate business out of the State of **New Jersey.**

48.     Defendant **TD BANK, NA**, ("TD") is a Canadian bank, that is publicly traded on the New York Stock Exchange and that purchased Commerce Bank in 2008. Commerce Bank was a privately held New Jersey Bank. Defendant TD conducts his interstate and international business out of **Toronto, Canada and the State of New Jersey.**

49.     Defendant **DANIEL STOLZ, ESQ**, ("Stolz") is a New Jersey based attorney, who is the Chapter 7 trustee for the Plaintiff's corporations and the NJSR real estate holding. **STOLZ** receives money from Defendant **ALLSTATE** for purported legal services. Defendant Stolz conducts his interstate business out of the State of **New Jersey.**

50.     Defendant **JOHN DIORIO, ESQ**, ("DiOrio") is a New Jersey based attorney, who represented the Plaintiff in his capacity as the Debtor in the Chapter 7 proceeding, which is ongoing. Defendant DIORIO commenced representing Defendant **GEICO** in approximately late 2015. Defendant DiIorio conductes his interstate business out of the State of **New Jersey.**

51.     Defendant **RICHARD CRIST** ("Crist") was the CEO of Defendant ALLSTATE from 2012 to 2016.  Defendant **CRIST** is a major shareholder in Defendant **ALLSTATE**. Defendant Crist conducted his interstate business out of the States of **New Jersey, New York and the District of Columbia.**

52.     Defendant **ERIC KANEFSKY, ESQ** ("Kanefsky") was the acting director of the New Jersey division of consumer affairs, having been appointed to the position by Defendant Christie in May 2012, one month after Defendant Hafner was ordered by Defendant Christie to file her complaint to revoke Kaul's medical license. Defendant Kanefsky conducts his interstate business out of the States of **New Jersey**

53.     Defendant **BRIAN R. MARTINOTTI, ESQ** ("Martinotti") is a district judge in the United States District Court for the District of New Jersey, who was appointed to the federal bench by New Jersey US Senators and politicians, Robert Menendez and Cory Booker, the former who had been indicted on charges of public corruption. His co-conspirator, Solomon Melgen was found guilty in a federal court in Florida, but Menendez was found not guilty in a federal court in New Jersey, the same court to which he had recommended judicial appointments. The defendants bribed Defendant Martinotti to obstruct Kaul's prosecution of K1 and dismiss the case. Defendant Martinotti conducts his interstate business out of the States of **New Jersey and the District of Columbia.**

54.     Defendant **SCOTT METZGER, MD** ("Metzger") is a New Jersey based physician, and a business partner of Defendant Peter Staats, who used monies from Defendant

ASIPP to bribe Defendant Christie to have himself appointed to Defendant NJBME. Defendant Metzger, who is now the vice-president of Defendant NJBME, obstructed Kaul's application, submitted in April 2019, for reinstatement of his medical license, a license that was illegally suspended on April 2, 2012 and revoked on March 12, 2014. Defendants Metzger, Staats and Kaufman are all senior members of the New Jersey chapter of Defendant ASIPP. Defendant Metzger conducts his interstate business out of the States of **New Jersey and the District of Columbia.**

**55.** Defendant **JOHN BURDINE, MD** ("Burdine") is a Louisiana based physician, who used monies from Defendant ASIPP to bribe Governor Jindal to be appointed to Defendant LMB. Defendant Burdine, who is now the president of Defendant LMB, obstructed Feldman's application, submitted in 2018, for reinstatement of his medical license, that was illegally suspended in 2016. Defendants Metzger, Staats, Kaufman and Burdine are all senior members of the state chapters of Defendant ASIPP. Defendant Burdine conducts his interstate business out of the States of **New Jersey and the District of Columbia.**

**56.** Defendant **CECELIA MOUTON, MD** ("Mouton") was simultaneously the executive director and director of investigations of Defendant LMB, but was dismissed from that position in 2018, due to repeated acts of abuse of public office and corruption. Defendant Mouton's actions were found to have been responsible for the suicide deaths of multiple Louisiana physicians. Defendant Mouton had been involved in a romantic affair with lawyer, Jack Stollier, of the politically active law firm of Stollier-Reiss, a law business that receives over two (2) million dollars annually from Defendant Mouton Defendant conducted her interstate business out of the States of **Louisiana, Mississippi, and the District of Columbia.**

**57.** Defendant **RICHARD STANLEY, ESQ** ("Stanley") is a private lawyer who receives compensation from Defendant Mouton, as part of a series of quid pro quo schemes, in which he provides legal counsel to Defendant LMB, while providing kickbacks to Defendant Mouton from the state funded compensation. These defendants embezzle state funds under the cloak of state authority, and in the process deprive the public of funds that could otherwise be used to fund health and welfare programs for poverty stricken, homeless and hungry sections of the Louisiana populace. Defendant Stanley conducts his interstate business out of the States of **Louisiana and Mississippi.**

58.    Defendants, **JOHN ROE 1-50**, and **JANE DOE 1-50** are as yet unidentified individuals who have assisted the named defendants in the commission of their crimes.

59.    Defendants, **ABC CORP. 1-50, AND/OR XYZ, P.C. 1-50** are as yet unidentified corporations that have assisted the named Defendants in the commission of their crimes.

## 7.  Overview of Plaintiffs' Legal Claims

**60.**    Defendants' commission of the crimes of wire fraud and mail fraud are the predicate acts that constitute the definition of a Racketeering Enterprise under the Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO) (18 USC 1961, <u>et seq</u>.).

**61.**    RICO, as enacted, constitutes a potent weapon against enterprise liability. RICO's civil law provisions (hereinafter "civil RICO") provide injured plaintiffs with the incentive to sue by providing a treble damage award plus attorneys' fees. As does antitrust litigation, civil RICO suits enable private party enforcement of criminal statutes.

**62.**    With deterrence in mind, RICO includes a provision allowing private parties to bring a civil suit for treble damages. The plaintiff must overcome two pleading burdens to state a claim for damages under RICO.

**63.**    First, the plaintiff must allege that the defendant has violated the substantive RICO statute, commonly known as "criminal RICO." In so doing, the plaintiff must allege the existence of seven constituent elements: **(1)** that the defendant **(2)** through the commission of two or more acts **(3)** constituting a "pattern" **(4)** of "racketeering activity" **(5)** directly or indirectly invests in, or maintains an interest in, or participates in **(6)** an "enterprise" **(7)** the activities of which affect interstate or foreign commerce. Second, the plaintiff must allege that he was injured in his business or property by reason of a violation of section 1962.

**64.**    Plaintiff submits that he can meet all of the requirements to establish a violation of Section 1962 of the Federal RICO Act and, thus, is entitled to an award of treble damages, attorney's fees and costs.

## 8.Statement of Fact Common to Kaul and Feldman

65.     Plaintiff Kaul, a recognized pioneer in minimally invasive spine surgery, revolutionized the specialty when in 2005 he performed the first outpatient minimally invasive lumbar fusion: https://www.youtube.com/watch?v=JX4bnRPPucI&t=1s. Plaintiff Feldman, an internationally acclaimed specialist in the minimally invasive technique, performed the first outpatient minimally invasive lumbar discectomy in Louisiana in 1999.

66.     Plaintiffs Kaul and Feldman, as with other similarly trained physicians, came into professional conflict with neurosurgeons, who believed that they were the only practitioners with the skills necessary to perform these procedures. However, the majority of neurosurgeons had received no training in FGI during their residencies, and they obtained little experience after graduation. This was in contrast to the vast experience obtained by the Plaintiffs and similarly trained physicians. From the mid 1990s onwards, the video-endoscopic technology and fluoroscopic technologies continued to evolve, as did anesthetic techniques that permitted rapid post-operative recoveries: https://www.youtube.com/watch?v=oxaV5IJuZ7c&t=9s

67.     When Plaintiff Kaul performed the first outpatient lumbar interbody fusion, he used an expandable interbody device to place bone graft in the intervertebral space. This was performed through an 8mm incision, and did not require any destruction of the muscles, bones or ligaments in the patient's back. The device was inserted in a collapsed format and was then expanded when in the correct position. This specific part of the procedure revolutionized the spine industry and has led to the development of numerous other expandable devices. This technique has become the standard of care for the treatment of degenerative spinal disorders. Plaintiff Feldman developed the first outpatient surgical facility in Louisiana in 2001, devoted entirely to the performance of minimally invasive spinal discectomies.

68.     The work of Plaintiffs Kaul and Feldman caused immense professional jealousy that caused the physician Defendants to engage in conduct that was unethical, unprofessional and illegal (**K2-D.E. 2 Page ID 139**). Their racketeering schemes commenced in approximately 2007/8, and incorporated multi-pronged strategies that involved encouraging patients to file lawsuits and medical board complaints against the Plaintiff, threatening to withdraw business from spinal device representatives unless they stopped supplying the Plaintiff, conspiring to prevent the Plaintiff from obtaining hospital privileges, and issuing reports for insurance companies that denied the Plaintiff reimbursement for procedure he performed. The practice of Plaintiff Feldman began to be sabotaged in approximately 2008 by defendants Burdine, LMB, Mouton and Stanley, in order to drive him out of business, so that Defendant Burdine could monopolize the minimally invasive spine surgery market in Louisiana. Defendant Burdine, like Defendant

Kaufman, is a senior member of Defendant ASIPP, and used the monies of the political action committees of Defendant ASIPP to bribe local politicians, lawyers and board administrators, such as Mouton, to have Plaintiff Feldman's license suspended.

69.    However, when it became apparent that none of the aforementioned tactics had worked, the Defendants conspired to bribe and did bribe Defendant Christie and Governor Jindal to have them order Defendants NJBME and LMB to revoke the Plaintiffs' license. The proceedings to revoke the Plaintiff's license were conducted criminally and the resultant revocation was illegal. The Plaintiff was subjected to political corruption and judgments that were summary in nature, that deprived him of his livelihood and his ability to support his family. The proceedings in the New Jersey Office of Administrative Law were a massive fraud **(Reference: IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A. KAUL, MD TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY – OAL DOCKET NO.: BDS 08959-2012N),** in which Defendants Solomon, Przybylski and Kaufman collectively committed two hundred and seventy-eight (278) separate instances of perjury and evidential omission, misrepresentation and gross mischaracterization **(K1-D.E. 225 + 225-1 + 225-2: Page ID 4940 to 5273).**

## 9.Statement of Fact Specific to Kaul

**A.    Defendant Allstate and GEICO have corrupted the New Jersey Superior Court, Union County into using the IFPA (N.J.S.A. 17:33A-1 et seq.) to violate the Constitutional due process rights of members of the medical community.**

70.    The IFPA is an ostensibly civil statute designed to combat insurance fraud in New Jersey, but the text and applications of the statute are decidedly criminal in nature. There is a symbiotic relationship between the Special Investigations Units of the Insurance Carriers and the New Jersey Office of the Insurance Fraud Prosecutor, the latter being affiliated with the Department of Banking and Insurance.

71.    Defendant GEICO filed a lawsuit against the Plaintiff, in the United States District Court, District of New Jersey on April 24, 2013, in which it alleged he had violated the IFPA. The claim was dismissed with prejudice on December 8, 2014, with no evidence ever having been presented. Defendant Allstate filed a claim against the Plaintiff on February 15, 2015 that was identical to the IFPA claims filed by GEICO on April 24, 2013, and dismissed on the aforesaid date.

72.    The IFPA has been increasingly used by joint SIU(private)/OIFP(state) entities to conduct investigations that portend to be civil, but are in actuality investigations whose purpose is to improperly collect evidence to file criminal charges. Defendant Allstate has repeatedly conspired with the OIFP to use the civil process to circumvent the constitutional protections normally afforded to individuals who are the subject of criminal investigations.

73.    The IFPA has been interpreted by corrupted New Jersey state courts (Morris + Union) to deny physician defendants the right to a jury. The argument adopted by the state courts is based on an erroneous finding that the relief sought by Defendant Allstate was in equity and not law, and thus there was no entitlement to a jury. In these cases, Defendant Allstate argued that the reason the legislature did not expressly ascribe the right of a jury trial, was because it allegedly did not want anything impeding a speedy trial.

74.    The IFPA and its unconstitutional application in New Jersey state courts, has been associated with jury denials and motion applications that are rarely, if ever, decided in favor of the Defendant.

75.    Defendants Allstate and GEICO have engaged in widespread violations of the due process rights of the provider community in multiple states. They have been able to perpetrate these schemes through the purchasing of local politicians and collusion with state agencies

**B.    Defendants Solomon, Przybylski and Kaufman collectively committed two hundred and seventy-eight (278) separate instances of perjury, misrepresentation, evidential omission and gross mischaracterization in the proceeding in the New Jersey Office of Administrative Law (April 9, 2013 – June 28, 2013) + The Defendants committed bribery in quid pro quo schemes with Defendant Christie, in order to have the Plaintiff's medical license revoked.**

76.    In or about the beginning of September 2017, the Plaintiff obtained, for the first time, an entire copy of the trial transcript IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A. KAUL, MD, TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY. The proceeding was conducted in the New Jersey Office of Administrative Law between April 9, 2013 and June 28, 2013, and was adjudicated, without a jury, by Defendant Jay Howard Solomon, Esq. Defendant Solomon issued his Final Opinion on December 13, 2013.

77.    Between September 2017 and January 11, 2018, the Plaintiff conducted a comparative analysis of Defendant Solomon's Final Opinion with the trial transcript and submitted evidence. The analysis resulted in the production of a document entitled, 'The Solomon Critique', which proves that Defendants Solomon, Przybylski and Kaufman collectively committed **two hundred and seventy-eight (278) separate instances of perjury and evidential omission, misrepresentation and gross mischaracterization**. Defendant Solomon's fraudulent opinion provided an illegal basis for the revocation of Kaul's license. The revocation of Kaul's license caused the loss of his livelihood and the collapse of six (6) medium sized corporations, that were forced to file for Chapter 11 Bankruptcy on June 17, 2013 in the District of New Jersey **(Case No. 13-23366(VFP).**

78.    The Defendants bribed and conspired with Defendant Christie and his agents, to have Defendant NJBME revoke Kaul's license. The Defendants were economic competitors of the Plaintiff, that all lost money when the Plaintiff made money. The financial reserves for which the Parties competed, consisted of the auto/health premiums paid by patients/clients to Defendants Allstate and GEICO. This reservoir of capital, intended to cover the costs associated with auto related injuries, was finite, and as the Plaintiff's minimally invasive spine surgery practice expanded, he commandeered a greater percentage of the reservoir. The Defendants calculated that the return on their bribes, would be more than compensated for by **(i)** the debt avoidance (Defendants Allstate + GEICO) that the revocation of the Plaintiff's license would permit, and **(ii)** by the diversion to the Defendant Physicians and Hospitals of an increased percentage of the capital reservoir, for reimbursement for their professional services. Defendant Christie benefitted by receiving these racketeering profits into his political campaigns, and off-shore bank accounts and trusts located in tax havens.

C.    **The Plaintiff has consistently been denied substantive justice in administrative,**
**state and federal courts in New Jersey.**

79.    In early January 2012 two inspectors from the State made an unannounced visit
to NJSR Surgical Center, the Plaintiff's Medicare Certified, AAAHC accredited surgical
center in Pompton Lakes, NJ. These individuals willfully concealed the purpose of their
visit from Kaul, as they interviewed Kaul's staff and collected evidence. When asked by
Kaul the reason for the visit they falsely told him that it was a routine inspection. They
did not inform him that it was part of an investigation, the purpose of which was to
revoke his medical license. These individuals appeared on a Tuesday January 3, 2012, at a
time when Kaul was operating and requested to enter the operating room while Kaul was
performing a minimally invasive spinal fusion. Kaul denied their request.

80.    The inspectors presented no warrants, despite the fact that the proceedings
were quasi-criminal in nature that sought to deprive him of his property. These
individuals did not inform Kaul or his staff of their rights, before they commenced their
interviews and gathering of evidence.

81.    On April 2, 2012 Defendant NJBME suspended the Plaintiff's license based on
false allegations that he was not qualified to perform minimally invasive spine. The
allegations were premised on the reports of two 'experts', Defendants Przybylski and
Kaufman, who were market competitors of Kaul, and who had received money from the
State to testify. Defendants Przybylski and Kaufman continued their false testimony in
April 2013, when they testified against Kaul in the proceedings in the New Jersey Office
of Administrative Law, in Newark, NJ. The latter proceeding resulted in the illegal
revocation of Kaul's license. Defendants Kaufman and Przybylski took an oath, and then
participated in the massive fraud detailed in 'The Solomon Critique' (K1-D.E. 225).

82.    The Plaintiff commenced performing minimally invasive spine surgery in 2002
and successfully performed eight hundred (800) cases with good to very good outcomes
in 90-95% of cases with a 0.1% complication.

83.    The Plaintiff was more educated, qualified, trained and credentialed to perform
minimally invasive spine surgery than Defendants Przybylski and Kaufman. The Plaintiff
**(i)** possessed a license to practice medicine and surgery; **(ii)** was board certified by the
American Academy of Minimally Invasive Spinal Medicine and Surgery; **(iii)** was
credentialed by at least six (6) surgical centers to perform minimally invasive spine
surgery; **(iv)** was credentialed by the federal government to perform minimally invasive
spine surgery; **(v)** had commenced his training in minimally invasive spine surgery in
2002, three (3) years before Defendant Przybylski.

84.    On May 9, 2012 Kaul signed an interim consent order with Defendant NJBME, in
which he agreed, pending the outcome of a full hearing, to limit his practice to

interventional spinal procedures. The order permitted Kaul to apply for minimally invasive spine privileges at a hospital, and on, or about May 16, 2012, Kaul submitted an application to a local hospital.

85.     On May 9, 2012 Defendant Christie's Attorney General, Jeffrey Chiesa ("Chiesa") made highly prejudicial pre-hearing comments to Marla Diamond, a New York radio show host, in which he stated that the Plaintiff was not qualified to perform minimally invasive spine surgery. These comments were made before any evidentiary proceedings and were intended to prejudice the Plaintiff's right to a fair hearing **(D.E. 2 Page ID 152).**

86.     On or about May 16, 2012 the Plaintiff commenced discussions with Bayonne Medical Center in Bayonne, NJ, to obtain privileges for minimally invasive spine surgery.

87.     On May 22, 2012 the acting director of the division of consumers affairs and Defendant Kanefsky, filed a motion to suspend the Plaintiff's CDS prescribing license, in the knowledge that it would prevent him from obtaining hospital privileges. This was an illegal and unilateral act perpetrated by a subordinate of the New Jersey Governor, and denied the Plaintiff his right to due process (**D.E. 2 Page ID 152**).

88.     The Plaintiff indicated that unless the CDS license was reinstated he would commence legal action, and on May 29, 2012, in retaliation, Kanefsky filed a motion to rescind the consent agreement. The motion was based on false allegations that the Plaintiff had not modified his website or complied with an improper subpoena.

89.     On June 7, 2012 the Plaintiff, based on the aforesaid actions of Chiesa and Defendant Kanefsky, filed a motion in the Mercer County Superior Court that sought the appointment of a special prosecutor and ad hoc medical board. The Plaintiff argued that he would not receive a fair and impartial hearing in New Jersey, and that Chiesa's prejudicial comments evidenced the prejudicial nature of the proceedings (**D.E. 2 Page ID 179**).

90.     The motion was denied, as was the appeal, and neither Defendant Chiesa nor Kanefsky responded to testimony subpoenas, arguing that the proper forum was the pending hearing before Defendant NJBME. The denials further evidenced Kaul's argument that he would not receive justice in New Jersey.

91.     On June 13, 2012 Kanefsky's motion to rescind the consent agreement was argued before Defendant NJBME. Chiesa and Defendant Kanefsky ignored testimony subpoenas and had them quashed by Defendant NJBME. The Plaintiff's right to cross examine parties who were seeking to deprive him of his property violated his Fourteenth Amendment right to due process (**K2-D.E. 2 Page ID 203**).

92.     On June 13, 2012, Defendant Hafner played a video of a patient, who improved after Kaul had performed a successful minimally invasive outpatient lumbar fusion: https://www.youtube.com/watch?v=guwx5kuBiEg&t=3s
Hafner considered the video evidence that Dr. Kaul had deviated from Defendant Przybylski's fictitious standard of care, a standard that he admitted on May 6, 2013 did not exist. However, it mattered not to Hafner that the patient improved, because she must have held the same view that Defendant Lomazow expressed at the end of his 2014 video interview, which is that patients *"know nothing"*
https://www.youtube.com/watch?v=sFtE8EvEMsU

93.     On June 13, 2012 Defendant NJBME rescinded the consent agreement, based on false allegations that the Plaintiff had not modified his website and had not responded to subpoenas from Defendant NJBME. The subpoenas were improper, because the matter had been transferred from Defendant NJBME to the New Jersey Office of Administrative Law on May 28, 2012, which thus assumed subpoena jurisdiction. Upon the transfer from Defendant NJBME the Plaintiff became entitled to discovery from Defendant NJBME, and submitted testimony subpoenas to AG Jeffrey Chiesa, DCA Acting Director Eric Kanefsky and Investigator Susan Sugalski, an individual who had worked with Defendant NJBME as an investigator. Defendant Hafner did not produce these witnesses because she falsely claimed that the matter had been transferred back to Defendant NJBME. The subpoenas were then quashed by Defendant NJBME, and the Plaintiff was denied his due process right to examine two witnesses who had respectively made public prejudicial comments and illegally suspended the Plaintiff's CDS prescribing license.

94.     The Plaintiff never had the opportunity to cross-examine Chiesa#, defendants Hafner and Kanefsky. The Plaintiff's motions for a special prosecutor and ad hoc medical board were denied in the New Jersey Superior Court System at both the trial and appellate levels, and his testimony subpoenas were quashed by Defendant NJBME.

95.     On August 30, 2012, Kaul's attorney, Jeffrey Randolph, sent a letter to Jessie Sheffert, Esq, an attorney who represented a surgical center at which Kaul had worked. In the letter, Randolph explained that Defendant NJBME's assertion that Kaul should have had alternative privileges to perform minimally invasive spine surgery was wrong. Defendant Solomon prevented this letter from being entered into evidence in the administrative law proceedings, because Defendant Hafner falsely claimed she had not received the document (**K2-D.E. 2-1 Page ID 425**).

96.     On December 20, 2012 the State issued a cease and desist letter to Kaul that ordered him to close the NJSR Surgical Center. Subsequent to the suspension of Kaul's license, other physicians had been performing procedures at the facility. Kaul appealed the order, which was stayed pending the outcome of the licensure proceedings. The cease and desist letter was arbitrary and had no basis in law or fact. It was just one of

many examples of how Defendant Christie abused state agencies, to further the defendants' schemes against the Plaintiff's properties, interests and reputation.

97.     From April 9, 2013 to June 28, 2013 the matter was tried in the New Jersey Office of Administrative Law (**IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A. KAUL, MD TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY – BDS 08959-2012N**).  The two main issues litigated in the hearing pertained to patient outcomes, and whether Kaul was qualified to perform minimally invasive spine surgery.

98.     The case advanced by Hafner was founded principally on the opinions of Defendants Przybylski and Kaufman, who falsely testified that Kaul had grossly deviated from the standard of care in his treatment of eleven (11) patients in the following six (6) clinical and administrative categories: **(1)** clinical outcomes; **(2)** hospital privileges; **(3)** education and training; **(4)** surgical technique; **(5)** consent forms; **(6)** discography.

99.     Defendants Przybylski and Kaufman falsely testified that: **(a)** the patients had poor clinical outcomes – **however,** the clinical files indicated that the patients improved after the care they received from Kaul; **(b)** because Kaul did not have hospital privileges, he had grossly deviated from the standard of care – **however,** as Defendants Przybylski and Kaufman either knew or ought to have known, the possession or non-possession of hospital privileges has no legal relevance to the standard of care, as was articulated by Judge Howard Coburn on January 25, 2012 in the matter of Jarrell v Kaul (MRS-L-2634-07); **(c)** because Kaul had obtained his minimally invasive spine surgery training through mini-fellowships and continuing medical education courses, he had grossly deviated from the standard of care – **however,** Defendant Przybylski admitted that he had obtained his minimally invasive spine surgery training by attending the same continuing medical education courses as Kaul, but had commenced his training in 2005, three (3) years after Kaul. Defendants Przybylski and Kaufman either knew or ought to have known that education and training have no legal relevance to the standard of care, as was articulated Judge Howard Coburn in Jarrell v Kaul; **(d)** because Kaul used devices in an off-label manner he had grossly deviated from the standard of care – **however,** Defendant Przybylski admitted that he frequently used devices in an off-label manner; **(e)** because patient consent forms were allegedly unsigned, Kaul had deviated from the standard of care – **however,** Kaul submitted into evidence signed consent forms for all eleven (11) patients; **(f)** because Kaul utilized discography in as a diagnostic tool, that he had deviated from the standard of care – **however,** the use of discography contributed to the fact that the eleven (11) patients improved after surgery

100.    The proceeding was adjudicated by Defendant Solomon, prosecuted by Defendant Hafner, and 'expert' testimony was provided by Defendants Przybylski and Kaufman. The entire proceeding was a massive fraud, in which Defendants Solomon, Przybylski and Kaufman collectively committed **two hundred and seventy-eight (278) separate instances of perjury and evidential misrepresentations, omissions and gross**

<u>mischaracterizations.</u> These are detailed in '<u>The Solomon Critique</u>' (<u>K1-D.E. 225</u>) copies of which were sent to the nine justices of the United States Supreme Court. Letters were also sent to the US Attorney and the New Jersey Attorney General, that sought the matter be criminally investigated.

101.    On the days that Defendant Przybylski testified, Kaul ensured that an independent transcriptionist recorded the proceedings, an act that visibly agitated Defendant Solomon.

102.    In support of their case, the state relied on eleven (11) patients, whom they alleged had sustained complications consequent to surgeries performed by Kaul. Only six (6) patients actually testified, but Defendant Solomon permitted Defendant Przybylski's testimony about the other five (5) patients to be entered onto the record. This testimony was subsequently used by Defendant Solomon to wrongfully recommend the revocation of Kaul's license. Kaul was denied the opportunity to examine these five (5) patients.

103.    In early September the Plaintiff was made aware that evidence from the OAL hearing had been tampered with and falsified. The Plaintiff sent letters, dated September 12 and 13, 2013 respectively, to Defendants Solomon and Christie, that requested the matter be investigated (<u>D.E. 2 Page ID 215</u>). The matter was not investigated.

104.    On September 16, 2013 Kaul filed an ethics complaint against Defendant Hafner (<u>K2-D.E. 2 Page ID 226</u>). In 2014 Kaul brought this complaint to the attention of the attorney assisting him with his application for license reinstatement. Kaul suggested that Hafner should have no involvement in the proceeding. The attorney, Michael Keating dismissed Kaul's concerns, despite the fact that Hafner had used prejudicial and pejorative language in her opposition to Kaul's application. Kaul subsequently discovered that Keating was a partner at the law firm at which Defendant Christie had been a partner. Keating never disclosed this conflict of interest to Kaul.

105.    On October 15, 2013 the Plaintiff submitted a post-trial brief in the administrative law proceeding <u>(K1-D.E. 179-1 Page ID 2672 to 2711).</u>

106.    On Sunday November 17, 2013, Defendant NJMG published Defendant Washburn's illegally recorded interview. It was six-thousand (6000) word article that slandered Kaul's appearance and accent. Washburn described Kaul was having a *"frayed wallet ... lace-less shoes"* and referred to his accent disparagingly as an *"upper-crust British accent."* The purpose of this characterization was to portray Kaul as an elitist, an individual out of touch with the 'common man.' Defendant Washburn did this in the knowledge that it would create antipathy and eliminate any sympathy for Kaul. The truth, however, of Kaul's life is that he grew up in poverty and became an orphan at sixteen (16), after his mother died of cancer when he was fourteen (14) and his father

34

died of a heart attack when he was sixteen (16). Kaul entered medical school at the age of eighteen (18). These were details Defendant Washburn knew, but chose not to include in her defamatory and slanderous story, a story that involved her criminally violating Kaul's rights under federal and state law. Defendant Washburn illegally recorded the interview. Kaul sent Defendant Washburn a letter dated January 9, 2014 that requested a copy of the illegally obtained audio recording (**K2-D.E. 2 Page ID 224**) but Defendant Washburn refused his request.

107.    In response to Defendant Washburn's article, a number of Kaul's patients provided a video response and on December 26, 2013 Kaul sent a letter (**K2-D.E. 2 Page ID 230**) to Defendant Solomon, in which he asked Defendant Solomon, a Bergen County resident, if he had read the article. If Solomon had read the article it would have been an act of judicial misconduct, because Solomon was effectively the judge, jury and prosecutor. The timing of the release of Defendant Washburn's article was intended to prejudice the local population against Kaul. Members of Defendant NJBME lived in this population. This was the same tactic used by Chiesa on May 9, 2012 when he declared to CBS-New York journalist, Marla Diamond, that Kaul was not qualified to perform minimally invasive spine surgery. These acts are further evidence of Kaul's argument that he will not receive justice in New Jersey.

108.    Defendant NJMG **removed** Defendant Washburn's article from the internet in approximately late 2017.

109.    On December 13, 2013 Defendant Solomon issued his opinion. It was a one hundred and five-page (105) document that bore little resemblance to the trial testimony and evidence. Defendant Solomon recommended that the Plaintiff's license be revoked. In his opinion Defendant Solomon ignored the law that permits the holder of a plenary license the right to practice Medicine and Surgery. Kaul had an active unrestricted plenary license, for the period during which he performed minimally invasive spine surgery.

110.    The law regarding plenary licenses was stated by Judge Howard Coburn in the matter of Jarrell v Kaul **(MRS-L-2634-07)**. His recitation directly contradicts the fraudulent testimony that was given on June 12, 2012 and in April 2013 by Defendant Przybylski, regarding what constitutes the standard of care (**K2-D.E. 2 Page ID 233**).

111.    On January 5, 2014 Kaul sent a letter to President Obama that sought the assistance of the federal government in the investigation of the tampering with evidence **(K2-D.E. 2 Page ID 236)**. Kaul, confident in the strength of his case, had no hesitation in sending a letter to the President of the United States, that invited United States Government to review the case.

112.    On January 9, 2014 Kaul sent a letter to Defendant Washburn that requested a copy of the audio recording of the interview she had conducted with Kaul on August 13,

2013. At the commencement of the interview Defendant Washburn acknowledged that state actors had tampered with evidence in the administrative proceedngs.

**113.**    After the issuance on December 13, 2013 of Defendant Solomon's fraudulent opinion, the matter was returned to Defendant NJBME, and a hearing was scheduled for February 12, 2014. The Plaintiff sent a letter to Defendant NJBME, dated February 6, 2014, in which he brought their attention to the malfeasant conduct of Defendants Kaufman and Lomazow and advised them that he would not attend the hearing (**K2-D.E. 2-1 Page ID 241**).

114.    On March 12, 2014 Defendant NJBME entered its final order, which revoked the Plaintiff's license and imposed a financial penalty of $450,000.00. The amount was based on the inflated legal fees of the New Jersey Attorney General and fines imposed for alleged instances of 'gross malpractice'. These alleged instances were entered onto the record in the administrative law proceedings (April 9, 2013 to June 28, 2013) through the testimony of Defendant Przybylski, who as is detailed in 'The Solomon Critique', committed perjury thirty (30) times. The revocation was illegal. The fine was thus illegal, and violative of the Eight Amendment, in the same manner as was found in Timbs v Indiana (17-1091).

115.    The Plaintiff chose not to appeal the matter in New Jersey Superior Court, Appellate Division, as he did not believe, based on his experience, that he would be able to procure justice in New Jersey. From 2012 to 2019 Kaul's belief has been proven to be true by administrative + state + bankruptcy + federal courts within the geographic boundaries of New Jersey.

116.    On January 29, 2015 Kaul filed a complaint with the US Attorney for the District of New Jersey that sought an investigation into the evidence tampering. Two weeks after Kaul had filed the complaint, he telephoned the office of the US Attorney to ascertain the status of the complaint and was told, *"We are not an investigative agency"*. Kaul had initially approached the FBI but was referred to the US Attorney, Paul Fishman. The latter individual had worked under Defendant Christie, when he was the US Attorney for the District of New Jersey (**D.E. 2-1 Page ID 244**).

117.    In 2015 Kaul submitted multiple letters to the New Jersey Attorney General, the US Attorney for the District of New Jersey and insurance carriers, that sought their assistance in retrieving a copy of his file from Defendant NJBME, and investigating the evidence tampering and illegal audio recording. Kaul received no responses (**K2-D.E. 2-1 Page ID 248**).

118.    On February 22, 2016 the Plaintiff filed a lawsuit in the United States District Court, Southern District of New York (**16-CV-1397**) in which the Defendants were accused, amongst other things, of violating RICO and committing anti-trust violations. The Complaint sought the reinstatement of the Plaintiff's medical license, monetary

compensation and a public apology. The Plaintiff filed the matter in the SDNY because he had been a New York resident from 2005 to 2012, had venue privilege and was convinced that he would not receive justice in New Jersey, due to the politico-legal nexus he described in his brief to the Second Circuit Court of Appeals (**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT – CASE NO. 16-1397-CV – D.E. 41**)

119.    The Judge assigned to the case, Richard Sullivan, transferred the matter sua ponte to the District of New Jersey. The Plaintiff sent the Judge a letter, in which he objected to the transfer, based on his opinion that he would not receive justice in New Jersey (**K2-D.E. 2-1 Page ID 257**). The Judge ignored the Plaintiff's pleas and on April 27, 2016 transferred the file to the District of New Jersey. The Plaintiff filed an interlocutory appeal (**¶ 90 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT – CASE NO. 16-1397-CV – D.E. 41**) with the Second Circuit Court of Appeals, which was denied by a three-member panel on September 9, 2016, based on the Court's assertion that because the order from the SDNY was not a final order, it did not have jurisdiction. The Plaintiff filed a motion for an *en banc* review but received no response from the Court. If and when a final order is entered in the District of New Jersey, the matter will return to the United States Court of Appeals for the Second Circuit for adjudication on the question of venue.

***120.***    On July 26, 2016, the Plaintiff submitted a motion to the DNJ that sought to have the matter transferred back to the SDNY. Counsel for Defendant Cohen objected (**K2-D.E. 2-1 Page ID 263**) and the Court entered a TEXT ORDER on July 27, 2016 that stated, ***"The issue, however, may be discussed during the next scheduled conference."*** The next conference was held on March 23, 2017 and was limited to discussions regarding a motion by Defendant Heary and Rutgers to vacate default.

121.    On September 8, 2016 Kaul submitted a letter to the District of New Jersey, that highlighted the Plaintiff's profound concerns about the impartiality of the venue and requested that his motion to transfer the matter back to the S.D.N.Y be considered (**K2-D.E. 2-1 Page ID 265**). The Court never considered the motion.

122.    In mid-August 2016 the Plaintiff served information subpoenas on a number of Third-Party Witnesses. The State Defendants objected to the Plaintiff's efforts at evidence gathering, the Plaintiff responded, but the Court prohibited the Plaintiff from gathering evidence relevant to the claims (**K2-D.E. 2-1 Page ID 267**).

123.    The matter has been pending in the DNJ since April 27, 2016, during which time the Plaintiff has filed several motions for default judgment against Defendant Lewis Stein, Esq. On March 3, 2016, Defendant Stein was sent a Waiver of Summons and Notice of Litigation (**K2-D.E. 2-1 Page ID 377**), that was accompanied with a flash drive that contained a copy of the Summons, Complaint and Exhibits. On the flash drive was a small white label, on which Kaul had written the number four (4). Defendant Stein ignored the Waiver of Summons. On May 2, 2016 Defendant Stein was served with a

hard copy of the Summons and Complaint (**K2-D.E. 2-1 Page ID 376**), but failed to plead or otherwise answer. On December 22, 2016 the Plaintiff requested entry of Default against Defendant Stein (**K2-D.E. 2-1 Page ID 381**) and Default was entered by the Clerk on December 28, 2016. On June 13, 2017 the Plaintiff filed a motion to enter Default Judgment **(K1-D.E. 192-2 – Page ID: 3567 to 3611)** and on July 7, 2017 the Court denied the motion **(K1-D.E. 202 – Page ID: 3767 to 3772).** In its opinion the Court suggested that one of the reasons Defendant Stein failed to answer, was that he might have been confused about the venue of the case. On November 17, 2017, Defendant Stein was served with a copy of the summons and First Amended Complaint, and signed a document entitled CONFIRMATION OF SERVICE (**K2-D.E. 2-1 Page ID 378**).

124.    On June 30, 2017 the Court entered an Order that dismissed the Plaintiff's First Amended Complaint, but permitted him to file a Second Amended Complaint, which he submitted on August 10, 2017.

125.    On October 18, 2017 the Court filed an Order that required the Second Amended Complaint be reduced in length. Kaul believes it is relevant to this record, that every complaint filed in the United States District Court for the District of New Jersey, by Defendant Geico, within the last ten years has been in excess of three hundred (300) pages. At a case management conference on October 18, 2017, the Court and the Plaintiff agreed to submit a revised Second Amended Complaint of approximately one and hundred and forty (140) pages. The Defendants were granted forty-five (45) days to respond, and the Plaintiff was granted thirty (30) days to file his response.

126.    On October 18, 2017, during the case management conference, the Court denied the Plaintiff's request to commence the service of information subpoenas.

127.    Similarly, the Court has not permitted the Plaintiff any discovery, and quashed information subpoenas that the Plaintiff served on Third Party Witnesses in July/August 2016 **(K1-D.E. 111 – Page ID: 990)**.

128.    On October 27, 2017 the Plaintiff filed a revised Second Amended Complaint that was, with exhibit dividers, one hundred and fifty (150) pages.

129.    Forty-five (45) days later, the Defendants had failed to respond to the Plaintiff's revised Second Amended Complaint, and on December 22, 2017 the Plaintiff sent a letter to the Court that brought its attention to the issue (**K2-D.E. 2-1 Page ID 380**).

130.    The Court issued a letter order on February 8, 2018 that identified purported deficiencies in the Plaintiff's revised Second Amended Complaint. The Plaintiff responded by filing on February 22, 2018, an abbreviated version of the revised Second Amended Complaint.

131.    The Defendants did not respond to the Plaintiff's revised Second Amended Complaint, and on April 4, 2018 the Plaintiff filed a letter with the Court that requested it set a deadline for the Defendants to answer or otherwise plead (**K2-D.E. 2-1 Page ID 385**).

132.    The Plaintiff's Complaint remained pending in the DNJ for two (2) years, during which the Plaintiff's efforts at discovery were either quashed or denied. The Plaintiff's motions for default judgment were all denied.

133.    The illegal suspension and revocation of the Plaintiff's license in 2012 and 2014 respectively, were accompanied by a prolonged period of highly defamatory and prejudicial media coverage. This caused the Plaintiff to become the target of multiple lawsuits from patients and insurance carriers, that were filed in the New Jersey Superior Court System. The Plaintiff was arrested on September 21, 2016 on a warrant for unpaid child support, at which time he became aware that the State, a defendant in K1, had, in May 2016, initiated proceedings against him for unpaid taxes. These legal actions were a direct consequence of the illegal suspension (2012) and revocation (2014) of Kaul's license.

134.    In October 2016 Kaul submitted a request with the Court that sought permission to file a TRO and injunction against the state, pending the outcome of the federal proceedings (**K2-D.E. 2-1 Page ID 387**).

135.    Within the New Jersey State Courts, the Plaintiff's motions for various forms of relief have been universally denied. The Union County Court repeatedly denied the Plaintiff's requests for discovery in Allstate v Kaul (Docket No. UNN-L-322-15) (**K2-D.E. 2-1 Page ID 324**), but continued to enter adverse orders against the Plaintiff due to his inability to provide discovery (**K2-D.E. 2-1 Page ID 357**).

136.    A large majority of the state court judges were appointed to their positions by Defendant Christie, and in one particularly egregious case, Allstate v Kaul, the judge denied every motion filed by the Plaintiff, granted every motion filed by Defendant Allstate, and repeatedly denied the Plaintiff's requests for discovery from Defendant Allstate.

137.    The same Judge, in December 2016 and February 2017 in the matter of Santos v Kaul (Docket No. UNN-L-322-15) quashed deposition and document subpoenas served by the Plaintiff on Third Party Witnesses, the majority of whom are neurosurgeons (**K2-D.E. 2-1 Page ID 361**). The denials were based, illegally, on the res judicata and collateral estoppel effect of the K1 federal claims. The Plaintiff explained to the Court that there had been no adjudication of the K1 claims, and that the preclusion doctrines were thus inapplicable. The argument was met with silence.

138.    The subpoenas were directed to multiple neurosurgeons and a member of the medical board, Jacqueline Degregorio, who had voted on June 13, 2012 against rescinding the consent agreement into which the Plaintiff and the medical board had entered on May 9, 2012.

139.    The irrefutable evidence of the administrative, state and federal proceedings indicate that the Plaintiff has not been the recipient of Justice in New Jersey, and has, at least since 2012 been the victim of a profoundly corrupt politico-legal network, that has suppressed the Plaintiff's efforts at gathering evidence necessary to advance and defend his interests. These are some of the reasons the Plaintiff sought the appointment of a special prosecutor and ad hoc medical board, to oversee Defendant NJBME's administration of the Plaintiff's licensing proceeding in 2012.

140.    The Plaintiff vigorously fought to have K1 remain in the SDNY for good cause. The central thrust of the Plaintiff's argument in early 2016 was that he would not be afforded substantial justice in New Jersey, and the evidence in 2019 has proven that to be the case.

141.    The Plaintiff has brought the '<u>The Solomon Critique</u>' to the attention of the Justices of the United States Supreme Court. The Plaintiff did this in order to alert them to the criminal conduct of individuals, who as the evidence proves, so willfully perverted the course of justice, to suit the economic and political agendas of the K1 + K2 Defendants. Defendants Solomon, Przybylski, Kaufman and Hafner 'pulled the trigger', while their co-conspirators supplied the bribes, propagated the lies and profited from the Plaintiff's losses **(K1-D.E. 233 – Page ID: 5545 to 5600).**

D.    <u>The Plaintiff's medical license was revoked because of Political Corruption at the New Jersey Board of Medical Examiners and because the Mechanism of Physician Regulation in New Jersey is illegally Configured</u>

142.    The Division of Consumer Affairs controls the medical board. Its members are political
appointees, with no senate approval, who occupy their positions at the pleasure of the Governor.

143.    The Office of the Attorney General is controlled by the Department of Law and Public Safety (DLPS), and assigns lawyers who simultaneously prosecute cases against physicians, while acting as internal counsel to the board. The Governor controls the DLPS. This constitutes an unconstitutional, and illegal merger of investigative, prosecutorial and adjudicatory functions of physician regulation.

144.    The Office of Administrative Law is part of the executive branch of state government, and its members are politically appointed. The executive is the Governor.

**145.**    The unconstitutional configuration of physician regulation permitted Defendant Christie to exercise complete control of the legal proceedings that caused the revocation of Kaul's license. At best it was a charade, at worst a 'kangaroo court', that dispensed a politically motivated judgment based on false expert and patient testimony. The Defendants have many decades of experience in 'kangaroo' justice and went to immense lengths to ensure that there was an appearance of the **"full panoply"** of due process. The earliest indication that the outcome had been pre-ordained was when Defendant Christie's Attorney General, Jeffrey Chiesa, on May 9, 2012, broadcast to the media, that Kaul was not qualified to perform minimally invasive spine surgery. These comments were made before the commencement of any evidentiary proceedings (**K2-D.E. 2 Page ID 162).**

**146.**    The Defendants exercised control of the aforementioned process by funneling bribes, to Defendant Christie, disguised as 'campaign donations', and by paying fees to lobbyists and public relation companies commercially intertwined with New Jersey politicians.

**147.**    The process is not independent, is purely political and is in gross violation of the due process clause of the Fourteenth Amendment, that requires an impartial tribunal, when life, liberty and property are at stake. Simply by virtue of the fact that the mechanism of physician regulation is unconstitutional, none of these protections/rights were afforded to the Plaintiff.

**148.**    On April 5, 2018 a Physician's Bill of Rights (SENATE BILL NO. 286) introduced by Louisiana Senator, John Milkovich, was approved by the Louisiana Senate (**K2-D.E. 2-1 Page ID 391**). The purpose of the bill is to ensure that physician regulation is conducted lawfully and in accordance with the due process protections of the United States Constitution. Kaul was not afforded these protections. The Defendants gross violations of his Constitutional right to due process, have conferred criminal liability on the defendants.

**E.    The Plaintiff's pioneering work in the field of minimally invasive spine surgery caused professional jealousy amongst his business and professional competitors**

**149.**    In 2005 Kaul performed the first outpatient lumbar spinal fusion at the Market Street Surgical Center Saddle Brook, New Jersey. Kaul's innovative work caused overt hostility within the New Jersey neurosurgical community, whose members frequently slandered Kaul. One such example occurred in late 2013, when neurosurgeon Thomas Peterson publicly called Kaul a ***"murderer"*** in front of one of Kaul's employees, Linda Reyes, on whose brother Peterson had just operated (**K2-D.E. 2-1 Page ID 458**).

**150.**    The Plaintiff, based upon his own knowledge of the views held by many neurosurgeons, understood that their hostility towards Kaul was partly rooted in their

**false** belief that anyone who did not participate in their training programs, could not possibly have the skills to perform minimally invasive spine surgery. This self-serving view, however, does not accurately reflect the technological advances that have occurred in the field of minimally invasive spine surgery. The most significant advance has been that of Fluoroscopic Guidance and Interpretation (FGI), which is the most critical component of minimally invasive spine surgery. On August 4, 2018, Kaul interviewed anesthesiologist, Harshu Chaobal regarding his knowledge of the political corruption and neurosurgical conspiracy involved in the revocation of his license. Based on the interview, Kaul drafted an affidavit, but Chaobal then refused to sign it, for fear of retaliation from neurosurgeons from whom he received work (**K2-D.E. 80-1 Page ID 1515**).

151.    Kaul, through multiple communications with members of the New Jersey medico-legal community came to know that the commercial success of his practice, and the publicity associated with his philanthropic work with The Spine Africa Project, contributed to the jealousy that is evidenced in the Zerbini Affidavit **(K2-D.E. 2 Page ID 143**).

152.    In 2005 the Defendant neurosurgeons used their influence within the credentialing committees of hospitals, to prevent Kaul from obtaining clinical privileges at Meadowlands Hospital.

153.    Between 2010 to 2012 multiple articles were published about the Plaintiff's minimally invasive spine surgery work and in 2011 it was reported in the Bergen Record, that NJSR Surgical Center had a zero percent (0%) post-operative infection rate.

154.    On March 3, 2011 the Kaul opened the NJSR Surgical Center, a Medicare certified, AAAHC accredited facility in Pompton Lakes, New Jersey. It is a four-thousand (4000) square foot facility, in which Kaul successfully performed interventional spinal procedures and outpatient minimally invasive fusions and discectomies.

155.    In the period from 2005 to 2012 Kaul came to know through conversations with spine device representatives, patients and physicians, that his professional and commercial success had caused immense jealousy within the medical community. Examples of this defamatory conduct included: **(i)** comments made by Defendant Heary to Kaul's patient, Frances Kuren in 2008, in which Defendant Heary told Kuren that Kaul was not qualified to perform minimally invasive spine surgery, and that she should file a complaint with Defendant NJBME and initiate a lawsuit. Kuren's fraudulent actions precipitated the proceeding that resulted in the illegal revocation of Kaul's license; **(ii)** comments made by Defendant Kaufman to Kaul's patients Corey Johnson in 2010, in which Defendant Kaufman, just before he stuck a ten-inch needle into Johnson's spine, loudly exclaimed, ***"That motherfucker Richard Kaul is trying to take over the spine business, and we are going to put stop to it.*"**; **(iii)** comments made by Defendant Kaufman to John Zerbini in 2012, in which Defendant Kaufman described how he and

another group of doctors were going to destroy Kaul's reputation and medical career, and leave him and his family with nothing (**K2-D.E. 2 Page ID 140**).

156.    From April 2013 to June 2013 there were several press releases and articles that highlighted the Defendants' misconduct (**K2-D.E. 2-2 Page ID 482**).

157.    On September 23, 2013 Johnson filed a complaint with the President of University Hospital, James Gonzalez, but received no reply (**K2-D.E. 2 Page ID 140**).

158.    Kaul's commercial success presented an economic threat to defendants Allstate and GEICO, who bribed Christie to have Kaul's license revoked. The purpose was to negate their statutory economic obligation to pay Kaul for clinical services that he had legitimately rendered to their customers.

159.    From approximately 2006 to 2012 the Plaintiff successfully treated thousands of patients who had sustained spinal injuries consequent to car accidents. Hundreds of these individuals had purchased expensive personal injury protection policies from defendants GEICO and Allstate, with the understanding that should they require medical attention for traumatic injuries, the costs would be covered. New Jersey has a no-fault system, that over the last decade has incorporated a fee arbitration system that ensures healthcare providers and facilities are compensated for the provision of clinical services. The arbitrators are lawyers, well versed in healthcare law, and render payment decisions based on the medical evidence presented.

160.    From 2006 to 2012 the Plaintiff prevailed on almost ninety-nine percent (99%) of all claims presented for arbitration. Defendants GEICO and Allstate employed their legions of lawyers to contest each and every claim and lost almost ninety-nine percent (99%) of all claims. When defendants Allstate and GEICO are unable to prevail in state sanctioned arbitration forums, they resort to filing frivolous lawsuits in corrupted federal and state courts, in the knowledge that the majority of providers are unable to match their legal resources, and the judges have been bribed.

161.    Defendants Allstate and GEICO's pattern of racketeering is that Defendant GEICO runs into federal court, while its racketeering comrade, Defendant Allstate, runs into the New Jersey Superior Court, Union County. Defendant GEICO, unable to defeat the Plaintiff in the arbitration forums, filed a one-hundred and eight-page (108), three hundred and thirty-nine paragraph complaint against the Plaintiff, his corporations, and three of his employee physicians, on April 24, 2013.

162.    The matter was dismissed without prejudice on December 8, 2014, with absolutely no evidence ever having been presented to support any of the eleven (11) causes of action.

163.    On February 15, 2015 Defendant Allstate filed an almost identical lawsuit

against the Plaintiff in the New Jersey Superior Court, Union County Court, and as with Defendant GEICO,

Defendant Allstate has not presented any evidence in support of its one hundred and eleven (111) page, three hundred and sixty-four (364) paragraph, seventeen (17) count complaint. It is simply Defendant Allstate's avenue to re-litigate claims it lost against the Plaintiff in state sanctioned arbitration forums.

164.     The accounts receivable of Kaul's practice grew three hundred percent (300%) from March 2011 to April 2012, and he performed cases on an outpatient basis, that although termed "complex" by neurosurgeons, proved to be simple, because of the surgical techniques he employed. Kaul observed, during many of the CME courses, that many neurosurgeons do not have good stereo-tactical hand-eye coordination, a prerequisite for the effective use of FGI, the most critical component of minimally invasive spine surgery. These technical deficits are a consequence of neurosurgical training, which does not expose the student to FGI, to the same degree experienced by physicians from interventional pain and radiological backgrounds.

165.     In the US the completion of a residency and board certification do not require the graduate to pass a technical skills test, but simply a written and oral examination. That would be akin to issuing a driver's license without the road test. Thus, the only way that one could compare the abilities of two surgeons, as for example with two baseball players, is to observe them in action. Kaul's videos demonstrate him in action, while no video evidence exists to support the technical abilities, or lack thereof, of any of the other physician defendants. In fact, many of Kaul's colleagues observed him operating, and submitted letters that attested to his surgical skills (**K2-D.E. 2-1 Page ID 410**). When Kaul's license was suspended in April 2012, he suggested to Defendant NJBME that he be independently observed. This common-sense suggestion was ignored.

**166.**     Kaul's reputation in the field of minimally invasive spine surgery grew steadily from 2002, and he frequently taught his technique to other physicians, who both observed him in the operating room and attended hands-on cadaver training courses. At many of these courses the attendees included neurosurgeons and orthopedic spine surgeons **(K1-D.E. 225-1 – Page ID: 5119).**

167.     Commencing in 2010 Kaul's philanthropic and professional work received extensive media coverage. A segment on Channel 12 news in August 2011 apparently caused members of the New Jersey neurosurgical community to tell Spineology representative, Robert McGann that *"it* [the Channel 12 interview] ***was the last straw"***: https://www.youtube.com/watch?v=q_HBzqfggrg


**F.     The Defendants conspired to eliminate the Plaintiff from the practice of medicine by encouraging patients to file complaints with Defendant New Jersey Board of Medical Examiners**

168.    Defendants Kaufman, Heary, Przrbylski, Cohen and Staats commenced a campaign of legal harassment in approximately 2007, when they began to file complaints against the Plaintiff with Defendant NJBME. At approximately the same time these defendants encouraged patients to file lawsuits against the Plaintiff. These defendants conspired with Defendant Hafner and local malpractice lawyers to initiate the claims, in which Defendants Kaufman and Przybylski invariably provided 'expert testimony'.

169.    Defendants Kaufman, Heary, Przybylski, Cohen and Staats used their senior positions within their professional societies and hospitals to further these schemes, which were planned and orchestrated at meetings that occurred in New Jersey, Illinois and Washington, D.C. A majority of the communications occurred via e-mail and text.

170.    Defendants Kaufman, Heary, Przybylski, Cohen and Staats discussed these schemes with other physicians and patients on the premises of Defendants HUMC and AHS, in a period that commenced in approximately 2007 and continues to this day.

G.    **The Defendants conspired to engage in media censorship and suppress the Plaintiff's First Amendment Right to Free Speech**

171.    In early April 2013, Rutgers student, Sidra Bajwa, attended the administrative proceeding in the New Jersey Office of Administrative Law on the seventh (7th) floor of 33 Washington Street, Newark, NJ.

172.    Bajwa wrote an opinion piece about her experience of the event. The article was published the following week in the print and online version of the Observer, the Rutger's student newspaper (**K2-D.E. 2-1 Page ID 419**).

173.    The story garnered significant attention from the student body and eventually came to the attention of Defendant Christie, who upon information and belief, contacted the President of Rutgers, Dr. Robert Barchi, and demanded that the online version be removed (**K2-D.E. 2-1 Page ID 421**).

174.    The student editors not only removed Bajwa's article but published a story that attacked Bajwa's objectivity and falsely reported a detail about a case from the UK that had occurred in 1999, in which Kaul had provided intravenous sedation to a patient. This act of censorship caused a number of students to protest and caused Bajwa to complain to the Dean of Rutgers (**K2-D.E. 2-1 Page 456**).

175.    In response to the false Observer article, Kaul's lawyer sent the student editors a letter that demanded a retraction (**K2-D.E. 2-1 Page ID 421**).

176.    From the commencement of the proceedings against Kaul, the Defendants conspired with Defendant NJMG and other NJ media outlets to publish stories that were slanderous, defamatory and illegally procured.

**H.    The Plaintiff's medical license was revoked because of the massive fraud detailed in, 'The Solomon Critique'.**

177.    The Defendants tampered with evidence to fit their fraudulent narrative. The irrefutable evidence of this is contained within, 'The Solomon Critique' (**K1- D.E. 225 – PageID: 4940 to 5273**), which proves that Defendants Solomon, Przybylski and Kaufman collectively committed **two hundred and seventy-eight (278) separate instances of perjury and evidential misrepresentation, omission and gross mischaracterization**. Defendant Washburn discussed the issue of evidence tampering with the Plaintiff on August 13, 2013, at the commencement of an interview that took place on the second floor of the Plaintiff's Medicare Certified, AAAHC accredited surgical center in Pompton Lakes, NJ (**K2-D.E. 2 Page ID 224**). The Plaintiff's public relations officer, Kelley Blevins, was present during this interview and two weeks earlier had discussed the issue with Defendant Washburn, during a meeting at a hotel in **Manhattan, New York.**

178.    Defendant NJBME took no internal or external investigatory action when the Plaintiff informed them in February 2014 (**K2-D.E. 2-1 Page ID 241**), that evidence had been tampered with in the proceedings in the New Jersey Office of Administrative Law. Defendant NJBME simply discounted the Plaintiff's claims, referring to them as *"insubstantial"* (**K2-D.E. 2-1 Page ID 424**). 'The Solomon Critique' has proven them to be immensely substantial and proves that Defendant NJBME provided cover to a criminal conspiracy in which they played a pivotal role.

*179.*    Physician Kenneth Zahl described to the Plaintiff in 2016, how members of the Office of the New Jersey Attorney General had engaged in the illegal shredding of critical pieces of evidence in other cases. In Zahl v Warhaftig (Docket No. 13-CV-01345), Zahl filed a motion on August 6, 2013 that sought access to the OAL servers, based on the report of an expert in digital forensics, who raised the issue of **evidence tampering**. The expert, Robert Gezelter, stated in ¶ 29 of his report, *"I can conclude, with a high degree of professional certitude, based upon my professional experience and familiarity with Microsoft Word that, assuming that ALJ Gerson correctly dated his signature on Exhibit "3" before the close of court (4:00 PM EST) on December 7, 2008, that one or more individuals made changes to Exhibit "3" which are recorded as having been made after ALJ Gerson purportedly executed the subject Initial Decision."* Zahl asserted, *"There is clear evidence of an altered administrative law court decision, a cover-up of the tampering, and missing evidence."*

180.    Zahl had his license revoked in New Jersey in approximately 2005 and filed suit against Defendant Lomazow in the United States District Court, District of New Jersey in approximately 2009. The claim was dismissed and Zahl's appeal to the Third Circuit was

denied. However, the litigation involved allegations that members of the Office of the New Jersey Attorney General had shredded critical pieces of evidence, and that Defendant Lomazow had used the power of his office to intimidate Zahl's experts into not testifying for him. This was a tactic used by Defendant NJBME to professionally isolate Kaul. The experts that testified on behalf of Kaul in the administrative law proceedings were Drs. Solomon Kamson and Kent Remley, who are based, respectively, in the States of Washington and Indiana.

181.    On or about January 22, 2014, Defendant Lomazow gave an interview, in which he discussed the events of his eight (8) year tenure at Defendant NJBME. During the interview he suggested that Dr. Kenneth Zahl was responsible for the **death/suicide** in 2006 of Deputy Attorney General, Paul Kenny, and described his interactions with Zahl. For three years Kenny's wife tried unsuccessfully to have her husband's untimely death investigated. The interview concludes with Lomazow's scathing description of the patients who had come to support Zahl:
https://www.youtube.com/watch?v=sFtE8EvEMsU

I.    **Defendants Allstate + GEICO propagated knowing falsehoods that Kaul had committed insurance fraud + Defendant TD negligently failed to perform any due diligence before acting on Defendants Allstate and GEICO's patent falsehoods + Defendants Stolz + DiOrio conspired with Defendants Allstate + GEICO to commit fraud against Kaul + Creditors of the Bankruptcy Estate.**

182.    In approximately 2008/2009 Kaul entered into loan agreements with Defendant TD, in order to procure funding for the development of the NJSR Surgical Center, in Pompton Lakes, NJ. Defendant TD demanded that Kaul assign them all of his banking and financial services, both business and personal.

183.    In May 2011 Defendant TD accelerated their loans and demanded full repayment on their business and personal loans. At this time Kaul was unaware of their conspiracy with the other Defendants.  Kaul had two meetings with legal and business representatives of Defendant TD. The first was with senior loan officer, Terry McCoy, at the Lawrenceville location in NJ, and the second was with the Defendant's lawyer, William Fiore, Esq in Newark. Both meetings were exceptionally hostile, and demands were made for immediate repayment of the loans. Kaul was current with the loans, and no good cause was given by Defendant TD. In fact, at the meeting in Newark, when Kaul explained he first had to service a federal IRS debt, Fiore retorted: *"I don't give a fuck about the IRS."* The meeting concluded shortly thereafter. Kaul intends on referring Fiore's law firm, Meyner and Landis to the Inland Revenue Service, with a recommendation to investigate whether the lawyers for Defendant TD have engaged in tax evasion.

184.    Kaul agreed to increase the monthly payments and repeatedly requested that
Defendant TD provide a structured payment plan. Defendant TD ignored Kaul's efforts
to structure an agreement.

185.    On October 26, 2012, Defendant TD filed a lawsuit in the New Jersey Superior
Court, Morris County, that sought to mandate Kaul and his corporations immediately
repay Defendant TD's loans. Kaul, upon receiving the complaint, gave it to a lawyer, and
requested it be answered. The lawyer failed to file answers, and because Kaul was
preoccupied with preparing for the administrative law proceeding, he did not follow up,
and thus the complaint went unanswered.

186.    Defendant TD obtained a default judgment, and on April 2, 2013 the Morris
County Court entered an order for the appointment of a receiver. On April 9, 2013, the
first day of the administrative law proceeding, the receiver seized all of Kaul's personal
and corporate assets and as a consequence, Kaul's attorney filed a motion to withdraw
from the administrative case. The motion was denied.

187.    At the end of May 2013 Kaul became homeless.

188.    On June 17, 2013 Kaul, on behalf of his corporations filed for Chapter 11
Bankruptcy. On July 21, 2014 the proceedings were converted to a Chapter 7
liquidation, consequent to the revocation of Kaul's license on March 12, 2014.

189.    Kaul retained Defendant DiIOrio to defend his interests in the Chapter 7. The
Court appointed Defendant Stolz as the trustee to the estate. The estate's largest asset
was its accounts receivable (AR), of approximately forty-five million dollars
($45,000,000.00). The estate also possessed a surgical center registration for NJSR
Surgical Center and a license to build a new surgical center. Kaul obtained one of the last
licenses issued by the State in 2009, before the commencement of a moratorium on
surgical center development.

190.    Defendant Stolz has collected less than 0.1% of the AR from Defendants Allstate
and GEICO, and none of the forty-four (44) plus creditors have received any monies
from Defendant Stolz. In fact, the only monies that were 'clawed back' were from
lawyers and accountants who had provided professional advice to Kaul and his
corporations. Defendant Stolz filed numerous claims against these practitioners, the
majority of whom have small businesses.

191.    Defendant DiIOrio provided fraudulent legal advice to Kaul during the Chapter 7
proceedings. The real estate that contained the NJSR Surgical Center was not part of the
Chapter 11 estate. However, on its conversion to a Chapter 7 Defendant Stolz and his
now deceased partner, Robert Wasserman, threatened to file claims against Kaul and
his ex-wife, unless he signed over the deed to the real estate. Kaul sent Wasserman a
letter, dated December 14, 2015, in which Kaul advised Wasserman of the civil and

criminal penalties that he would incur, if evidence emerged that he had aided and abetted the Defendants crimes (D.E. 2-2 Page ID 492). Kaul initially refused, but DiIOrio advised Kaul that if he did not transfer the deed, then it was likely that his ex-wife and children would become homeless. Under immense duress and fraudulent legal representation, Kaul was improperly divested of his ownership in the NJSR real estate.

192.     In late 2015 Defendant DiIOrio suggested to Kaul that he file for personal bankruptcy. Kaul did not.

193.     In mid-May 2017, upon checking the Bankruptcy Docket, Kaul discovered that Defendant DiIOrio was listed as legal counsel for Defendant GEICO. Kaul sent a letter to Defendant DiIOrio that explained his concerns and his intention to commence legal action if DiIOrio did not consent to an interview (**K2-D.E. 2-1 Page ID 404**). DiOrio did not respond to Kaul's letter.

194.     In 2017 Kaul also sent several e-mails to Defendant Stolz that requested information on how much of the accounts receivable he had collected. Defendant Stolz, who provides legal services to Defendants Allstate and GEICO, did not provide the information. Upon information and belief Defendant Stolz has collected less than 0.1% of the monies owed to Kaul by Defendants Allstate and GEICO.

**J.     Kaul is Qualified, Educated, Credentialed and Trained to perform Minimally Invasive Spine Surgery, contrary to the Defendants' false allegations. Kaul has performed eight hundred (800) cases with good to very good outcomes in 90-95% of cases.**

195.     Kaul is a minimally invasive spine surgeon, who graduated in 1988 from the Royal Free Hospital School of Medicine in London, UK. He subsequently underwent eight (8) years of post-graduate training in the US and UK, in the fields of general surgery, anesthesiology, interventional pain and minimally invasive spine surgery.

196.     In August 1996 Kaul became licensed to practice Medicine and Surgery in New Jersey.

197.     In September 1996 Kaul became Board Certified by the American Board of Anesthesiology.

198.     From 2002 to 2012 performed eight hundred (800) minimally invasive spine surgeries and a total of six thousand (6000) spine procedures, with good to very good outcomes in 90-95% of cases, and a complication rate of 0.1%: https://www.youtube.com/watch?v=9NjJV7XhBB0&t=172s

199.     From 1992 to 2001 Kaul administered approximately ten thousand (10,000) anesthetics.

**200.**    In 2005 Kaul performed the first outpatient minimally invasive lumbar fusion: https://www.youtube.com/watch?v=50R5N9bJMAg&t=202s and in 2011 Kaul performed the first outpatient corrections of an adolescent spondylolisthesis and a multi-level degenerative scoliosis https://www.youtube.com/watch?v=oxaV5IJuZ7c&t=1s

201.    From 2003 to 2012 Kaul was credentialed by at least six (6) state licensed surgical centers to perform minimally invasive spine surgery.

202.    From 2002 to 2012 Kaul attended approximately eighty (80) hands on cadaver training courses, and also educated other physicians in the minimally invasive spinal technique.

203.    Defendant Przybylski commenced performing minimally invasive spine surgery in 2005, three (3) years after Kaul.

204.    In 2004 Kaul became board certified by the American Academy of Minimally Invasive Medicine and Surgery.

205.    None of the Physician Defendants are board certified by the American Academy of Minimally Invasive Spinal Medicine and Surgery.

206.    In 2008 Kaul established the Spine Africa Project, a 501 (c) 3 US based charity whose mission is to provide free healthcare and education to impoverished communities in Africa, India and the US: https://www.youtube.com/watch?v=Zu50ik2l2Sc&t=1227s. Defendant Christie's criminal conduct caused immense harm to the charity, that resulted, in 2012, in the cessation of Kaul's philanthropic work.

207.    On June 22, 2009 an independent arbitrator entered a judgment **(NJSR a/s/o Frances Kuren v Palisades Ins.-Forum File No. NJ1232047)** against Palisades Ins. and awarded Kaul his fee for having performed a minimally invasive spinal fusion on patient FK. The arbitrator found that Kaul was properly licensed; the procedure was properly performed and was medically necessary. Significantly the arbitrator found, after a review of all of the clinical evidence, *"Dr. Kaul recommended pain management intervention followed by surgical intervention. The course of treatment performed by Dr. Kaul was consistent with the clinically supported symptoms, diagnosis and indications of the patient. Dr. Kaul's treatment plan was the most appropriate level of service that is in accordance with the standards of good practice and standard professional treatment protocols".* Kaul utilized the same treatment algorithms on all of his patients.

208.    On March 3, 2011 Kaul opened NJSR Surgical Center, a Medicare certified,

AAAHC accredited facility in Pompton Lakes, New Jersey. The Center credentialed Kaul to perform interventional spinal procedures and minimally invasive fusions and discectomies.

209.    Kaul's practice grew three hundred percent (300%) from March 2011 to April 2012, and he increasingly performed cases on an outpatient basis, that although termed "complex" by neurosurgeons, proved to be simple because of the surgical techniques employed by Kaul:
https://www.youtube.com/watch?v=oxaV5IJuZ7c&t=11s

210.    Kaul's reputation in the field of minimally invasive spine surgery grew steadily from 2002, and he frequently taught his technique to other physicians, who observed him in the operating room and attended his lectures:
https://www.youtube.com/watch?v=AObxnXGmQkk&t=303s. The following video was presented at the medical board hearing on June 13, 2012 by Defendant Hafner, as evidence, incredulously, of Kaul's alleged malfeasance. A procedure is done perfectly, the patient gets better, and the Plaintiff is criticized:
https://www.youtube.com/watch?v=guwx5kuBiEg&t=162s

**K.    Kaul has sustained a new and independent injury consequent to the defendants' "pattern of racketeering"**

211.    On May 21, 2019 the Pennsylvania Medical Board denied Kaul's application for licensure. It based its decision on the revocation of Kaul's medical license in New Jersey, on March 12, 2014. The denial constitutes a **"new racketeering injury"** that is a direct consequence of the defendants RICO violations, as detailed below. Kaul has once again been **"injured in his business or property"** and his right to sue for damages from this **"new racketeering injury"** begun to accrue on May 21, 2019. The Supreme Court in Malley-Duff, 483 U.S. 107 held that each time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to the plaintiff at the time he discovered or should have discovered the injury.

**L.    The defendants have, through a series of quid pro quo schemes, corrupted the United States District Court for the District of New Jersey, including Judge Martinotti, and have thus prohibited the court, or any of its judges, from any further involvement in any cases to which Kaul is a party.**

212.    The defendants, from the commencement of K1 have corrupted the judges within the United States District Court for the District of New Jersey. Plaintiff Kaul's repeated requests that they submit to the court record and Kaul copies of their form A0 10, were ignored. Thus, on August 19, 2019 Kaul filed a writ of mandamus in the United States Court of Appeal for the

Third Circuit, that seeks an order compelling the disclosure by the judges of their financial holdings and conflicts of interest (K1 – D.E. 393 Page ID 9406).

213.    The arguments raised in the writ are: **(i)** Kaul respectfully asserts that the refusal of the district court judges to provide their financial holdings and conflicts of interest is because they have been corrupted and are conflicted. This corruption and conflicts of interest have caused the non-adjudication of motions, have obstructed Kaul's prosecution of the case, have caused the entry of illegal orders, and a dismissal of the case; **(ii)** Kaul respectfully asserts that the law finds that a Writ of Mandamus is a legitimate legal instrument to effectuate the interests of justice, **when a district judge/s admits to having engaged in bribery/ex parte communications**, but refuses to submit his/her financial disclosures/conflicts of interest; **(iii)** Kaul respectfully asserts that certain district court judges have either failed to file forms AO10, and or submitted inaccurate information in violation of 5 U.S.C. app. § 104, thus precluding Kaul from fully ascertaining their financial holdings and conflicts of interest; **(iv)** Kaul respectfully requests that this Court emergently grant Kaul's petition for a writ of mandamus, that Kaul asserts will (1) prove the district court judges are conflicted and corrupted; (2) prove that their orders are illegal, which will; (3) mandate the illegal orders be made NULL AND VOID and that all Kaul related cases be TRANSFERRED OUT of the District of New Jersey and ; (4) mandate the entry of summary judgment against all defendants; **(v)** Kaul respectfully requests that this Court grant his petition for a writ of mandamus as it will not impinge on the district court's inherent case management authority, but will mitigate the defendants/district court's obstruction of Kaul's prosecution of the case; **(vi)** Kaul respectfully assets that his application for a writ of mandamus satisfies the "three conditions" set forth by the United States Supreme Court.

214.    Defendant Martinotti has conspired and colluded with the defendants in a series of quid pro quo schemes, in which the defendants have bribed him and or members of his family to the third-degree, in return for dismissing K1 and administratively terminating, on June 26, 2019, Kaul's twenty-two (22) motions for summary judgment. These acts of judicial corruption and malfeasance caused Kaul to file, on September 3, 2019, a writ of mandamus in the United States Supreme Court, seeking an order to mandate the district court adjudicate the motions.

215.    The malfeasance and judicial misconduct of Defendant Martinotti, was a continuation of that committed by district judge, Kevin McNulty, who became disqualified from the case on May 22, 2019 (K1-D.E. 340 Page ID 8670), subsequent to a disqualification motion filed by Kaul on May 8, 2019 (K1-D.E. 334 Page ID 8591). Defendant Martinotti, as with Judge McNulty, accepted bribes from the defendants and converted the United States District Court for the District of New Jersey into a racketeering enterprise.

216.    On April 4, 2019 Kaul filed a lawsuit against Defendant Charles E. Schumer, in which he alleged, amongst other things, a deprivation of right under color of law (19-CV-13477 D.E. 2), based on the fact that Defendant Schumer, the brother-in-law of disqualified district judge, Kevin McNulty, had engaged in a series of quid pro quo schemes with the K1 defendants, in which he abused the power of political office to collude and conspire with his brother-in-law, who abused the authority of the federal bench, to violate Kaul's constitutional right to due

process and obstruct Kaul's prosecution of K1. Defendant Martinotti, upon appointment to the case on June 6, 2019, committed the same felonies as Defendant Schumer and his brother-in-law.

217.    In a period from April 2, 2012 to the present, Kaul, as he argued vociferously in his appeal to the United States Court of Appeals for the Second Circuit (Case No. 16-1397 D.E. 41) would not receive "**substantive justice**" in any court within the geographic boundaries of the State of New Jersey. The facts have proved Kaul to be correct, and Judge Martinotti, in the knowledge that he has been corrupted by the defendants, converted his bench into a racketeering enterprise, in furtherance of the defendants' long-standing criminal conspiracy.

**M.    Defendant NJBME, in August 2019, has committed a "new racketeering injury" against Kaul, by denying his application for reinstatement of his license, based on non-payment of an illegal 'fine', that Defendant NJBME knows is a consequence of the illegal revocation of Kaul's license in 2014.**

218.    On April 25, 2019 Kaul submitted an application to Defendant NJBME for reinstatement of his medical license, a license that had been illegally revoked on March 12, 2014, as part of a massive fraud, as detailed in 'The Solomon Critique' (K1-D.E. 225) and 'The Solomon Critique 2' (K1-D.E. 299).

219.    On August 9, 2019, the executive director of Defendant NJBME, William Roeder, an individual who had been named as a defendant in K1, but was dismissed by disqualified district judge, Kevin McNulty on June 30, 2017 (K1-D.E. 200), sent Kaul a letter denying his application. In response, Kaul submitted a letter (**Exhibit 4**), in which he highlighted the ongoing "**open-ended pattern of racketeering**" by Defendant NJBME, and their continued deprivation of his right under color of law, a deprivation that commenced on April 2, 2012 and is ongoing in 2019.

220.    Defendant NJBME, in the knowledge that the evidence proves the revocation was the product of a state-orchestrated conspiracy, engineered by Defendant Christie. In the conspiracy the defendants committed the crimes of perjury, obstruction of justice, mail fraud, wire fraud, kickbacks, extortion. The defendants perpetuated these crimes, by continuing to violate Kaul's constitutional right to due process, a right, as the record proves, of which the defendants have with malice, forethought and criminal intent, deprived Kaul through their abuse of the authority of administrative, state, bankruptcy and federal courts within the geographic boundaries of the State of New Jersey.

**N.    The defendants, in May 2019, engaged in the felony of Witness Tampering by attempting to bribe Kaul's witness, John Zerbini, into not providing testimony in support of Kaul.**

221.    In approximately May 2014 Defendant Kaufman, on behalf of the defendants attempted to bribe Kaul's witness, John Zerbini, into withdrawing his affidavit and testimony in support of Kaul. Zerbini communicated to Kaul that Defendant Kaufman called him on his mobile phone,

and tnat his phone records indicate the Madison, NJ based number from which he called.'The Zerbini Certification' is identified above within the 'Evidence' subsection, and is proof of the conspiracy elements of the charges levied against the defendants. Kaul asserts that the above body of evidence would secure criminal convictions of certain defendants, including those who committed crimes under the 'cloak' of state authority.

## 10.     Statement of Fact Specific to Feldman

O.     **The Plaintiff has consistently been denied substantive justice in administrative, state and federal courts in Louisiana**

**222.**     In a period from 2010 to 2018, Plaintiff Feldman has had his constitutionally protected right to due process violated in every administrative, state and federal court within the geographic boundaries of Louisiana, by defendants LMB, Mouton, Stanley and Burdine.

**223.**     Plaintiff Feldman has been denied both procedural and substantive justice, in that Defendants Mouton, Burdine, Stanley and LMB have not followed the procedures and policies promulgated by the LMB, have violated Plaintiff Feldman's right to due process under both the state and federal constitution, and have destroyed exculpatory evidence.

P.     **Defendants Mouton, Burdine and Stanley conspired to and did conceal exculpatory evidence from Plaintiff Feldman**

**224.**     Defendants Mouton, Burdine, Stanley and LMB have withheld and or concealed from Plaintiff Feldman, exculpatory evidence that they knew would disprove their claims against him, and refused his repeated requests for discovery during the administrative board proceedings. The defendants prevented Plaintiff Feldman's patient witnesses from testifying on his behalf, the purpose being to prevent evidence being entered onto the record that proved the falsity of the defendants' claims, and proved that Plaintiff Feldman is a highly competent and well-respected physician, whose patients experienced superior clinical outcomes.

**225.**     Defendants Mouton, Burdine, Stanley and LMB with malice, knowingly and willfully misrepresented to Plaintiff Feldman, the fact that they were in possession of evidence that disproved their claims. The defendants destroyed this evidence just after Defendants LMB had suspended Plaintiff Feldman's license.

Q.     **Defendants Mouton, Burdine and Stanley denied and deprived Plaintiff Feldman the right to present evidence in support of his administrative licensing case.**

**226.**     The defendants abused the power of the unconstitutional merger of adjudicative and prosecutorial function, present within the process of physician regulation within the state of Louisiana, to quash and suppress all witness testimony in support of Plaintiff Feldman. Defendants Mouton and Stanley, because of the bribes they paid members of Defendant LMB with monies from the state-payor tax fund, and monies procured through licensing fees and physician penalties, engaged in a series of quid pro quo schemes, in which the quid was the bribe, and the quo was the violation of Plaintiff Feldman's due process rights. The purpose of the scheme was to eliminate Plaintiff Feldman from the Louisiana minimally invasive spine surgery market, and then extort his assets disguised as 'fines'.

227.    Plaintiff Feldman's expert witnesses had their testimony constantly interrupted and truncated by members of Defendants LMB, and the transcripts produced by the state did not appear to reflect the testimony provided. Plaintiff Feldman's lawyer objected to the violation of procedure, but was without exception, overruled on each objection.

**R.    Defendants Mouton, Burdine and Stanley destroyed and or had omitted exculpatory evidence, that proved Plaintiff Feldman was innocent of the charges upon which his license was suspended.**

228.    There existed evidence that proved the falsity of the charges filed against Plaintiff Feldman by Defendant LMB. This evidence consisted of the coroner's report which indicated that the patient had dies of natural causes, and that the death was not related to the procedure performed by Dr. Feldman. Defendant LMB ignored this evidence, and the administrative law judge, Bagnaris, who is not a judge but simply a lawyer, omitted this critical evidence from his report.

229.    The defendants were able to perpetrate these crimes because of the pervasive corruption within Defendant LMB and because of the unconstitutional configuration of the mechanism of physician regulation in Louisiana, that violates the due process clauses of both state and federal constitutions. There exists no separation, as required by the United States Constitution, of the functions of adjudication and prosecution, and it is this illegal configuration that has fostered the culture of corruption, illegally seized men's property, liberty and life, and is now used to violate the Eight Amendment in the dispensation of cruel and unusual punishments in the form of excessive, arbitrary and punitive financial penalties and post-suspension conditions. Plaintiff Feldman, as part of the suspension order, and as part of the conditions for his re-application was prohibited from leaving the State of Louisiana.

S   **R. Defendant Stanley, in collusion and conspiracy with defendants Mouton and Burdine bribed the administrative law judge, to order the suspension of Plaintiff Feldman's medical license.**

230.    Bribes were paid by Defendants Mouton and Burdine to Defendants Stanley and the so-called administrative law judge, Bagnaris, with monies taken from state funds procured from licensing fees and excessive penalties levied on previous physicians.

231.    Defendant Stanley, a lawyer, in full knowledge that he was violating the law, in representing Defendant LMB, within a system that he knew was illegal and unconstitutional, was motivated by greed, cognizant of the fact that he was violating the due process rights of Plaintiff Feldman, and that he knew would result in the illegal deprivation of Plaintiff Feldman's livelihood.

T   **S.    Defendant LMB denied Plaintiff Feldman the right to present evidence in support of his case, and withheld exculpatory evidence from his lawyer.**

**232.**     Defendant LMB suppressed and prevented the submission of evidence by Plaintiff Feldman, that disproved the claims of Defendant LMB. Throughout the administrative board proceedings, the defendants conspired and did commit an obstruction of justice, purposed to hinder Plaintiff Feldman's presentation of his case, in order to restrict the record for the purposes of appellate review. The defendants committed these crimes, in full knowledge of their illegality, and the criminal liability that would ensue if these offenses became exposed. Defendant Stanley, a lawyer, understood the liability that flowed from the defendants' violations of section 1983 of the Civil Rights Act of 1964.

X. V     **Defendant LMB conducted the administrative board proceeding in secrecy, and under intense security, in which the public were denied access, and from which his wife was prevented attending.**

233.     In furtherance and facilitation of the defendants' criminal scheme to deprive Plaintiff Feldman of his right to due process, the administrative board proceedings were conducted in secrecy and out of the public's view, in order to conceal their knowingly illegal violations of Plaintiff Feldman's procedural and substantive rights to a fair and impartial trail, as required under the United States Constitution.

234.     Plaintiff Feldman's wife, colleagues and patients were not permitted to be present in the administrative courtroom during the proceedings, and in fact many were not even permitted to enter the building.

Y. V     **Defendant LMB consisted of Plaintiff Feldman's market competitors, such as Burdine, who abused the power of Defendant W. LMB to eliminate the competition that Plaintiff Feldman presented in the minimally invasive spine surgery market in Louisiana.**

**235.**     Plaintiff Feldman developed one of the most successful minimally invasive spine surgery practices in Louisiana, and was internally recognized as a teacher and mentor to many surgeons from around the world. This success caused his business competitor, Defendant Burdine, to bribe politicians and Defendants Mouton and Stanley, in order to be appointed to Defendant LMB. Once appointed to Defendant LMB, Defendant Burdine abused the power of Defendant LMB to eliminate Plaintiff Feldman from the practice of medicine, in order to monopolize the relevant market.

236.     Defendants Mouton, Burdine, LMB and Stanley manufactured a case as a pre-text to remove Plaintiff Feldman's medical license, and caused the state's 'experts', all of whom were paid significant sums of money, to commit perjury about the practice of Plaintiff Feldman. A practice that had been in existence for over thirty (30) years, during which Plaintiff Feldman had successfully treated tens of thousands of patients with complicated and debilitating painful spinal conditions.

W   **Defendant LMB, in collusion and conspiracy with defendants Mouton and Burdine encouraged its experts to commit perjury against Plaintiff Feldman.**

**237.**    The state's experts committed perjury when they testified that the care Plaintiff Feldman delivered to a particular patient had grossly deviated from the standard of care and caused the patient's demise. The 'experts' knew, as per the coroner's report that the adverse outcome was a consequence of a pre-existing cardiac abnormality, which was the direct cause of the outcome. The purpose of the perjury was to bolster a case that the defendants knew was false, and purposed to eliminate the competition presented by the successful practice of Plaintiff Feldman.

**238.**    Defendants Mouton and Burdine met on several occasions with their 'expert' before the administrative proceeding, during which they conspired with, and instructed their 'expert' on the false testimony to be provided. These meetings were conducted in state buildings, and across the US wires, and consisted of the communication of knowingly fraudulent information, purposed to further the scheme to illegally suspend Plaintiff Feldman's medical license in Louisiana. The defendants knew and intended to prevent Plaintiff Feldman from continuing his work in states in which he possessed licenses, in order to deplete his financial resources, so that he became unable to fund his legal fight against Defendant LMB.

W.X   **Defendants LMB, Burdine, Mouton and Stanley disseminated knowingly fraudulent information to Defendant Federation of State Medical Boards and all state medical boards, using the US mail and wires, regarding the illegal suspension of Plaintiff Feldman's license.**

239.    Defendants Mouton, Stanley, Burdine and LMB with malice and in the knowledge that the suspension of Plaintiff Feldman's license was illegal, used the US mail and wires to transmit a knowingly fraudulent instrument i.e. the order of suspension, to every state and federal healthcare agency in the United States and beyond, in order to destroy Plaintiff Feldman's reputation, his thirty (30) year medical career, and his ability to support himself and his family. The defendants conspired and did commit mail and wire fraud, in furtherance of their scheme of racketeering, in which they converted defendants LMB, the Federation, and every other state medical board in the United States into racketeering enterprises, through which they furthered their scheme, part of which was to impose and attempt to extort $500,000 from Plaintiff Feldman, as a condition of his application for reinstatement of his illegally suspended license.

240.    The defendants colluded and conspired to disseminate this knowingly fraudulent information, cognizant of the criminal liability that they would incur, but continued in the perpetration of the scheme, believing that because they had successfully committed such crimes in the past, and not been indicted or otherwise held accountable, that there would be no legal consequences or repercussions. The defendants were also of the mind, albeit mistakenly, that as agencies of the state, their actions would be protected pursuant to sovereign immunity.

**Y.** **Defendants LMB, Mouton, Burdine and Stanley used the mail and wires to disseminate to every state and federal healthcare agency, including Defendant California Medical Board, in furtherance of their scheme to destroy Plaintiff Feldman's reputation and livelihood, knowingly fraudulent information regarding the illegal suspension of Plaintiff Feldman's medical license.**

**241.**    Defendants Mouton, Burdine, Stanley and LMB co-opted Defendant CMB into their illegal scheme, although Defendant CMB willingly and without any regard to the due process rights of Plaintiff Feldman, entered into the ever expanding criminal enterprise. Defendant CMB conducted a cursory hearing, in which none of the legal safeguards required under both the state and federal constitutions, were provided. Defendant CMB based its decision simply on the illegal order issued by Defendant LMB, without ensuring that Plaintiff Feldman's constitutional right to a fair and impartial tribunal, had been afforded him by Defendant LMB.

242.    Defendant CMB, although not a signatory to the illegal interstate agreement orchestrated by Defendant Federation, conducts its business with other state medical boards, to the effect that it is in actuality, a participant in this agreement, that is violative of the Commerce Clause of the United States Constitution.

**Z** **Defendants Federation, LMB, CMB, Burdine, Stanley and Mouton conspired and committed to conspire to destroy Plaintiff Feldman's medical career, because of the economic threat he posed to Defendant Burdine.**

243.    Commencing in approximately 1999, Plaintiff Feldman began developing what would become one of the most successful minimally invasive spine surgery practices in Louisiana. In approximately 2004 he opened his own surgical center, and continued to share his expertise with other physicians. Defendant Burdine perceived the success of Plaintiff Feldman as a threat to his growing business, and because of his inferior credentials, believed the only way to compete with Plaintiff Feldman, was to bribe the governor of the state, Bobby Jindal, an individual who appointed physicians to Defendant LMB. Having secured a place on Defendant LMB, Defendant Burdine, used the authority of the position to begin sabotaging Plaintiff Feldman's minimally invasive spine surgery practice. He, in collusion and conspiracy with defendants Mouton and Stanley, commenced a campaign of legal harassment, that resulted in the illegal suspension of Plaintiff Feldman's license in 2016.

244.    The defendants' conspiracy  was conducted through face-to-face meetings, over the US mail and wires, and at meetings conducted with public relations individual, Alton Ashey, who attended the quarterly meetings of the Louisiana chapter of K1/K2 defendant American Society of Interventional Pain Physicians (ASIPP). At these meetings Ashey colluded and conspired with Defendant Burdine, in a quid pro quo scheme that involved Ashey receiving monies from K1.K2 defendant ASIPP, in return for having Jindal appoint Defendant Burdine to Defendant LMB. A corrupt intersection of medicine + law + politics + business.

**AA.** **Defendant Stanley bribed Louisiana Appellate Court Judge, Roland Belsom, in approximately October 2018, in order to influence the outcome of Plaintiff Feldman's appeal to the Fourth Circuit Court of Appeals.**

244.     Subsequent to the illegal suspension of Plaintiff Feldman's license in 2016, he appealed the matter to the Louisiana Fourth Circuit Court of Appeals. The matter was adjudicated in September 2018, but no transcript or audio recording was produced or made available to Plaintiff Feldman, and in fact when Plaintiff Feldman attempted to obtain a copy he was informed by the court that no recording existed. Plaintiff Feldman lost the appeal, despite the legal precedent of  Haygood v. Dental Board of Louisiana (No. 2011-CA-1327), in which the court found that the configuration of the dental board was unconstitutional. Despite this case and despite the fact that the exact same issue existed in the medical board, the appellate court found against Plaintiff Feldman, because it had been corrupted by Defendant Stanley.

**BB.** **Defendants MMB, LMB, Burdine, Stanley and Mouton conspired and colluded to prevent Plaintiff Feldman from presenting evidence in support of his defense to maintain his license in the State of Mississippi: Page 61.**

\

# 11.   Claims for Relief

**COUNT ONE**
**VIOLATIONS OF 18 U.S.C. § 1962(c)-(d)**
**THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ**
**(By Plaintiff Feldman against Defendants Federation + LMB + CMB + MMB + Mouton + Stanley**
**+ Burdine)**
**The FMB Association-In-Fact-Enterprise**

246.   Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein

247.   Plaintiff brings this Count against Defendants Federation + CMB + AMB + Mouton + Stanley (inclusively, for the purpose of this count, the "FMB RICO Defendants"). At all relevant times each of the FMB RICO Defendants has been a "**person**" under 18 U.S.C. § 1961(3), because each is capable of holding, and does hold, "**a legal or beneficial interest in property.**" Section 1962(c) makes it "**unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.**" See 18 U.S.C. § 1962(c).

248.   Section 1962(d) makes it unlawful for "**any person to conspire to violate**" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

249.   As explained in detail below, the FMB RICO Defendants sought, amongst other things, to eliminate Plaintiff Feldman from the practice of medicine, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing.

250.   The FMB RICO Defendants pursued these ends through a fraudulent scheme, the purpose of which was to enhance their economic and political power, through the commission of the multiple predicate acts mail fraud + wire fraud + obstruction of justice + bribery + kickbacks + perjury, over a period of at least six (6) years.

251.   The FMB RICO Defendants scheme constitutes a "**pattern of racketeering**" as defined within 1962(c), with the requisite elements of longevity + purpose + relationship, and with the necessary element of relationship to the F1 Association-In-Fact Enterprise. As detailed below this scheme and its furtherance of the F1 Association-In-Fact Enterprise, violated sub-sections (c) + (d) of section 1962 of RICO.

**AA.**   **Description of the FMB RICO Association-In-Fact Enterprise**

252.    RICO defines an enterprise as "**any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.**" 18 U.S.C. § 1961 (4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationship among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

253.    Since at least 1986, Defendant Federation has maintained professional relationships with Defendants LMB + CMB + MMB, the nature of which has been the dissemination and sharing of information pertaining to physician regulation. These relationships are codified within the illegal **interstate agreement**, to which twenty-seven (27) states are signatories, and the remainder, although not having physically signed, have acted in privity, and thus under the law, have submitted themselves to the liability incurred from its violation of the Commerce Clause.

254.    Since the introduction in 1986 of the Healthcare Quality Improvement Act, the business of 'physician regulation' in the United State has become a multi-billion-dollar industry, from which the FMB RICO Defendants have commercially profited, at the expense of, and under guise of, professing to want to "**protect the public**". The FMB RICO Defendants have 'hijacked' the HQIA and the authority of unregulated state medical boards, and have perverted the intent of Congress, through the commission of 'sham peer review' and "patterns of racketeering", for political and economic gain, at the expense of, and with no concern as to public safety.

255.    Subsequent to the enactment of the HQIA, the FMB RICO Defendants, have developed dense and highly secretive communication networks, not available to the public, in which they are alleged to have transmitted information regarding their schemes to illegally profit at the expense of the physician community.

256.    Many of these communications were centered on the conspiratorial acts of the FMB RICO Defendants to sabotage Plaintiff Feldman's efforts to continue practicing medicine in the United States.

257.    Defendants LMB + Mouton + Burdine + Stanley, after having illegally suspended Plaintiff Feldman's medical license, and in the knowledge that their scheme to suspend his license was polluted with bribery + obstruction of justice + perjury + fraud, transmitted the product of their crime, i.e. the suspension, across the US wires and mail, to, amongst others, Defendants CMB + MMB + Federation.

258.    The FMB RICO Defendants "pattern of racketeering" was conducted through the FMB RICO Association-In-Fact Enterprise, the purpose of which was to profit from their controlling positions within the enterprise and through their conduction and participation in the affairs of the FMB RICO Association-In-Fact Enterprise.

259.    The FMB RICO Defendants used their controlling positions within the FMB RICO Enterprise to facilitate the furtherance of their "pattern of racketeering" through the FMB RICO Association-In-Fact Enterprise, in order to exclude Plaintiff Feldman from the practice of medicine in the United States, and to increase their economic and political power. The FMB RICO Defendants propagated these illegal schemes under the 'cloak of authority', in the knowledge that they did not **protect the public**", and in fact caused immense harm to thousands of Plaintiff, Dr. Feldman's patients.

260.    At all relevant times, the FMB RICO Defendants operated an ongoing association-in-fact enterprise, which was formed for the purpose of ensuring the illegal elimination of Plaintiff Feldman from the minimally invasive spine surgery market in the United States and the subsequent monopolization of the market by the neurosurgeons. Most of these meetings occurred behind closed doors in California + Louisiana + Mississippi + Washington, D.C. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4).

261.    Alternatively, each of the FMB RICO Defendants constitutes a single legal entity "**enterprise**" within the meaning of 18 U.S.C. § 1961(4), through which the FMB RICO Defendants conducted their pattern of racketeering activity. The FMB RICO Defendants separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the FMB RICO Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "FMB RICO Association-In-Fact- Enterprise".

262.    At all relevant times, the FMB RICO Association-In-Fact Enterprise constituted a single "**enterprise**" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated- in-fact for the common purpose of engaging in the FMB RICO Defendants profit making scheme, and the fraudulent scheme to eliminate Plaintiff, Dr. Feldman, from the practice of minimally invasive spine surgery.

263.    The FMB RICO Association-In-Fact Enterprise consists of the following entities and individuals: **(a)** Defendants Burdine; **(b)** Defendants Mouton; **(c)** Stanley; **(d)** Defendants LMB + CMB + MMB; **(d)** Defendant Federation.

264.    While each of the FMB RICO Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the FMB RICO Association-In-Fact Enterprise's affairs, at all relevant times, the FMB RICO Association-In-Fact Enterprise: **(a)** had an existence separate and distinct from each FMB RICO Defendant; **(b)** was separate and distinct from the pattern of racketeering in which the FMB RICO Defendants engaged; and **(c)** was an ongoing and continuing organization consisting of legal entities, including the FMB RICO Defendants, along with other individuals and entities, including unknown third parties.

265.    The FMB RICO Association-In-Fact Defendants and their co-conspirators, through their illegal FMB RICO Association-In-Fact Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the FMB RICO Association-In-Fact Enterprise's activities by illegally conspiring to have the Plaintiff, Dr. Feldman's license revoked, monopolizing the minimally invasive spine surgery market, artificially elevating their prices, and illegally reducing competition.

266.    Defendants Mouton + Burdine + LMB orchestrated the FMB RICO Association-In-Fact Scheme, whereby they leveraged their dominant political positions to have the Plaintiff's medical license revoked. The purpose of the Scheme which was to eliminate competition and facilitate Defendant Burdine's monopolization of the minimally invasive spine surgery market, from which Defendant Burdine profited through increased referrals from local neurosurgeons, and their professional associates at The Neuro Medical Center, in Baton Rouge, Louisiana.

267.    The FMB RICO Association-In-Fact Enterprise was provided with the use of state agencies (Defendants LMB + CMB + MMB) personnel (Defendants Mouton + Stanley) and resources (State Treasury) which they illegally used to revoke the Plaintiff Feldman's license. These services were provided in order to eliminate Plaintiff Feldman from the practice of minimally invasive spine surgery in the United States, in furtherance of the scheme, that was spear-headed by Defendant Burdine in collusion and conspiracy with neurosurgeons at the Neuro Medical Center.

### COUNT TWO
### VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
### THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ.
### (By Plaintiff against Defendants Christie + Kaufman + Przybylski + Heary + Staats + Lomazow + Hafner + Cohen + CNS + ASIPP)
### The CHC RICO Association-In -Fact-Enterprise

268.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

269.    Plaintiff brings this Count against Defendants Christie + Kaufman + Przybylski + Heary + Staats + Lomazow + Hafner + Cohen + CNS (inclusively, for the purpose of this count, the "CHC RICO Defendants'). At all relevant times each of the CHC RICO Defendants has been a "person" under 18 U.S.C. § 1961(3), because each is capable of holding, and does hold, "**a legal or beneficial interest in property**." Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." See 18 U.S.C. § 1962(c).

270.    Section 1962(d) makes it unlawful for "**any person to conspire to violate**" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

271.    As explained in detail below, the CHC RICO Defendants sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing.

272.    The CHC RICO Defendants pursued these ends through a fraudulent scheme designed to secure increased revenues and market share, increase their political power within the medical community and secure their commercial relationships with each other. As explained in detail below, the CAC RICO Defendants years-long misconduct violated sections 1962(c) and (d).

## BB. CC.  Description of the CHC RICO Enterprise

273.    RICO defines an enterprise as "**any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity**." 18 U.S.C. § 1961 (4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationship among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

274.    For years ASIPP played a small but meaningful role in the emerging field of minimally invasive spine surgery. It entered into verbal agreements with the neurosurgical members of Defendant CNS, from whom its members were referred patients. The horizontal agreement required that members of Defendant ASIPP would artificially limit their members scope of practice to percutaneous discectomies.

275.    In the past decade, however, Defendant ASIPP began to exert influence in their role as the arbiters of who was qualified to perform minimally invasive spine surgery, to influence the success or failure of high-profile interventional pain physicians who did not contribute financially to ASIPP, but who had expanded their scope of practice. Defendant ASIPP, because of its horizontal agreements with Defendant CNS and other spine societies, sought to control who entered the interventional pain and minimally invasive spine surgery sector.

276.    Negotiations between the CHC RICO Defendants regarding the division of the spine market, took place in complex, closed-door meetings, during which the parties discussed the threat of the Plaintiff's expanding outpatient minimally invasive spine surgery practice. In order to ensure that their members continued to receive referrals from the neurosurgeons who had become concerned that the Plaintiff's practice would expand nationally. The Defendants ASIPP agreed to participate in a scheme to have the Plaintiff's medical license revoked and stop him from performing minimally invasive

spine surgery. The Defendant Neurosurgeons had become aware that the Plaintiff was training other minimally invasive spine surgeons, and that his work was being widely publicized.

277.    At all relevant times, the CHC RICO Defendants operated an ongoing association-in-fact enterprise, which was formed for the purpose of ensuring that that the horizontal agreements and market share distributions of the other CHC RICO Defendants continued to grow, by fraudulently excluding the Plaintiff, monopolizing the market and then artificially increasing their prices. Most of these meetings occurred behind closed doors in Morris County, NJ and Washington, D.C. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4).

278.    Alternatively, each of the CHC RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the CHC RICO Defendants conducted their pattern of racketeering activity. The CHC RICO Defendants separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the CHC RICO Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CHC RICO Association-In-Fact- Enterprise".

279.    At all relevant times, the CHC RICO Association-In-Fact Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated- in-fact for the common purpose of engaging in the CHC RICO Defendants profit making scheme, and the fraudulent scheme to provide 'experts' to ensure the revocation of the Plaintiff's license.

280.    The CHC RICO Association-In-Fact Enterprise consisted of the following entities and individuals: **(a)** Defendants ASIPP, Kaufman and Staats; **(b)** Defendants CNS, Heary and Przybylski; **(c)** Defendants Christie, Lomazow and Hafner; **(d)** Defendant Cohen.

281.    While each of the CHC RICO Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CHC RICO Association-In-Fact Enterprise's affairs, at all relevant times, the CHC RICO Association-In-Fact Enterprise: **(a)** had an existence separate and distinct from each CHC RICO Defendant; **(b)** was separate and distinct from the pattern of racketeering in which the CHC RICO Defendants engaged; and **(c)** was an ongoing and continuing organization consisting of legal entities, including the CHC RICO Defendants, along with other individuals and entities, including unknown third parties.

282.    The CHC RICO Association-In-Fact Defendants and their co-conspirators, through their illegal CHC RICO Association-In-Fact Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CHC RICO Association-In-Fact Enterprise's activities by illegally conspiring to have the

66

Plaintiff's license revoked, protecting their illegal horizontal 'fusion-percutaneous' agreements, monopolizing the markets, artificially elevating their prices, and illegally reducing competition.

283.    Defendants Staats, Kaufman, Przybylski, Heary and Cohen orchestrated the CHC RICO Association-In-Fact Scheme, whereby they leveraged their dominant political positions to have the Plaintiff's medical license revoked. The purpose of the Scheme which was to eliminate competition and facilitate the Defendant Neurosurgeons monopolization of the minimally invasive spine surgery market, from which Defendants Kaufman and Staats profited through increased referrals from the Defendant Neurosurgeons.

284.    The CHC RICO Association-In-Fact Enterprise was provided with the use of state agencies (Defendant NJBME) personnel (Defendant Hafner + Defendant Solomon) and resources (State Treasury) which they illegally used to revoke the Plaintiff's license. These services were provided in return for bribes and 'campaign donations' paid by the CHC RICO Association-In-Fact Defendants to Defendant Christie.

285.    In furtherance of the scheme, Defendants Kaufman, Staats, Heary, Przybylski and Cohen each affirmatively misrepresented or concealed from their members, the existence of bribes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. These Defendants understood that if the general members became aware of the scheme, they would have passed a vote against it, realizing the liability it would incur. Specifically, these Defendants claimed that the monies paid to Defendant Christie, were intended to assist them in their efforts to counter pending fee reductions from Defendant Allstate and GEICO, when, in fact, they were quid pro quo payments to Defendant Christie to have the Plaintiff's license revoked. The majority of ASIPP and CNS members were not direct commercial competitors of the Plaintiff, as was the case with Defendants Kaufman, Staats, Heary, Przybylski and Cohen, all of whom competed for patients from the same pool. i.e. New Jersey.

 **M. The CHC RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues.**

286.    Each CHC RICO Association-In-Fact Defendant benefited financially from the CHC RICO Association-In-Fact Enterprise, as they took on the treatment of patients that had been under the care of the Plaintiff. In addition, Defendants Kaufman and Staats, for their cooperation with the scheme, received more referrals from Defendants Heary, Przybylski and Cohen. The increased patient flow led to increased revenues, and the perception within the medical community of their increased professional standing, which in turn caused an increase in referrals from community physicians.

287.    In exchange for the bribes paid to Defendant Christie by Defendants Staats and ASIPP, one of Staats's partners was appointed to Defendant NJBME, a position he used to block the Plaintiff's application in 2014 for license reinstatement.

288.    At all relevant times, the CHC RICO Association-In-Fact Enterprise: **(a)** had an existence separate and distinct from each CHC RICO Association-In-Fact Defendants; **(b)** was separate and distinct from the pattern of racketeering in which the CHC RICO Association-In-Fact Defendants engaged; and **(c)** was an ongoing and continuing organization consisting of legal entities, including the CHC RICO Association-In-Fact Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise, which was formed for the purpose of bribing Governor Christie, in order to have the medical board revoke the Plaintiff's license. The revocation led to an increase in revenue to the CHC RICO Association-In-Fact Defendants, but not necessarily to the general members of Defendants ASIPP and CNS.

289.    The CHC RICO Association-In-Fact Defendants, as well as Defendant Staats's partner, Scott Metzger, MD, all consult for the insurance industry, and regularly provide opinions that deny payment to other physicians, for services for which they themselves are reimbursed.

290.    The CHC RICO Association-In-Fact Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries. These activities included the marketing, promotion, advertisement and delivery of minimally invasive spine surgery throughout the country, and the receipt of monies from the provision of such services.

291.    Within the CHC RICO Association-In-Fact Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The CHC RICO Association-In-Fact Enterprise used this network for the purpose of promoting the revocation of the Plaintiff's license, in order to intimidate other minimally invasive spine surgeons into not performing minimally invasive spinal fusions. The network was also used to attack the Plaintiff's character and disseminate false allegations that he had engaged in insurance fraud. The falsity of these latter claims was proved when Defendant GEICO's lawsuit filed in the United States District Court, District of New Jersey on April 27, 2013, was dismissed with prejudice on December 8, 2014.

292.    Each participant in the CHC RICO Association-In-Fact Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CHC RICO Association-In-Fact Enterprise, the CHC RICO Association-In-Fact Defendants functioned as a continuing unit with the purpose of furthering the CHC RICO Association-In-Fact Scheme. The CHC RICO Association-In-Fact Defendants participated in the operation and management of the CHC RICO Association-In-Fact Enterprise by directing its affairs, as described herein.

68

While the CHC RICO Association-In-Fact Defendants participated in, and are members of the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

293.    The CHC RICO Association-In-Fact Defendants exerted substantial control over the CHC RICO Association-In-Fact Enterprise, and participated in the affairs of the enterprise by: **(a)** deciding how monies were dispersed from the political action committees; **(b)** communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Defendant Christie, and members of both state and federal governments; **(c)** developing policies and guidelines for clinical care, that were consistent with the horizontal agreements and market share plans; **(d)** procuring appointments to regulatory boards and insurance panels, which they used to further their personal economic agendas; **(e)** procuring positions on hospital credentialing committees, which they used to exclude competition from the hospital; **(f)** procuring positions on medical expert panels, which they used to testify against their competition in medical malpractice suits; **(g)** misrepresenting and/or concealing from the general members the true nature of the relationship and agreements between the members of the enterprise and the scheme in their conspiracy to have the Plaintiff's license revoked ; **(h)** otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; **(i)** ensuring that the other CAC RICO Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

294.    Without each CHC RICO Association-In-Fact Defendants willing participation, the CHC RICO Association-In-Fact Scheme and common course of conduct would not have been successful. The CHC RICO Association-In-Fact Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

### N. LG.  Predicate Acts: Mail Fraud + Wire Fraud + Bribery + Obstruction of Justice

295.    To carry out, or attempt to carry out, the scheme to defraud, the CHC RICO Association-In-Fact Defendants, each of whom is a person associated-in-fact with the CHC RICO Association-In-Fact Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CHC RICO Association-In-Fact Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

296.    Specifically, the CHC RICO Association-In-Fact Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two

predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

297.    The multiple acts of racketeering activity which the CHC RICO Association-In-Fact Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CHC RICO Association-In-Fact Defendants' regular use of the facilities, services, distribution channels, and employees of the CHC RICO Association-In-Fact Enterprise. The CHC RICO Association-In-Fact Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

298.    The CHC RICO Association-In-Fact Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

299.    In devising and executing the illegal scheme, the CHC RICO Association-In-Fact Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public and the Plaintiff's patients, that the Plaintiff was not qualified to perform minimally invasive spine surgery, a materially false representation. For the purpose of executing the illegal scheme, the CHC RICO Association-In-Fact Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

**From paragraph 217 to 264 Kaul has pled with particularity, fact specific to each element, of each claim, against each defendant, in a separate and distinct manner:**

300.    <u>**Defendant Christie + Defendant Heary**</u>:
<u>Date range</u>: 2008 to 2019
<u>Conduits of Communication + Bribery to Christie</u>: Public relations firms Mercury Public Relations + Princeton Public Relations.
<u>Mode of Communication</u>: Face to face.
<u>Substance of communication</u>: Schemes to revoke Kaul's license + destroy Kaul's reputation + destroy Kaul's economic standing + cause Kaul to be ostracized + cause Kaul to leave the United States.
<u>Tactics employed</u>: Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mails and wires to transmit written, telephone, or

electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers

301.    **Defendant Christie + Defendant Lomazow:**
<u>Date range</u>: 2008 to 2019.
<u>Conduits of Communication + Bribery to Christie</u>: Public relations firm (Mercury Public Relations + Princeton Public Relations + Law Firm (Brach Eichler + Wolf Samson).
<u>Mode of Communication</u>: Face to face.
<u>Substance of communication</u>: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.
<u>Tactics employed</u>: Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers.

302.    **Defendant Christie + Defendant Hafner:**
<u>Date range:</u> 2008 to 2019.
<u>Conduits of communication + Bribery to Christie</u>: Through state government intermediaries.
<u>Mode of communication</u>: Face to face.
<u>Substance of communication</u>: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.
<u>Tactics employed</u>: Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license.

Location: Governor's office in Trenton + Christie/Republican political fund raisers.

303.    **Defendant Christie + Defendant Cohen**:
Date range: 2008 to 2019.
Conduits of communication + Bribery to Christie: Public relations firm (Mercury Public Relations + Princeton Public Relations + Law Firm (Brach Eichler + Wolf Samson).
Mode of communication: Face to face.
Substance of communication: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.
Tactics employed: Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license.
Location: Governor's office in Trenton + Christie/Republican political fund raisers.

304.    **Defendant Kaufman + Defendant Christie:**
Date range: 2009 to 2019.
Conduits of communication + Bribery to Christie: Public relations firm (Mercury Public Relations + Princeton Public Relations + Law Firm (Brach Eichler + Wolf Samson) + Through state government intermediary + Political campaign fundraisers + Political campaign donations campaign donations.
Mode of communication: Face to face.
Substance of communication: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.
Tactics employed: Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license.
Location: Governor's office in Trenton + Christie/Republican political fund raisers.

305.    **Defendant Kaufman + Defendant Przybylski**:

Date range: 2008 to 2019.

Mode of communication: E-mail + Voice message + SMS (text) + Face to face.

Substance of communications: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.

Tactics employed: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mail and wires to transmit letters, e-mails and other materials negotiating the horizontal agreements and market share distributions + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CHC RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license  + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license.

Location: Morristown Memorial Medical Center + Surgicare Associates Surgical Center + Christie/Republican political fund raisers.

306.    **Defendant Kaufman + Defendant Heary**:

Date range: 2008 to 2019.

Mode of communication: E-mail + Voice message + SMS (text) + Face to face.

Substance of communications: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.

<u>Tactics employed</u>: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mail and wires to transmit letters, e-mails and other materials negotiating the horizontal agreements and market share distributions + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CHC RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license.
<u>Location</u>: Morristown Memorial Medical Center + Hackensack Medical Center + Surgicare Associates Surgical Center + Christie/Republican political fund raisers.

307.  **Defendant Kaufman + Defendant Staats**:
<u>Date range</u>: 2008 to 2019.
<u>Mode of communication</u>: E-mail + Voice message + SMS (text) + Face to face.
<u>Substance of communications</u>: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.
<u>Tactics employed</u>: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the

US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mail and wires to transmit letters, e-mails and other materials negotiating the horizontal agreements and market share distributions + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CHC RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license.
Location: Morristown Memorial Medical Center + Hackensack Medical Center + Surgicare Associates Surgical Center + Christie/Republican political fund raisers.

308.    **Defendant Kaufman + Defendant Lomazow**:
Date range: 2008 to 2019.
Mode of communication: E-mail + Voice message + SMS (text) + Face to face.
Substance of communications: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.
Tactics employed: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave

the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mail and wires to transmit letters, e-mails and other materials negotiating the horizontal agreements and market share distributions + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CHC RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license  + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license.
<u>Location</u>: Morristown Memorial Medical Center + Hackensack Medical Center + Surgicare Associates Surgical Center + Christie/Republican political fund raisers.

309.  **<u>Defendant Kaufman + Defendant Hafner</u>:**
<u>Date range</u>: 2008 to 2019.
<u>Mode of communication</u>: E-mail + Voice message + SMS (text) + Face to face.
<u>Substance of communications</u>: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.
<u>Tactics employed</u>: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mail and wires to transmit letters, e-mails and other materials negotiating the horizontal agreements and market share distributions + Use of the US

mails and wires to transmit letters, emails and other materials indicating that the CHC RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license.
Location: Morristown Memorial Medical Center + Hackensack Medical Center + Surgicare Associates Surgical Center + Christie/Republican political fund raisers.

310.    **Defendant Kaufman + Defendant Cohen:**
Date range: 2008 to 2019.
Mode of communication: E-mail + Voice message + SMS (text) + Face to face.
Substance of communications: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.
Tactics employed: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mail and wires to transmit letters, e-mails and other materials negotiating the horizontal agreements and market share distributions + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CHC RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants

and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license.
<u>Location</u>: Morristown Memorial Medical Center + Ridgedale Surgical Center + Surgicare Associates Surgical Center + Christie/Republican political fund raisers.

311.    **Defendant Kaufman + Defendant ASIPP**:
<u>Date range</u>: 2008 to 2019.
<u>Mode of communication</u>: E-mail + Voice message + SMS (text) + Face to face.
<u>Substance of communications</u>: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.
<u>Tactics employed</u>: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mail and wires to transmit letters, e-mails and other materials negotiating the horizontal agreements and market share distributions + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CHC RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license.
<u>Location</u>: Morristown Memorial Medical Center + Christie/Republican political fund raisers.

312.    **Defendant Przybylski + Defendant Christie**:
See above. As with Defendant Kaufman + Defendant Christie.

313.    **Defendant Przybylski + Defendant Kaufman**:
See above. As with Defendant Kaufman + Defendant Przybylski.

314.    **Defendant Przybylski + Defendant Heary**:
See above. As with Defendant Kaufman + Defendant Heary.

315.    **Defendant Przybylski + Defendant Staats**:
See above. As with Defendant Kaufman + Defendant Staats.

316.    **Defendant Przybylski + Defendant Lomazow**:
See above. As with Defendant Kaufman + Defendant Lomazow.

317.    **Defendant Przybylski + Defendant Hafner**:
See above. As with Defendant Kaufman + Defendant Hafner.

318.    **Defendant Przybylski + Defendant Cohen**:
See above. As with Defendant Kaufman + Defendant Cohen.

319.    **Defendant Przybylski + Defendant CNS**:
See above. As with Defendant Kaufman + Defendant ASIPP.

320.    **Defendant Heary + Defendant Christie**:
See above. As with Defendant Kaufman + Defendant Christie.

321.    **Defendant Heary + Defendant Lomazow**:
See above. As with Defendant Kaufman + Defendant Lomazow.

322.    **Defendant Heary + Defendant Hafner**:
See above. As with Defendant Kaufman + Defendant Hafner.

323.    **Defendant Heary + Defendant Cohen**:
See above. As with Defendant Kaufman + Cohen.

324.    **Defendant Heary + Defendant CNS**:
See above. As with Defendant Kaufman + Defendant ASIPP.

325.    **Defendant Staats + Defendant Christie**:
See above. As with Defendant Kaufman + Defendant Christie.

326.    **Defendant Staats + Defendant Lomazow**:

See above. As with Defendant Kaufman + Defendant Lomazow.

327.    **Defendant Staats + Defendant ASIPP**:
Date range: 2009 to 2019.
See above. As with Defendant Kaufman + Defendant ASIPP.

328.    **Defendant Lomazow + Defendant Christie**:
See above. As with Defendant Kaufman + Defendant Christie.

329.    **Defendant Lomazow + Defendant Hafner**:
See above. As with Defendant Kaufman + Defendant Hafner.

330.    **Defendant Hafner + Defendant Christie**:
See above. As with Defendant Kaufman + Defendant Christie.

331.    **Defendant Hafner + Defendant Kaufman**:
See above. As with Defendant Kaufman + Defendant Hafner.

332.    **Defendant Hafner + Defendant Przybylski**:
See above. As with Defendant Kaufman + Defendant Przybylski.

333.    **Defendant Hafner + Defendant Heary**:
See above. As with Defendant Kaufman + Defendant Heary.

334.    **Defendant Hafner + Defendant Lomazow**:
See above. As with Defendant Kaufman + Defendant Lomazow.

335.    **Defendant Hafner + Defendant CNS**:
See above. As with Defendant Kaufman + Defendant ASIPP.

336.    **Defendant Hafner + Defendant ASIPP**:
See above. As with Defendant Kaufman + Defendant ASIPP.

337.    **Defendant Cohen + Defendant Christie**:
See above. As with Defendant Kaufman + Defendant Christie.

338.    **Defendant Cohen + Defendant Kaufman**:
See above. As with Defendant Kaufman + Defendant Cohen.

339.    **Defendant Cohen + Defendant Przybylski**:
See above. As with Defendant Kaufman + Defendant Przybylski

340.    **Defendant Cohen + Defendant Heary**:
See above. As with Defendant Kaufman + Defendant Heary.

341.   **Defendant Cohen + Defendant Staats:**
See above. As with Defendant Kaufman + Defendant Staats.

342.   **Defendant Cohen + Defendant Lomazow:**
See above. As with Defendant Kaufman + Defendant Lomazow.

343.   **Defendant CNS + Defendant Przybylski**:
See above. As with Defendant Przybylski + Defendant CNS.

344.   **Defendant CNS + Defendant Hafner**:
See above. As with Defendant Hafner + Defendant ASIPP.

345.   **Defendant ASIPP + Defendant Kaufman**:
See above. As with Defendant Kaufman + Defendant ASIPP.

346.   **Defendant ASIPP + Defendant Staats**:
See above. As with Defendant Staats + Defendant ASIPP.

347.   **Defendant ASIPP + Defendant Hafner**:
See above. As with Defendant Hafner + Defendant ASIPP.

**322.** The CHC RICO Association-In-Fact Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:
**(a)** Mail Fraud: The CHC RICO Association-In-Fact Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to revoke the Plaintiff's medical license by means of misrepresentations and omissions.
**(b)** Wire Fraud: The CHC RICO Association-In-Fact Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

348.   The CHC RICO Association-In-Fact Defendants' use of the mails and wires include, but are not limited to: **(a)** the transmission of letters, e-mails and other materials negotiating the horizontal agreements and market share distributions; **(b)** the transmission of letters, emails and other materials indicating that the CHC RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation; **(c)** written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; **(d)** written, telephone, or electronic communications instructing its members not to support the Plaintiff in any litigation; **(e)** written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; **(f)** the use of the mails or wires to bill

for or collect the increased revenues that flowed from the elimination of the Plaintiff from the practice of medicine.

349.    The CHC RICO Association-In-Fact Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with every state licensing board, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, and other healthcare related third-party entities in furtherance of the scheme. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the Plaintiff from the practice of medicine.

350.    Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

351.    The CHC RICO Association-In-Fact Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CHC RICO Association-In-Fact Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CHC RICO Association-Fact Defendants in these offenses. They have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators, through the illegal scheme and their common course of conduct. The CHC RICO Association-In-Fact Defendants aided and abetted others in violation of the above laws.

352.    To achieve their common goals, the CHC RICO Association-In-Fact Defendants encouraged patients to file lawsuits against the Plaintiff, filed complaints with state and federal healthcare regulatory authorities, instructed their members to discontinue communications with the Plaintiff and encouraged the media to publish defamatory articles.

353.    The CHC RICO Association-In-Fact Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CHC RICO Association-In-Fact Defendants and their co-conspirators had to agree to conceal their fraudulent scheme and illegal tactics. The CHC RICO Association-In-Fact Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions

made by them and would cease treating and engaging in healthcare commerce with the Plaintiff.

354.     The CHC RICO Association-In-Fact Defendants engaged in this pattern of related and continuous predicate acts against the Plaintiff for eight years. The predicated acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eliminating the competition he presented, and increasing the CHC RICO Association-In-Fact Defendants revenues. The predicate acts were related and not isolated events.

355.     During the CHC RICO Association-In-Fact Defendants' perpetration of their scheme, the true purpose of the fraudulent nature of their racket, to increase revenues through the elimination of the Plaintiff from the practice of medicine, was revealed to each of the CHC RICO Association-In-Fact Defendants. Nevertheless, in furtherance of their scheme, the CHC RICO Association-In-Fact Defendants continued to disseminate falsehoods that the Plaintiff was not qualified to perform minimally invasive spine surgery.

356.     By reason of, and as a result of the misconduct of the CHC RICO Association-In-Fact Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his medical practice and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of his children's home and the fracturing of his relationship with his children.

357.     The CHC RICO Association-In-Fact Defendants' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT THREE
### VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
### THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ.
### (By Plaintiff against Defendants Christie + GEICO + Allstate + TD + Stolz + DiOrio + Crist + Solomon + Hafner + Martinotti)
### The CAD RICO Association-In -Fact-Enterprise

358.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

359.    Plaintiff brings this Count against Defendants Christie + GEICO + Allstate + TD + Stolz + DiOrio + Crist + Solomon + Hafner (inclusively, for the purposes of this Count, the "CAD RICO Association-In-Fact Defendants").

360.    At all relevant times the CAD RICO Association-In-Fact Defendants have been "persons" under 18 U.S.C. §1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property." Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

361.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

362.    As explained in detail below, the CAD RICO Association-In-Fact Defendants sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing. The purpose of their scheme was to manufacture an excuse to avoid paying the Plaintiff's bills for the minimally invasive spine surgeries he had performed on customers of CAD RICO Association-In-Fact Defendants, Allstate and GEICO. The CAD RICO Association-In-Fact Defendants sought to achieve these ends, so that that the Plaintiff would leave the country, and not litigate the CAD RICO Association-In-Fact Defendants wrongful conduct. The CAD RICO Association-In-Fact Defendants pursued these ends through a fraudulent scheme of bribes and kickbacks to Defendant Christie, that were designed to secure increased revenues, an increased NYSE share price, increased political power over state legislators, increased market-share of the banking and insurance sector, and the manufacture of anticompetitive case law advantageous to their commercial agendas. As explained in detail below, the CAD RICO Association-In-Fact Defendants' years-long misconduct violated sections 1962(c) and (d).

363.    Defendants Stolz and DiOrio benefitted from the illegal scheme through increased revenues from legal work from Defendants GEICO and Allstate. Stolz abused his position as the trustee of the Chapter 7 proceeding in refusing to file claims against Defendants Allstate and GEICO for the monies they owed the Plaintiff's corporations. Stolz has collected less than 0.1% of the approximately ten million dollars ($10,000,000.00) owed by Defendants Allstate and GEICO to the Plaintiff and his creditors.

364.    Defendant DiOrio represented the Plaintiff in the Chapter 7 proceeding. Defendant DiOrio received legal work from Defendant GEICO in return for advising the Plaintiff to transfer the real estate title of his surgical center (NJSR Surgical Center) to the Chapter 7 estate. Defendant Stolz is the trustee of the Chapter 7 estate. Defendant Allstate is a client of Defendant Stolz and his law firm.

365.    Defendant Crist was the CEO of Defendant Allstate. Defendant Crist is a major shareholder in Defendant Allstate. Defendant Crist reaped enormous profits from the four hundred percent (400%) increase in Defendant Allstate's share price that occurred between 2012 and 2016. This increase was a direct consequence of the monies that Defendant Allstate illegally obtained from not paying the Plaintiff the millions they owed him.

366.    Defendants Allstate and GEICO used the revocation of the Plaintiff's license as an excuse to not pay hundreds of other minimally invasive spine surgeons the fees owed to them, and thus illegally diverted their clients' monies away from clinical care into executive compensation. As a consequence, their clients were deprived of pain-relieving procedures and many resorted to opiate painkillers. This is one of the causes of the opiate epidemic in New Jersey. The Defendants continue to increase the cost of insurance premiums, while denying care to patients and reducing fees to healthcare providers.

367.    Defendant Solomon and members of his family received material favors from Defendants Allstate and GEICO, in exchange for issuing a fraudulent legal opinion and recommending the revocation of the Plaintiff's license. Defendant Solomon was brought out of retirement to adjudicate the case against the Plaintiff and returned to retirement immediately after the case.

368.    Defendant Hafner knowingly cooperated with the other Defendants in a scheme that she understood was illegal, in both motive and means. Defendant Hafner played a central role in the drafting of Defendant Solomon's fraudulent opinion and knew that the document had been falsified. Defendant Hafner knew that she had a duty to report the crime to federal authorities, but willfully ignored that duty and did not report the crime to federal authorities. Defendant Hafner was a willing participant in the criminal conspiracy, and because of her cooperation is criminally liable.

### Description of the CAD RICO Enterprise

369.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features **(1)** a purpose; **(2)** relationships among those associated with the enterprise; and **(3)** longevity sufficient to permit those associates to pursue the enterprise's purpose.

370.    The CAD RICO Association-In-Fact Defendants have, through the increased revenue generated through their decades old scheme of kickbacks and bribery, increased their control of the state government, its agencies, its legislature and certain

members of its judiciary. This permitted them to exert control over the mechanism of physician regulation in order to revoke the Plaintiff's medical license. The excuse given by the medical board to revoke the Plaintiff's license was that he had, according to Defendants Przybylski and Kaufman, deviated from a standard of care, a standard that they ultimately admitted did not exist. The real reason for the revocation was their desire to avoid their financial obligations to the Plaintiff. Discussions between the CAD RICO Association-In-Fact Defendants regarding the Plaintiff's invoices for minimally invasive spine surgery took place in complex closed-door meetings, during which the parties discussed the threat to their corporate profits, of the Plaintiff's expanding outpatient minimally invasive spine surgery practice.

371.    In order to ensure that their corporate profits were not affected by the increasing commercial success of the Plaintiff's minimally invasive spine surgery practice, and the expanding number of minimally invasive spine surgeons being trained by the Plaintiff, the Defendant insurance carriers co-orchestrated a scheme, with the other CAD RICO Association-In-Fact Defendants to have the Plaintiff's medical license revoked. As part of the scheme the defendant insurance carriers disseminated false information within the medico-legal community, that the Plaintiff had committed insurance fraud. This was done in order to discredit the Plaintiff and isolate him from his colleagues and patients.

372.    The illegal scheme to maintain and increase the profits of Defendants Allstate and GEICO through the elimination of the Plaintiff's practice, benefited the shareholders and Defendants Crist, Christie, Solomon, Stolz and DiOrio, all of whom are corrupted members of the political and legal establishment. The illegal scheme also benefitted political lobbyists and public relations personnel, the 'middle-men' through whom Defendants Allstate and GEICO funneled bribes.

373.    At all relevant times the CAD RICO Association-In-Fact Defendants operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that their fraudulent scheme to have the Plaintiff's license revoked was perpetrated to its conclusion. A large majority of these meetings occurred behind closed doors in Newark and Trenton, many of which were attended by members of the Office of the New Jersey Attorney General, and most frequently by Defendant Hafner. The Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4).

374.    Alternatively, each of the CAD RICO Association-In-Fact Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the other Defendants conducted their pattern of racketeering activity. The CAD RICO Association-In-Fact Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the other Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CAD RICO Association-In-Fact Enterprise."

375.    At all relevant times, the CAD RICO Association-In-Fact Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the CAD RICO Association-In-Fact Defendants profit making scheme, and the fraudulent scheme to corrupt state agencies and actors to ensure the revocation of the Plaintiff's license.

376.    The CAD RICO Association-In-Fact Enterprise consisted of the following entities and individuals: **(a)** Defendant Allstate New Jersey Insurance Company; **(b)** Defendant GEICO; **(c)** Defendant TD Bank; **(d)** Defendant Christie; **(e)** Defendant Stolz; **(f)** Defendant DiOrio; **(g)** Defendant Christie; **(h)** Defendant Crist; **(i)** Defendant Solomon; **(j)** Defendant Hafner. While each of the CAD RICO Association-In-Fact Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CAD RICO Association-In-Fact Enterprise's affairs, at all relevant times, the CAD RICO Association-In-Fact Enterprise: (a) had an existence separate and distinct from each CAD Association-In-Fact Enterprise Defendant; (b) was separate and distinct from the pattern of racketeering in which the CAD RICO Association-In-Fact Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CAD RICO Association-In-Fact Enterprise Defendants, along with other individuals and entities, including unknown third parties.

377.    The CAD RICO Association-In-Fact Defendants and their co-conspirators, through their illegal CAD RICO Association-In-Fact Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CAD RICO Association-In-Fact Enterprise's activities by conspiring to have the Plaintiff's license illegally revoked, in order to manufacture an excuse to not pay the Plaintiff monies for the provision of minimally invasive spine surgery. Defendants Allstate and GEICO used the revocation of the Plaintiff's license as a basis to deny payment to other similarly trained minimally invasive spine surgeons.

378.    Defendants Allstate and GEICO orchestrated the CAD RICO Association-In-Fact Enterprise's scheme, whereby they leveraged their control of Defendant NJBME to have the Plaintiff's medical license revoked. The purpose of the Scheme which was to eliminate the Plaintiff from the practice of medicine, and thus eradicate their debt and eliminate any future financial liability that would have developed had the Plaintiff continued to practice minimally invasive spine surgery. The CAD RICO Association-In-Fact Defendants knew that the Plaintiff planned to open a four-operating room state licensed surgical center in New Jersey and had plans to expand nationally.

379.    Defendant Christie provided the CAD RICO Association-In-fact Enterprise with the use of state agencies (Defendant NJBME), personnel (Defendant Solomon + Defendant Hafner) and the resources (State Treasury) necessary to revoke the Plaintiff's license. Defendant Christie provided these services in return for bribes and monies

disguised as 'campaign donations'. The monies were part of a quid pro quo scheme, not protected by Noerr-Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license.

380.     In furtherance of the scheme, the CAD RICO Association-In-Fact Defendants each affirmatively misrepresented or concealed from their shareholders and the public, the existence of bribes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. Defendants Allstate and GEICO understood that if the shareholders had become aware of the scheme, they would have passed a vote against it, realizing the liability it would incur. Defendants Christie, Solomon and Hafner understood that if the public became aware of the illegal use of their taxes to fund the illegal scheme, they would have demanded an investigation and not voted for Defendant Christie in the 2013 New Jersey Gubenatorial election. Specifically, the CAD RICO Association-In-Fact Defendants claimed that the bribes paid were intended to assist them in their legislative efforts, when in fact they were quid pro quo payments to Defendant Christie, in order to have the Plaintiff's license revoked.

66 ✗. **The CAD RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues**

381.     Each CAD RICO Association-In-Fact Defendant benefited financially from the CAD RICO Association-In-Fact Enterprise. Defendants Allstate and GEICO eliminated past debt, and future liability. Defendant TD was rewarded with regulatory favors not offered to their banking competitors. These favors led to increased profits, increased executive compensation and an increased NYSE share price. Defendant Christie in return acquired funds for his political campaigns.

382.     As part of a quid pro quo that existed within the CAD RICO Association-In-Fact Enterprise, Defendant Christie discouraged the NJ Department of Banking and Insurance from enforcing regulatory violations against Defendant TD. This was in return for Defendant TD's **(i)** foreclosure in 2012 of the Plaintiff's business loans, **(ii)** their scheme in 2013 to prevent the sale of his Manhattan townhouse and **(iii)** the appointment in 2013 by a Morris County Court of a receiver who seized control of the Plaintiff's businesses. The latter event precipitated the filing by the Plaintiff on June 17, 2013, for Chapter 11 protection. This caused many of the Plaintiff's employees, a large percentage of whom were single mothers to become unemployed and lose their health insurance. This has resulted in vast profits for the CAD RICO Association-In-Fact Enterprise Defendants which would not have occurred, but for their involvement in quid pro quo schemes with Defendant Christie.

383.     At all relevant times, the CAD RICO Association-In-Fact Enterprise: **(a)** had an existence separate and distinct from each of the CAD RICO Association-In-Fact Defendants; **(b)** was separate and distinct from the pattern of racketeering in which the

CAD RICO Association-In-Fact Enterprise Defendants engaged; and **(c)** was an ongoing and continuing organization consisting of legal entities, including the CAD RICO Association-In-Fact Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise, which was formed for the purpose of bribing Defendant Christie. The purpose of the bribery was to have him order Defendant NJBME to revoke the Plaintiff's license. The revocation caused an increase in revenue to the CAD RICO Association-In-Fact Defendants. Defendants Allstate, GEICO and TD's increased profits and increased share prices, have not resulted in lower insurance and banking fees to the public.

384.    The CAD RICO Association-In-Fact Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CAD RICO Association-In-Fact Defendants and other entities and individuals associated-in-fact with the Enterprise's activities. The CAD RICO Association-In-Fact Defendants illegal scheme to have the Plaintiff's license revoked, caused them to profit from the increased revenues that flowed from the eradication of past debt and the elimination of future liability. These illegal profits were distributed to Defendants Christie, Solomon, Crist, Stolz and DiOrio disguised as executive compensation, share dividends, legal fees, campaign donations and no-show jobs for family members. The CAGTK RICO Defendants, comprise a group of "persons" who simultaneously regulate and profit from the New Jersey Banking and Insurance Sector.

385.    The CAD RICO Association-In-Fact Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the commercialization of risk, the lending of capital and the sale of financial products, the consequences of which have generated enormous profits.

386.    The CAD RICO Association-In-Fact Enterprise used their common communication network to promote false information that the Plaintiff was not qualified to perform minimally invasive spine surgery, had committed insurance fraud. Medicare fraud and bank fraud. The purpose of this propaganda campaign was to isolate the Plaintiff from the medico-legal community and any source of capital.

387.    Defendant TD filed a complaint in 2013 with www.checksystems.com that prevented the Plaintiff access to banking services. Defendant TD's misconduct caused the Plaintiff to become homeless in 2013 and compromised his economic position, which temporarily hindered his ability to litigate pending legal matters, and collect monies owed by Defendants Allstate and GEICO.

388.    Defendant GEICO filed a frivolous lawsuit against the Plaintiff on April 24, 2013. The falsity of its insurance fraud claims was proved when Defendant GEICO's lawsuit filed was dismissed with prejudice on December 8, 2014.

389.    The network was used to disseminate the aforementioned falsehoods to the minimally invasive spine surgery community, in order to dissuade them from pursuing their accounts receivable. This permitted Defendants Allstate and GEICO to improperly profit from a scheme polluted with bribes, fraud, kickbacks, obstruction of justice, perjury and a criminally fraudulent opinion rendered by Defendant Solomon.

390.    Each participant in the CAD RICO Association-In-Fact Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CAD RICO Association-In-Fact Enterprise, the CAD RICO Association-In-Fact Defendants functioned as a continuing unit with the purpose of furthering the CAD RICO Association-In-Fact Scheme.

391.    The CAD RICO Association-In-Fact Defendants participated in the operation and management of the CAD RICO Association-In-Fact Enterprise by directing its affairs, as described herein. While the CAD RICO Association-In-Fact Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

392.    The CAD RICO Association-In-Fact Defendants exerted substantial control over the CAD RICO Association-In-Fact Enterprise, and participated in the affairs of the enterprise by: (a) deciding how monies were dispersed from the political action committees; (b) communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Defendant Christie, and members of both state and federal governments; (c) developing policies, guidelines and fee schedules for clinical care, in which the Defendants Allstate and GEICO colluded with other New Jersey No-Fault Carriers to fix the prices of both auto insurance and the fees paid to healthcare providers; (d) procuring appointments to regulatory state agencies, which they abused to further their personal economic agendas; (e) writing healthcare related legislation; (f) funding state administered litigation against minimally invasive spine surgeons to whom they owed substantial monies; (g) misrepresenting and/or concealing from the public the true nature of the relationship and agreements between the members of the enterprise and the scheme to bribe Defendant Christie in order to revoke the Plaintiff's medical license; (h) otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; (i) ensuring that the other CAD RICO Association-In-Fact Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

393.    Without each CAD RICO Association-In-Fact Defendants' willing participation, the CAD RICO Association-In-Fact scheme and common course of conduct would not have been successful. The CAD RICO Association-In-Fact Defendants directed and controlled

the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

### Ø. HH   Predicate Acts: Mail and Wire Fraud

394.    To carry out, or attempt to carry out, the scheme to defraud, the CAD RICO Association-In-Fact Defendants, each of whom is a person associated-in-fact with the CAD RICO Association-In-Fact Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CAD RICO Association-In-Fact Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

395.    Specifically, the CAD RICO Association-In-fact Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

396.    The multiple acts of racketeering activity which the CAD RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CAD RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the CAD RICO Enterprise. The CAD RICO Association-In-Fact Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

397.    The CAD RICO Association-In-Fact Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

398.    In devising and executing the illegal scheme, the CAD RICO Association-In-Fact Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public, the Plaintiff's patients and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud,  materially false representations. For the purpose of executing the illegal scheme, the CAD RICO Association-In-Fact Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

From paragraph 316 to 387 Kaul has pled with particularity, fact specific to each element, of each claim, against each defendant, in a separate and distinct manner:

399.    Defendant Christie + Defendant GEICO:

Date range: 2008 to 2019.

Conduits of Communication + Bribery to Christie: Public relations firm (Mercury Public Relations + Princeton Public Relations + Law Firm (Brach Eichler + Wolf Samson) + Through state government intermediary + Directly + Political campaign fundraisers + Political campaign donations.

Mode of communication: E-mail + face to face

Substance of communications: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States + Scheme to use the bankruptcy proceedings to defraud Kaul of his assets, his real estate holdings and $ 45 million owed to him by insurance companies, including defendants Allstate + Geico + Scheme to conceal from Kaul the defendants' pattern of racketeering in the United States Bankruptcy Court for the District of New Jersey.

Tactics employed: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO (or appropriate name) Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license + Use of the US mails and wires to transmit

information in furtherance of their scheme of converting the United States Bankruptcy Court into a racketeering enterprise + Use of the US mails and wires to transmit false information that Kaul has committed insurance fraud, was not qualified to perform minimally invasive spine surgery, had committed bank fraud and was going to be criminally indicted for Medicare fraud + Obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment.
Location: Governor's office in Trenton + Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Rivkin Radler, Hackensack, NJ

**400.    Defendant Christie + Defendant Allstate:**
See above. As with Defendant Christie + Defendant GEICO.
Location: Governor's office in Trenton + Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey Law offices of Wasserman + Jurista + Stolz, Basking Ridge, NJ + Law offices of Pringle/Quinn/Anzano, Belmar, NJ + Law offices of Meyner Landis, Newark + NJ Office of the New Jersey Attorney General + Allstate corporate offices.

**401.    Defendant Christie + Defendant TD:**
See above. As with Defendant Christie + Defendant GEICO
Location: Governor's office in Trenton + Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Meyner Landis, Newark, NJ + TD corporate offices

**402.    Defendant Christie + Defendant Stolz:**
Date range: 2014 to 2019
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant GEICO
Mode of communication: See above. As with Defendant Christie + Defendant GEICO.
Substance of communications: See above. As with Defendant Christie + Defendant GEICO.
Tactics employed: Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CHC RICO (or appropriate name) Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the

revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO (or appropriate name) Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of their scheme of converting the United States Bankruptcy Court into a racketeering enterprise + Use of the US mails and wires to transmit false information that Kaul has committed insurance fraud, was not qualified to perform minimally invasive spine surgery, had committed bank fraud and was going to be criminally indicted for Medicare fraud + Obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment.
Location: United States Bankruptcy Court for the District of New Jersey + Law offices of Wasserman + Jurista + Stolz, Basking Ridge, NJ.

**403.    Defendant Christie + Defendant Dilorio:**
Date range: See above. As with Defendant Christie + Defendant Stolz.
Mode of communication: US mail + E-mail + Voice message + SMS (text) + Face to face.
Substance of communications: See above. As with Defendant Christie + Defendant Stolz.
Tactics employed: Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CHC RICO (or appropriate name) Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHC RICO (or appropriate name) Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of their scheme of converting the United States Bankruptcy Court into a racketeering enterprise + Use of the US mails and wires to transmit false information that Kaul has committed insurance fraud, was not qualified to perform minimally invasive spine surgery, had committed bank fraud and was going to be criminally indicted for Medicare fraud + Obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in

furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment.

Location: United States Bankruptcy Court for the District of New Jersey + Law offices of Shapiro Croland, Hackensack, NJ

**404.    Defendant Christie + Defendant Crist:**

Date range: 2009 to 2019

Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant Allstate.

Mode of communication: See above. As with Defendant Christie + Defendant DiIorio.

Substance of communications: See above. As with Defendant Christie + Defendant Allstate.

Tactics employed: See above. As with Defendant Christie + Defendant Allstate.

Location: See above. As with Defendant Christie + Defendant Allstate.

**405.    Defendant Christie + Defendant Solomon:**

Date range: 2013 to 2019

Conduits of Communication + Bribery to Christie: Directly + Political campaign fundraisers + Political campaign donations.

Mode of communication: See above. As with Defendant Christie + Defendant DiIorio.

Substance of communications: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.

Tactics employed: Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CAD RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to globally transmit the knowingly illegal revocation of Kaul's license to national and international healthcare related agencies (Federation of State Medical Boards + American Board of Anesthesiology + General Medical Council of the UK) and regulatory bodies, in furtherance of the illegal scheme to destroy Kaul's global reputation and livelihood, with the intention of causing his death + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have

Defendant NJBME revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of their scheme of converting the United States Bankruptcy Court into a racketeering enterprise + Use of the US mails and wires to transmit false information that Kaul has committed insurance fraud, was not qualified to perform minimally invasive spine surgery, had committed bank fraud and was going to be criminally indicted for Medicare fraud + Obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment.

Location: Christie/Republican political fund raisers + New Jersey Office of Administrative Law

406.    **Defendant Christie + Defendant Hafner:**

Date range: 2009 to 2019.

Conduits of Communication + Bribery to Christie: Law Firm (Brach Eichler + Wolf Samson) + Through state government intermediary + Directly + Political campaign fundraisers.

Mode of communication: See above. As with Defendant Christie + Defendant DiIorio.

Substance of communications: See above. As with Defendant Christie + Defendant Crist.

Tactics employed: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CAD RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CAD RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to globally transmit the knowingly illegal revocation of Kaul's license to national and international healthcare related agencies (Federation of State Medical Boards + American Board of Anesthesiology + General Medical Council of the UK) and regulatory bodies, in furtherance of the illegal scheme to destroy Kaul's

global reputation and livelihood, with the intention of causing his death + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of their scheme to converting the United States Bankruptcy Court into a racketeering enterprise + Use of the US mails and wires to transmit false information that Kaul has committed insurance fraud, was not qualified to perform minimally invasive spine surgery, had committed bank fraud and was going to be criminally indicted for Medicare fraud + Obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment.

### 407. Defendant GEICO + Defendant Christie:
See above. As with Defendant Christie + Defendant GEICO.

### 408. Defendant GEICO + Defendant Allstate:
Date range: 2006 to 2019
Mode of communication: US mail + E-mail + Voice message + SMS (text) + Face to face - 5
Substance of communications: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States + Scheme to use the bankruptcy proceedings to defraud Kaul of his assets, his real estate holdings and $ 45 million owed to him by insurance companies, including defendants Allstate + Geico + Scheme to conceal from Kaul the defendants' pattern of racketeering in the United States Bankruptcy Court for the District of New Jersey.
Tactics employed: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to

organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery – 9 Use of the US mails and wires to transmit letters, emails and other materials indicating that the CAD RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CAD RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to globally transmit the knowingly illegal revocation of Kaul's license to national and international healthcare related agencies (Federation of State Medical Boards + American Board of Anesthesiology + General Medical Council of the UK) and regulatory bodies, in furtherance of the illegal scheme to destroy Kaul's global reputation and livelihood, with the intention of causing his death + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of their scheme of converting the United States Bankruptcy Court into a racketeering enterprise + Use of the US mails and wires to transmit false information that Kaul has committed insurance fraud, was not qualified to perform minimally invasive spine surgery, had committed bank fraud and was going to be criminally indicted for Medicare fraud + Obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment.

Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Wasserman + Jurista + Stolz, Basking Ridge, NJ + Law offices of Pringle + Quinn + Anzano, Belmar, NJ + Law offices of Rivkin Radler, Hackensack, NJ + Law offices of Shapiro Croland, Hackensack, NJ + New Jersey Office of Administrative Law + Allstate corporate offices + Geico corporate offices.

### 409.  Defendant GEICO + Defendant TD:

Date range: 2010 to 2019

Mode of communication: See above. As with Defendant GEICO + Defendant Allstate.

Substance of communications: See above. As with Defendant GEICO + Defendant Allstate.

Tactics employed: See above. As with Defendant GEICO + Defendant Allstate.

Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Rivkin Radler, Hackensack, NJ + Law offices of Meyner Landis, Newark, NJ + Geico corporate offices.

### 410.  Defendant GEICO + Defendant Stolz:

Date range: 2014 to 2019.
Mode of communication: See above. As with Defendant GEICO + Defendant Allstate.
Substance of communications: See above. As with Defendant GEICO + Defendant Allstate.
Tactics employed: See above. As with Defendant GEICO + Defendant Allstate.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Wasserman + Jurista + Stolz, Basking Ridge, NJ + Law offices of Rivkin Radler, Hackensack, NJ + Geico corporate offices.

411.   **Defendant GEICO + Defendant DiIorio:**
Date range: 2014 to 2019.
Mode of communication: See above. As with Defendant GEICO + Defendant Allstate.
Substance of communications: See above. As with Defendant GEICO + Defendant Allstate.
Tactics employed: See above. As with Defendant GEICO + Defendant Allstate.
Location: United States Bankruptcy Court for the District of New Jersey + Law offices of Rivkin Radler, Hackensack, NJ + Law offices of Shapiro Croland, Hackensack, NJ + Geico corporate offices

412.   **Defendant GEICO + Defendant Crist:**
Date range: 2011 to 2019.
Mode of communication: See above. As with Defendant GEICO + Defendant Allstate.
Substance of communications: As above. As with Defendant GEICO + Defendant Allstate.
Tactics employed: See above. As with Defendant GEICO + Defendant Allstate.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Pringle/Quinn/Anzano, Belmar, NJ + Law offices of Rivkin Radler, Hackensack, NJ + New Jersey Office of Administrative Law + Geico corporate offices

413.   **Defendant GEICO + Defendant Solomon:**
Date range: 2011 to 2019.
Mode of communication: See above. As with Defendant GEICO + Defendant Allstate.
Substance of communications: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.
Tactics employed: See above. As with Defendant GEICO + Defendant Allstate.
Location: United States Bankruptcy Court for the District of New Jersey + Law offices of Rivkin Radler, Hackensack, NJ + New Jersey Office of Administrative Law + Geico corporate offices

414.   **Defendant GEICO + Defendant Hafner:**
Date range: 2010 to 2019
Mode of communication: See above. As with Defendant GEICO + Defendant Allstate.
Substance of communications: See above. As with Defendant GEICO + Defendant Allstate.
Tactics employed: See above. As with Defendant GEICO + Defendant Allstate.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Rivkin Radler, Hackensack, NJ + New Jersey Office of Administrative Law + Office of the New Jersey Attorney General + Geico corporate offices.

415.   **Defendant Allstate + Defendant Christie:**
Date range: See above. As with Defendant Christie + Defendant Allstate.
Conduits of Communication + Bribery to Christie:
Mode of communications: See above. As with Defendant Christie + Defendant Allstate.
Substance of communications: See above. As with Defendant Christie + Defendant Allstate.
Tactics employed: See above. As with Defendant Christie + Defendant Allstate.
Location: See above. As with Defendant Christie + Defendant Allstate.

416.   **Defendant Allstate + Defendant GEICO:**
Date range: See above. A with Defendant GEICO + Defendant Allstate.
Mode of communications: See above. As with Defendant GEICO + Defendant Allstate.
Substance of communications: See above. As with Defendant GEICO+ Defendant Allstate.
Tactics employed: See above. As with Defendant GEICO + Defendant Allstate.
Location: See above. As with Defendant GEICO + Defendant Allstate.

417.   **Defendant Allstate + Defendant TD:**
Date range: See above. As with Defendant GEICO + Defendant TD.
Mode of communications: See above. As with Defendant GEICO + Defendant TD.
Substance of communications: See above. As with Defendant GEICO+ Defendant TD.
Tactics employed: See above. As with Defendant GEICO + Defendant TD.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the
District of New Jersey + Law offices of Rivkin Radler, Hackensack, NJ + Law offices of Meyner
Landis, Newark, NJ + Allstate corporate offices.

418.   **Defendant Allstate + Defendant Stolz:**
Date range: 2014 to 2019.
Mode of communications: See above. As with Defendant GEICO + Defendant Stolz.
Substance of communications: See above. As with Defendant GEICO + Defendant Stolz.
Tactics employed:  See above. As with Defendant GEICO + Defendant Stolz.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the
District of New Jersey + Law offices of Wasserman + Jurista + Stolz, Basking Ridge, NJ + Law
offices of Meyner Landis, Newark + NJ Office of the New Jersey Attorney General + Allstate
corporate offices.

419.   **Defendant Allstate + Defendant Dilorio:**
Date range: 2014 to 2019.
Mode of communications: See above. As with Defendant GEICO + Defendant Dilorio.
Substance of communications: See above. As with Defendant GEICO + Defendant Dilorio.
Tactics employed: See above. As with Defendant GEICO + Defendant Dilorio.
Location: United States Bankruptcy Court for the District of New Jersey + Law offices of
Wasserman/Jurista/Stolz, Basking Ridge, NJ + Law offices of Shapiro Croland, Hackensack, NJ +
Office of the New Jersey Attorney General + Allstate corporate offices.

**420.    Defendant Allstate + Defendant Crist:**
Date range: 2006 to 2019.
Mode of communications: See above. As with Defendant GEICO + Defendant Crist.
Substance of communications: See above. As with Defendant GEICO + Defendant Crist.
Tactics employed: See above. As with Defendant GEICO + Defendant Crist.
Location: United States Bankruptcy Court for the District of New Jersey Law offices of Pringle /Quinn/Anzano, Belmar + NJ Law offices of Meyner Landis, Newark, NJ + Office of the New Jersey Attorney General + Allstate corporate offices.

**421.    Defendant Allstate + Defendant Solomon:**
Date range: 2011 to 2019.
Mode of communications: See above. As with Defendant GEICO + Defendant Solomon.
Substance of communications: See above. As with Defendant GEICO + Defendant Solomon
Tactics employed: See above. As with Defendant GEICO + Defendant Solomon.
Location: United States Bankruptcy Court for the District of New Jersey Law offices of Pringle /Quinn/Anzano, Belmar + NJ Law offices of Meyner Landis, Newark + NJ New Jersey Office of Administrative Law + Office of the New Jersey Attorney General + Allstate corporate offices.

**422.    Defendant Allstate + Defendant Hafner:**
Date range: 2010 to 2019
Mode of communications: See above. As with Defendant GEICO + Defendant Hafner.
Substance of communications: See above. As with Defendant GEICO + Defendant Hafner.
Tactics employed: See above. As with Defendant GEICO + Defendant Hafner.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Pringle/Quinn/Anzano, Belmar, NJ + Law offices of Meyner Landis, Newark, NJ + Office of the New Jersey Attorney General + Allstate corporate offices.

**423.    Defendant Allstate + Defendant Martinotti:**
Date range: 2019
Mode of communications: See above. As with Defendant GEICO + Defendant Hafner.
Substance of communications: See above. As with Defendant GEICO + Defendant Hafner.
Tactics employed: See above. As with Defendant GEICO + Defendant Hafner.
Location: United States District Court for the District of New Jersey + Office of the New Jersey Attorney General + Allstate corporate offices + Offices of US Senators Cory Booker and Robert Menendez.

**424.    Defendant TD + Defendant Christie:**
Date range: 2011 to 2019.
Conduit of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant TD.
Mode of communications: See above. As with Defendant Christie + Defendant TD.
Substance of communications: See above. As with Defendant Christie + Defendant TD.
Tactics employed: See above. As with Defendant Christie + Defendant TD.

Location: Governor's office in Trenton + Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Meyner Landis, Newark, NJ + TD corporate offices

425.    **Defendant TD + Defendant GEICO:**
Date range: 2011 to 2019.
Mode of communications: See above. As with Defendant GEICO + Defendant TD.
Substance of communications: See above. As with Defendant GEICO + Defendant TD.
Tactics employed: See above. As with Defendant GEICO + Defendant TD.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Meyner Landis, Newark, NJ + Office of the New Jersey Attorney General + Allstate corporate offices + TD corporate offices.

426.    **Defendant TD + Defendant Allstate:**
Date range: 2011 to 2019.
Mode of communications: See above. As with Defendant Allstate + Defendant TD.
Substance of communications: See above. As with Defendant Allstate + Defendant TD.
Tactics employed: See above. As with Defendant Allstate + Defendant TD.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Meyner Landis, Newark, NJ + Office of the New Jersey Attorney General + Allstate corporate offices + TD corporate offices.

427.    **Defendant TD + Defendant Stolz:**
Date range: 2014 to 2019.
Mode of communications: See above. As with Defendant GEICO + Defendant Stolz.
Substance of communications: See above. As with Defendant GEICO + Defendant Stolz.
Tactics employed: See above. As with Defendant GEICO + Defendant Stolz.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Wasserman/Jurista/Stolz, Basking Ridge, NJ + Law offices of Meyner Landis, Newark, NJ + TD corporate offices.

428.    **Defendant TD + Defendant DiIorio:**
Date range: 2014 to 2019.
Mode of communications: See above. As with Defendant GEICO + Defendant DiIorio.
Substance of communications: See above. As with Defendant GEICO + Defendant DiIorio
Tactics employed: See above. As with Defendant GEICO + Defendant DiIorio.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Meyner Landis, Newark, NJ + Law offices of Shapiro Croland, Hackensack, NJ + TD corporate offices

429.    **Defendant TD + Defendant Crist:**
Date range: 2011 to 2019.
Mode of communications: See above. As with Defendant GEICO + Defendant Crist.
Substance of communications: See above. As with Defendant GEICO + Defendant Crist.

<u>Tactics employed:</u> See above. As with Defendant GEICO + Defendant Crist.
<u>Location:</u> Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Pringle + Quinn + Anzano, Belmar + NJ Law offices of Meyner Landis, Newark + NJ Office of the New Jersey Attorney General + Allstate corporate offices +  TD corporate offices.

430.    **Defendant TD + Defendant Solomon:**
<u>Date range:</u> 2011 to 2019.
<u>Mode of communications:</u> See above. As with Defendant GEICO + Defendant Solomon.
<u>Substance of communications:</u> See above. As with Defendant GEICO + Defendant Solomon.
<u>Tactics employed:</u> See above. As with Defendant GEICO + Defendant Solomon.
<u>Location:</u> Law offices of Meyner Landis, Newark, NJ New Jersey Office of Administrative Law + Office of the New Jersey Attorney General + TD corporate offices.

431.    **Defendant TD + Defendant Hafner: (i)** <u>Date range:</u> 2010 to 2019; **(ii)** <u>Mode of communications:</u> See above. As with Defendant GEICO + Defendant Hafner: **(iii)** <u>Substance of communications:</u> See above. As with Defendant GEICO + Defendant Hafner: **(iv)** <u>Tactics employed:</u> See above. As with Defendant GEICO + Defendant Hafner: **(v)** <u>Location:</u> Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Meyner Landis, Newark, NJ + Office of the New Jersey Attorney General + TD corporate offices.

432.    **Defendant Stolz + Defendant Christie:**
See above. As with Defendant Christie + Defendant Stolz.

433.    **Defendant Stolz + Defendant GEICO:**
See above. As with Defendant GEICO + Defendant Stolz.

434.    **Defendant Stolz + Defendant Allstate:**
See above. As with Defendant Allstate + Defendant Stolz.

435.    **Defendant Stolz + Defendant TD:**
See above. As with Defendant TD + Defendant Stolz.

436.    **Defendant Stolz + Defendant Dilorio:**
<u>Date range:</u> 2014 to 2019
<u>Mode of communications:</u> See above. As with Defendant Allstate + Defendant Dilorio.
<u>Substance of communications:</u> See above. As with Defendant Allstate + Defendant Dilorio
<u>Tactics employed:</u> See above. As with Defendant Allstate + Defendant Dilorio
<u>Location:</u> Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Wasserman/Jurista/Stolz, Basking Ridge, NJ + Law offices of Shapiro Croland, Hackensack, NJ + New Jersey Office of Administrative Law + Office of the New Jersey Attorney General.

**437.    Defendant Stolz + Defendant Crist:**
Date range: 2014 to 2019.
Mode of communications: See above. As with Defendant Allstate + Defendant Crist.
Substance of communications: See above. As with Defendant Allstate + Defendant Crist.
Tactics employed: See above. As with Defendant Allstate + Defendant Crist.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Wasserman/Jurista/Stolz, Basking Ridge, NJ + Law offices of Pringle/Quinn/Anzano, Belmar, NJ + Office of the New Jersey Attorney General + Allstate corporate offices.

**438.    Defendant Stolz + Defendant Solomon:**
Date range: 2014 to 2019.
Mode of communication: See above. As with Defendant Allstate + Defendant Solomon.
Substance of communications: See above. As with Defendant Allstate + Solomon.
Tactics employed: See above. As with Defendant Allstate + Solomon.
Location: Law offices of Wasserman/Jurista/Stolz, Basking Ridge, NJ + New Jersey Office of Administrative Law + Office of the New Jersey Attorney General.

**439.    Defendant Stolz + Defendant Hafner:**
Date range: 2014 to 2019.
Mode of communication: See above. As with Defendant Allstate + Defendant Hafner.
Substance of communications: See above. As with Defendant Allstate + Defendant Hafner.
Tactics employed: See above. As with Defendant Allstate + Defendant Hafner.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Wasserman/Jurista/Stolz, Basking Ridge, NJ + Office of the New Jersey Attorney General + Allstate corporate offices.

**440.    Defendant DiIorio + Defendant Christie:**
See above. As with Defendant Christie + Defendant DiIorio.

**441.    Defendant DiIorio + Defendant GEICO:**
See above. As with Defendant GEICO + Defendant DiIorio.

**442.    Defendant DiIorio + Defendant Allstate**
See above. As with Defendant Allstate + Defendant DiIorio.

**443.    Defendant DiIorio + Defendant TD:**
See above. As with Defendant TD + Defendant DiIorio.

**444.    Defendant DiIorio + Defendant Stolz:**
See above. As with Defendant Stolz + Defendant DiIorio.

**445.    Defendant DiIorio + Defendant Crist:**
Date range: 2014 to 2019.

Mode of communications: See above. As with Defendant Allstate + Defendant Dilorio.
Substance of communications: See above. As with Defendant Allstate + Defendant Dilorio.
Tactics employed: See above. As with Defendant Allstate + Defendant Dilorio.
Location: See above. As with Defendant Allstate + Defendant Dilorio,

446.    **Defendant Dilorio + Defendant Solomon:**
Date range: 2014 to 2019
Mode of communications: US mail + E-mail + Voice message + SMS (text) + Face to face - 5
Substance of communications: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States + Scheme to use the bankruptcy proceedings to defraud Kaul of his assets, his real estate holdings and $ 45 million owed to him by insurance companies, including defendants Allstate + Geico + Scheme to conceal from Kaul the defendants' pattern of racketeering in the United States Bankruptcy Court for the District of New Jersey - 7
Tactics employed: Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CAD RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CAD RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of their scheme of converting the United States Bankruptcy Court into a racketeering enterprise + Use of the US mails and wires to transmit false information that Kaul has committed insurance fraud, was not qualified to perform minimally invasive spine surgery, had committed bank fraud and was going to be criminally indicted for Medicare fraud + Obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment.
Location: Law offices of Wasserman + Jurista + Stolz, Basking Ridge, NJ New Jersey Office of Administrative Law + Office of the New Jersey Attorney General + Allstate corporate offices - 17

Geico corporate offices.

**447.    Defendant DiIorio + Defendant Hafner:**
Date range: 2014 to 2019.
Mode of communications: See above. As with Defendant DiIorio + Defendant Solomon.
Substance of communications: See above. As with Defendant DiIorio + Defendant Solomon.
Tactics employed: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license+ Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CAD RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to globally transmit the knowingly illegal revocation of Kaul's license to national and international healthcare related agencies (Federation of State Medical Boards + American Board of Anesthesiology + General Medical Council of the UK) and regulatory bodies, in furtherance of the illegal scheme to destroy Kaul's global reputation and livelihood, with the intention of causing his death + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of their scheme of converting the United States Bankruptcy Court into a racketeering enterprise + Use of the US mails and wires to transmit false information that Kaul has committed insurance fraud, was not qualified to perform minimally invasive spine surgery, had committed bank fraud and was going to be criminally indicted for Medicare fraud + Obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment.
Location: Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Office of the New Jersey Attorney General + Allstate corporate offices + Geico corporate offices.

**448.    Defendant Crist + Defendant Christie:**
See above. As with Defendant Christie + Defendant Crist.

**449.    Defendant Crist + Defendant GEICO:**
See above. As with Defendant GEICO + Crist.

**450.    Defendant Crist + Defendant Allstate:**
See above. As with Defendant Allstate + Defendant Crist.

**451.    Defendant Crist + Defendant TD:**
See above. As with Defendant TD + Defendant Crist.

**452.    Defendant Crist + Defendant Stolz:**
See above. As with Defendant Stolz + Defendant Crist.

**453.    Defendant Crist + Defendant DiIorio:**
See above. As with Defendant DiIorio + Defendant Crist.

**454.    Defendant Crist + Defendant Solomon:**
Date range: 2011 to 2019
Mode of communications: See above. As with Defendant DiIorio + Defendant Solomon.
Substance of communications: See above. As with Defendant Allstate + Defendant Solomon.
Tactics employed: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CAD RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CAD RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have

Defendant NJBME revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of their scheme of converting the United States Bankruptcy Court into a racketeering enterprise + Use of the US mails and wires to transmit false information that Kaul has committed insurance fraud, was not qualified to perform minimally invasive spine surgery, had committed bank fraud and was going to be criminally indicted for Medicare fraud + Obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment.
Location: United States Bankruptcy Court for the District of New Jersey + Law offices of Pringle/Quinn/Anzano, Belmar, NJ + New Jersey Office of Administrative Law Office of the New Jersey Attorney General + Allstate corporate offices.

455.   **Defendant Crist + Defendant Hafner:**
Date range: 2010 to 2019.
Mode of communications: US mail + E-mail + Voice message + SMS (text) + Face to face.
Substance of communications: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States + Scheme to use the bankruptcy proceedings to defraud Kaul of his assets, his real estate holdings and $ 45 million owed to him by insurance companies, including defendants Allstate + Geico + Scheme to conceal from Kaul the defendants' pattern of racketeering in the United States Bankruptcy Court for the District of New Jersey.
Tactics employed: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CAD RICO Association-In-Fact Defendants had instructed their

members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CAD RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to globally transmit the knowingly illegal revocation of Kaul's license to national and international healthcare related agencies (Federation of State Medical Boards + American Board of Anesthesiology + General Medical Council of the UK) and regulatory bodies, in furtherance of the illegal scheme to destroy Kaul's global reputation and livelihood, with the intention of causing his death + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of their scheme of converting the United States Bankruptcy Court into a racketeering enterprise + Use of the US mails and wires to transmit false information that Kaul had committed insurance fraud, was not qualified to perform minimally invasive spine surgery, had committed bank fraud and was going to be criminally indicted for Medicare fraud + Obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment.

<u>Location:</u> Christie/Republican political fund raisers + United States Bankruptcy Court for the District of New Jersey + Law offices of Wasserman/Jurista/Stolz, Basking Ridge, NJ + Law offices of Pringle/Quinn/Anzano, Belmar, NJ + New Jersey Office of Administrative Law + Office of the New Jersey Attorney General + Allstate corporate offices.


**456.     Defendant Solomon + Defendant Christie:**
See above. As with Defendant Christie + Defendant Solomon.


**457.     Defendant Solomon + Defendant GEICO:**
See above. As with Defendant GEICO + Defendant Solomon


**458.     Defendant Solomon + Defendant Allstate:**
See above. As with Defendant Allstate + Defendant Solomon.


**459.     Defendant Solomon + Defendant TD:**
See above. As with Defendant TD + Defendant Solomon.


**460.     Defendant Solomon + Defendant Stolz:**
See above. As with Defendant Stolz + Defendant Stolz.

**461.    Defendant Solomon + Defendant DiIorio:**
See above. As with Defendant DiIorio + Defendant Solomon.

**462.    Defendant Solomon + Defendant Crist:**
See above. As with Defendant Crist + Defendant Solomon.

**463.    Defendant Solomon + Defendant Hafner:**
Date range: 2013 to 2019.
Mode of communications: US mail + E-mail + Voice message + SMS (text) + Face to face.
Substance of communications: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized + Scheme to have Kaul leave the United States.
Tactics employed: Use of US mail and wires to file false complaints against him with Defendant NJBME + Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul + Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery and had committed insurance fraud – 4
Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CAD RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to globally transmit the knowingly illegal revocation of Kaul's license to national and international healthcare related agencies (Federation of State Medical Boards + American Board of Anesthesiology + General Medical Council of the UK) and regulatory bodies, in furtherance of the illegal scheme to destroy Kaul's global reputation and livelihood, with the intention of causing his death + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license + Use of the US mails and wires to transmit information in furtherance of their scheme of converting the United States Bankruptcy Court into a racketeering enterprise + Use of the US mails and wires to transmit false information that Kaul has committed insurance fraud, was not qualified to perform minimally invasive spine surgery, had committed bank fraud and was going to be criminally indicted for Medicare fraud + Obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment.

<u>Location:</u> New Jersey Office of Administrative Law + Office of the New Jersey Attorney General + Allstate corporate offices + Geico corporate offices.

**464.   Defendant Hafner + Defendant Christie:**
See above. As with Defendant Christie + Defendant Hafner.

**465.   Defendant Hafner + Defendant GEICO:**
See above. As with Defendant GEICO + Defendant Hafner.

**466.   Defendant Hafner + Defendant Allstate:**
See above. As with Defendant Allstate + Defendant Hafner.

**467.   Defendant Hafner + Defendant TD:**
See above. As with Defendant TD + Defendant Hafner.

**468.   Defendant Hafner + Defendant Stolz:**
See above. As with Defendant Stolz + Defendant Hafner.

**469.   Defendant Hafner + Defendant Dilorio:**
See above. As with Defendant Dilorio + Defendant Hafner

**470.   Defendant Hafner + Defendant Crist:**
See above. As with Defendant Crist + Defendant Hafner.

**471.   Defendant Hafner + Defendant Solomon:**
See above. As with Defendant Solomon + Defendant Hafner.

446. The CAD RICO Association-In-Fact Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:
**(a)** Mail Fraud: The CAD RICO Association-In-Fact Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent and /or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of bribes and kickbacks, to have the Plaintiff's license improperly revoked, his reputation destroyed, eradicate debt, eliminate future financial liability and prevent other minimally invasive spine surgeons from collecting monies that they were owed. These ends were pursued by means of false representations and omissions.
**(b)** Wire Fraud: The CAGTK RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be received, materials by wire for the purpose of executing the unlawful scheme to defraud the Plaintiff of monies he was owed for the provision of minimally invasive spine surgery, based on false pretenses, misrepresentations that the Plaintiff was not qualified to perform minimally invasive spine surgery, and had committed insurance and bank fraud.
**(c)** The CAD RICO Association-In-Fact Defendants' use of the mails and wires include, but are not limited to: **(i)** the transmission of letters, e-mails and other materials

regarding the price fixing of auto insurance policies and physician fee schedules; **(ii)** the transmission of letters, emails and other materials indicating that the CAD RICO Association-In-Fact Defendants had advised the medico-legal community not to support the Plaintiff in any litigation; **(iii)** written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; **(iv)** written, telephone, or electronic communications instructing the medico-legal community not to support the Plaintiff in any litigation; **(v)** written, telephone, or electronic communications regarding discussions between the CAD RICO Association-In-Fact Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; **(vi)** the use of the mails or wires to further schemes to eradicate the CAD RICO Association-In-Fact Defendants' debt to the Plaintiff, and eliminate future liability; **(vii)** the use of the mails and wires to instruct the Chapter 7 trustee not to pursue the monies owed to the Plaintiff's corporations, and creditors.

447.    The CAD RICO Association-In-Fact Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with every American state licensing board, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, and other healthcare related third-party entities in furtherance of the scheme, the purpose of which was to harm the Plaintiff's economic and reputational standing. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the debt owed to the Plaintiff, and the eradication of future financial liability. Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

448.    The CAD RICO Association-In-Fact Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CAD RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CAD RICO Association-In-Fact Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

449.    The CAD RICO Association-In-Fact Defendants aided and abetted others in violation of the above laws. To achieve their common goals, the CAD RICO Association-In-Fact Defendants encouraged their clients to file lawsuits against the Plaintiff, filed

complaints with state and federal healthcare regulatory authorities, instructed their members to discontinue communications with the Plaintiff and encouraged the media to publish defamatory articles. The CAD RICO Association-In-Fact Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CAD RICO Association-In-Fact Defendants and their co-conspirators had to agree to conceal the fraudulent intent of the scheme, and its illegal tactics.

450.    The CAD RICO Association-In-Fact Defendants knew, and intended that Plaintiff's patients and business network, would cease communicating and engaging in healthcare commerce with the Plaintiff, consequent to the material misrepresentations and omissions made by them. Indeed, the Defendants knew that their only chance of eradicating their debt, and eliminating any future financial liability was to professionally and economically isolate the Plaintiff, with the expectation that he would leave the country.

451.    The CAD RICO Association-In-Fact Defendants engaged in a pattern of related and continuous predicate acts for eight (8) years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus for **(i)** Defendants Allstate and GEICO eradicating their debt and increasing their revenues, executive compensation and NYSE share price and thus for **(ii)** Defendant Christie increasing political donations into his political campaign and bribes into off-shore bank accounts and trusts, and thus for **(iii)** Defendant Solomon bribes into off-shore bank accounts and trusts and no-show jobs for family members, and thus for **(iv)** Defendant Crist increasing executive compensation and share dividends, and thus for **(v)** Defendants Stolz and DiOrio increasing legal fees, and thus for **(vi)** Defendant Hafner bribes funneled into off-shore accounts and trusts.

452.    The predicate acts also had the same or similar results, participants and methods of commission.

453.    During the CAD RICO Association-In-Fact Defendants' perpetration of their scheme the true purpose of the fraudulent racket was revealed to the CAD RICO Association-In-Fact Defendant, TD. Nevertheless, in furtherance of their scheme, Defendants TD continued to disseminate falsehoods that the Plaintiff had committed insurance fraud, Medicare fraud, bank fraud and was not qualified to perform minimally invasive spine surgery.

454.    By reason of, and as a result of the conduct of the CAD RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or property in multiple ways, including but not limited to the loss of his medical

license, the loss of his reputation, the loss of his livelihood, the loss of monies earned, and the loss of future earnings.

**455.**    The CAD RICO Association-In-Fact Defendants violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c)

## COUNT FOUR
## VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
## THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ.
## (By Plaintiff against Defendants Christie + HUMC + AHS + Garrett + Hafner + Stein + NJBME + Kanefsky)
## The CAS RICO Association-In -Fact-Enterprise

**456.**    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

**457.**    Plaintiff brings this Count against Defendants Christie + HUMC + AHS + Garrett + Hafner + Stein + NJBME (inclusively, for the purposes of this Count, the "CAS RICO Association-In-Fact Defendants"). At all relevant times the CAS RICO Association-In-Fact Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property." Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

**458.**    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

**459.**    As explained in detail below, the CAS RICO Association-In-Fact Defendants sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, eliminate the competition he and his surgical center presented, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing. The purpose of their scheme was to divert patients requiring minimally invasive spine surgery away from the Plaintiff's surgical center, and towards their facilities and physicians. As explained in detail below, the CAS RICO Defendants' years-long misconduct violated sections 1962(c) and (d).

### R. Description of the CAS RICO Association-In-Fact Enterprise

**460.** RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features **(1)** a purpose; **(2)** relationships among those associated with the enterprise; and **(3)** longevity sufficient to permit those associates to pursue the enterprise's purpose.

**461.** For years Defendants HUMC and AHS occupied the dominant role in the delivery of spine care in New Jersey, that positioned them at the center of the political and business sectors, with a wide and deep network of middleman known as 'political lobbyists' and 'public relation gurus'. The Defendants market share in the minimally invasive spine surgery sector began to decrease in approximately 2004, with increased development of free standing, predominantly physician owned, surgical centers.

**462.** The Plaintiff's performance in 2005 of the first outpatient minimally invasive spine fusion proved that the procedure could be done on a same day basis. As a consequence, Defendants HUMC and AHS lost business, and then engaged in a scheme of bribes and kickbacks, in which Defendant Christie used Defendants NJBME, Hafner and Solomon to revoke the Plaintiff's license, an event that caused his surgical center to file for Chapter 11 bankruptcy. As a consequence of the Defendant HUMC and AHS bribing Defendant Christie, he vetoed a bill in approximately 2011 that would have permitted one operating room surgical centers to apply for state licensure. The effect of the veto was to artificially reduce competition.

**463.** Defendants HUMC and AHS also engineered legislative changes that reduced surgical center funding from Defendants Allstate and GEICO and restricted the performance of minimally invasive spinal fusions to the Defendant Hospitals. This caused the closure of approximately fifty percent of facilities from 2004 to 2012. The effect of these changes has been to reduce the availability of minimally invasive spine surgery, an etiological factor in the opiate epidemic. The Defendant HUMC and AHS monopolization of the minimally invasive spine surgery sector has permitted them to engage in price gouging with private health insurers, the extra cost of which has been passed onto the public.

**464.** In the past five years, the Defendant HUMC and AHS monopolization of the minimally invasive spine surgery market has caused an exponential increase in revenues, increased political power and disproportionate leverage in negotiations with private insurance companies. The increased monies have resulted in aggressive expansion projects that have focused on highly profitable outpatient spine centers. The reduced competition from surgical centers has given the CAS RICO Association-In-Fact Defendant Hospitals increased bargaining power with private health insurers, in which the CAS RICO Association-In-fact Defendants have forced excessive reimbursement

rates, under threat of boycott to the private health insurer's clients. The Plaintiff's outpatient spine surgery model presented an enormous threat to Defendants HUMC and AHS, whose revenues would have been reduced if the Plaintiff's four operating room surgical center had opened.

465.   Defendants HUMC and AHS conspired with Defendants Christie, Hafner and NJBME to eliminate and legally compromise physicians and surgical centers that competed in their market. This was achieved through bribing Defendant Christie into signing legislation that **(i)** limited surgical center development, **(ii)** eliminated reimbursement to surgical centers for minimally invasive spine surgery, **(iii)** entered legislation that permitted Defendants Allstate and GEICO to stop paying surgical centers for minimally invasive spine surgery and **(iv)** initiated medical licensing prosecutions against physicians who practiced minimally invasive spine surgery independently in surgical centers with no hospital affiliations.

466.   Defendants HUMC and AHS illegal scheme to revoke the Plaintiff's license was perpetrated through a series of quid pro quos with Defendant Christie in which Defendants HUMC and AHS funneled bribes into off-shore accounts and aggressively funded Defendant Christie's political activities.

467.   Defendant Christie used state resources (State Treasury), agencies (Defendant NJBME) and personnel (Defendants Hafner + Solomon) to revoke the Plaintiff's license. The revocation caused the Plaintiff's corporations to file for Chapter 11 Bankruptcy and permitted Defendant Stolz to seize the Plaintiff's surgical center and a license he had obtained in 2009 to build a thirty-six thousand square foot, four operating room surgical center in Pompton Lakes, NJ. A moratorium on surgical centers was issued in 2009 because of pressure from Defendants HUMC, AHD, Allstate and GEICO.

468.   The Plaintiff obtained one of the last licenses issued, and it was illegally seized, along with all of the Plaintiff's property, as a consequence of the illegal schemes **(i) orchestrated** by Defendant Christie, **(ii) perpetrated** by Defendants Hafner, Solomon, NJBME, Lomazow, Stolz and DiOrio and **(iii) funded** by Defendants Allstate, GEICO, HUMS, AHS, Heary, Kaufman, Przybyslski, Staats, Crist, Stein, Cohen, ASIPP and CNS, Garrett, **(iv) facilitated** by Defendants TD, NJMG, Washburn.

469.   Discussions occurred between the CAS RICO Association-In-Fact Defendants regarding the Plaintiff, during which the parties discussed the threat to their corporate profits, of the Plaintiff's expanding outpatient minimally invasive spine surgery practice.

470.   In order to ensure that their corporate profits were not affected by the increasing commercial success of the Plaintiff's minimally invasive spine surgery practice, and the expanding number of minimally invasive spine surgeons being trained by the Plaintiff, the Defendant HUMC and AHS co-orchestrated a scheme, with the other CAS RICO Association-In-Fact Defendants to have the Plaintiff's medical license revoked. As part of

116

the scheme the CAS RICO Association-In-Fact Defendants disseminated false information within the medico-legal community, that the Plaintiff had committed insurance fraud and was not qualified to perform minimally invasive spine surgery. This was done in order to discredit the Plaintiff and isolate him from his colleagues and patients.

471.    The CAS RICO Association-In-Fact Defendants fraudulent scheme to eliminate the Plaintiff's practice and increase the profits of the Defendants HUMC and AHS, benefited their corporate executives, and permitted increased monies to be funneled through middlemen to Defendant Christie.

472.    At all relevant times the CAS RICO Association-In-Fact Defendants operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that their fraudulent scheme to have the Plaintiff's license revoked was perpetrated to its conclusion. A majority of these meetings occurred behind closed doors in Morris County and Bergen County, many of which were attended by members of the Office of the New Jersey Attorney General, and most frequently, Defendant Hafner. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4).

473.    Alternatively, each of the CAS RICO Association-In-Fact Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the other Defendants conducted their pattern of racketeering activity. The CAS RICO Association-In-Fact Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the other Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CAS RICO Association-In-fact Enterprise."

474.    At all relevant times, the CAS RICO Association-In-Fact Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the CAS RICO Association-In-Fact Defendants profit making scheme, and the fraudulent scheme to corrupt state agencies and actors to ensure the revocation of the Plaintiff's license.

475.    The association-in-fact CAS Enterprise consisted of the following entities and individuals: **(a)** Defendant HUMC; **(b)** Defendant AHS; **(c)** Defendant Garrett; **(d)** Defendant Stein; **(e)** Defendant NJBME; (f) Defendant Hafner; **(g)** Defendant Christie.

476.    While each of the CAS RICO Association-In-Fact Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CAS RICO Association-In-Fact Enterprise's affairs, at all relevant times, the CAS RICO Association-In-fact Enterprise: **(a)** had an existence separate and distinct from each CAS RICO Association-In-Fact Defendants; **(b)** was separate and distinct from the pattern of racketeering in which the CAS RICO Association-In-Fact Defendants engaged; and **(c)** was

an ongoing and continuing organization consisting of legal entities, including the CAS RICO Association-In-Fact Defendants, along with other individuals and entities, including unknown third parties.

477.    The CAS RICO Association-In-Fact Defendants and their co-conspirators, through their illegal CAS RICO Association-In-Fact Enterprise engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CAS RICO Association-In-Fact Enterprise's activities by bribing Defendant Christie to have the Plaintiff's license revoked. The revocation was publicized by Defendants NJMG and Washburn, who defamed and slandered the Plaintiff. The benefit to Defendant Stein of the revocation and defamation, was that it facilitated litigation he had commenced against the Plaintiff. Defendants NJMG and Washburn publicized this litigation on multiple occasions, which assisted the litigation, and gave Defendant Stein information about the Plaintiff's personal affairs.

478.    Defendant Christie provided the CAS RICO Association-In-Fact Enterprise with the use of state agencies (Defendant NJBME + New Jersey Office of Administrative Law)) personnel (Defendants Solomon + Hafner) and resources (State Treasury) necessary to revoke the Plaintiff's license. These services were provided in return for bribes funneled into off-shore accounts and trusts, and monies disguised as 'campaign donations' to Defendant Christie. The monies were part of a quid pro quo scheme, not protected under Noerr Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license.

479.    In furtherance of the scheme, the CAS RICO Association-In-Fact Defendants each affirmatively misrepresented or concealed from their corporate board members, the existence of bribes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. Defendants HUMC, AHS and Garrett understood that if the board members became aware of the scheme, they would have opposed it, realizing the liability it would incur. Specifically, the CAS RICO Association-In-Fact Defendants claimed that the monies paid to Defendant Christie were intended to assist them in their legislative efforts, when in fact, they were quid pro quo payments in order to have the Plaintiff's license revoked.

## S. The CAS RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

480.    At all relevant times, the CAS RICO Association-In-Fact Enterprise: **(a)** had an existence separate and distinct from each CAS RICO Association-In-fact Defendant; **(b)** was separate and distinct from the pattern of racketeering in which the CAS RICO Association-In-Fact Defendants engaged; and **(c)** was an ongoing and continuing organization consisting of legal entities, including the CAS RICO Association-In-Fact Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise.

**481.**   The CAS RICO Association-In-Fact Enterprise was formed for the purpose of bribing Governor Christie, in order to **(i)** have him instruct the medical board to revoke the Plaintiff's license, to **(ii)** veto legislation contrary to the commercial interests of the Defendant HUMC and AHS, and to **(iii)** use the licensing proceedings against the Plaintiff to mischaracterize the clinical significance of hospital privileges. In fact, there is no evidence that connects clinical outcomes with the possession of hospital privileges, and hospitals have a far higher mortality and morbidity rate than outpatient surgical centers.

**482.**   Defendants HUMC and AHS are able to conceal their complications because of the influence they have purchased with regulatory agencies and the media. The internal counsel for Defendant NJMG is on the board of Defendant HUMC. Defendants HUMC and AHS comprise a group of "persons" who simultaneously wield immense influence with regulatory agencies, while trading in the market regulated by these agencies.

**483.**   The CAS RICO Association-In-Fact Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as national marketing strategies and the treatment of patients from within the tri-state area, the consequences of which have generated enormous profits.

**484.**   Within the CAS RICO Association-In-Fact Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The CAS RICO Association-In-Fact Enterprise used this common communication network for purposes of promoting false information that the Plaintiff was not qualified to perform minimally invasive spine surgery, had committed insurance fraud, Medicare fraud and bank fraud. The purpose of this propaganda campaign was to isolate the Plaintiff from the medico-legal community and any source of capital.

**485.**   Each participant in the CAS RICO Association-In-Fact Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CAS RICO Association-In-Fact Enterprise, the CAS RICO Association-In-Fact Defendants functioned as a continuing unit with the purpose of furthering the CAS RICO Association-In-Fact Scheme.

**486.**   The CAS RICO Association-In-Fact Defendants participated in the operation and management of the CAS RICO Association-In-Fact Enterprise by directing its affairs, as described herein. While the CAS RICO Association-In-Fact Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements. The CAS RICO Association-In-Fact Defendants exerted substantial control over the CAS RICO Association-In-Fact Enterprise, and participated in the affairs of the enterprise by: **(a)** deciding how monies were dispersed from the political action

119

committees; **(b)** communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Defendant Christie, and members of both state and federal governments; **(c)** developing policies, guidelines and regulations that controlled where and by whom clinical care was delivered; **(d)** procuring appointments to regulatory state agencies, which they abused to further their personal economic agendas; **(e)** writing healthcare related legislation; **(f)** misrepresenting and/or concealing from the public the true nature of the relationship and agreements between the members of the enterprise and the scheme to bribe Defendant Christie in order to revoke the Plaintiff's medical license; **(g)** otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; **(h)** ensuring that the other CAS RICO Association-In-Fact Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

**487.**    Without each CAS RICO Association-In-Fact Defendants' willing participation, the CAS RICO Association-In-fact Scheme and common course of conduct would not have been successful.

**488.**    The CAS RICO Association-In-Fact Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

### Predicate Acts: Mail and Wire Fraud

**489.**    To carry out, or attempt to carry out, the scheme to defraud, the CAS RICO Association-In-Fact Defendants, each of whom is a person associated-in-fact with the CAS RICO Association-In-Fact Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CAS RICO Association-In-Fact Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

**490.**    Specifically, the CAS RICO Association-In-Fact Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

**491.**    The multiple acts of racketeering activity which the CAS RICO Association-In-Fact Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CAS RICO Association-In-Fact Defendants' regular use of the facilities, services,

distribution channels, and employees of the CAS RICO Association-In-Fact Enterprise. The CAS RICO Association-In-Fact Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

492.    The CAS RICO Association-In-Fact Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in perpetration of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

493.    In devising and executing the illegal scheme, the CAS RICO Association-In-Fact Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public, the Plaintiff's patients and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud, materially false representations. For the purpose of executing the illegal scheme, the CAS RICO Association-In-Fact Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

**From paragraph 437 to 491 Kaul has pled with particularity, fact specific to each element, of each claim, against each defendant, in a separate and distinct manner:**

494.    Defendant Christie + Defendant HUMC:
Date range: 2006 to 2019.
Conduits of Communication + Bribery to Christie: Public relations firm (Mercury Public Relations + Princeton Public Relations + Law Firm (Brach Eichler + Wolf Samson) + Through state government intermediary + Directly + Political campaign fundraisers + Political campaign donations.
Mode of Communications: US mail + E-mail + Voice message + SMS (text) + Face to face.
Substance of communication: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized - Scheme to have Kaul leave the United States.
Tactics employed: Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having

Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mail and wires to transmit letters, e-mails and other materials negotiating the horizontal agreements and market share distributions + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CAS RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CAS RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment
Location: Hackensack Medical Center + Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General

**495.    Defendant Christie + Defendant AHS:**
Date range: See above. As with Defendant Christie + Defendant HUMC.
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Morristown Memorial Hospital + Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General

**496.    Defendant Christie + Defendant Garrett:**
Date range: See above. As with Defendant Christie + Defendant HUMC.
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.

<u>Location:</u> Morristown Memorial Hospital + Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General

**497.    Defendant Christie + Defendant Hafner:**
<u>Date range:</u> 2009 to 2019.
<u>Conduits of Communication + Bribery to Christie:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Mode of Communications:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Substance of communication:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Tactics employed:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General.

**498.    Defendant Christie + Defendant Stein:**
<u>Date range:</u> 2006 to 2019.
<u>Conduits of Communication + Bribery to Christie:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Mode of Communications:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Substance of communication:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Tactics employed:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Office of the New Jersey Attorney General + Governor's office in Trenton – 7 Christie/Republican political fund raisers

**499.    Defendant Christie + Defendant NJBME:**
<u>Date range:</u> 2009 to 2019.
<u>Conduits of Communication + Bribery to Christie:</u> See above. As with Defendant Christie + Defendant HUMC
<u>Mode of Communications:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Substance of communication:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Tactics employed:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Governor's office in Trenton + Christie/Republican political fund raisers

**500.    Defendant Christie + Defendant Kanefsky:**
<u>Date range:</u> 2009 to 2019.
<u>Conduits of Communication + Bribery to Christie:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Mode of Communications:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Substance of communication:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Tactics employed:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Governor's office in Trenton + Christie/Republican political fund raisers

**501.    Defendant HUMC + Defendant Christie:**
<u>Date range:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Conduits of Communication + Bribery to Christie:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Mode of Communications:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Substance of communication:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Tactics employed:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Location:</u> Governor's office in Trenton + Christie/Republican political fund raisers + HUMC

**502.    Defendant HUMC + Defendant AHS:**

<u>Date range:</u> 2006 to 2019.

<u>Conduits of Communication + Bribery to Christie:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Mode of Communications:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Substance of communication:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Tactics employed:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Location:</u> Christie/Republican political fund raisers + HUMC + AHS + Office of the New Jersey Attorney General

**503.    Defendant HUMC + Defendant Garrett:**

<u>Date range:</u> 2006 to 2019.

<u>Conduits of Communication + Bribery to Christie:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Mode of Communications:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Substance of communication:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Tactics employed:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Location:</u> Hackensack Medical Center + Christie/Republican political fund raisers

**504.    Defendant HUMC + Defendant Hafner:**

<u>Date range:</u> 2009 to 2019

<u>Conduits of Communication + Bribery to Christie:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Mode of Communications:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Substance of communication:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Tactics employed:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Location:</u> Hackensack Medical Center + Office of the New Jersey Attorney General

**505.    Defendant HUMC + Defendant Stein:**

<u>Date range:</u> 2006 to 2019.

<u>Conduits of Communication + Bribery to Christie:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Mode of Communications:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Substance of communication:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Tactics employed:</u> See above. As with Defendant Christie + Defendant HUMC.

<u>Location:</u> Hackensack Medical Center + Christie/Republican political fund raisers

**506.    Defendant HUMC + Defendant NJBME:**
Date range: 2006 to 2019.
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Hackensack Medical Center + Office of the New Jersey Attorney General

**507.    Defendant HUMC + Defendant Kanefksy:**
Date range: 2009 to 2019
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Hackensack Medical Center + Office of the New Jersey Attorney General

**508.    Defendant AHS + Defendant Christie:**
Date range: 2006 to 2019.
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Morristown Memorial Hospital + Governor's office in Trenton + Christie/Republican political fund raisers.

**509.    Defendant AHS + Defendant HUMC:**
Date range: 2006 to 2019
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Morristown Memorial Hospital + Hackensack Medical Center.

**510.    Defendant AHS + Defendant Garrett:**
Date range: 2006 to 2019
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.

Location: Morristown Memorial Hospital + Hackensack Medical Center + Christie/Republican political fund raisers

**511.    Defendant AHS + Defendant Hafner:**

Date range: 2009 to 2019,

Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.

Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.

Substance of communication: See above. As with Defendant Christie + Defendant HUMC.

Tactics employed: See above. As with Defendant Christie + Defendant HUMC.

Location: Morristown Memorial Hospital + Office of the New Jersey Attorney General

**512.    Defendant AHS + Defendant Stein:**

Date range: 2006 to 2019

Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.

Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.

Substance of communication: See above. As with Defendant Christie + Defendant HUMC.

Tactics employed: See above. As with Defendant Christie + Defendant HUMC.

Location: Christie/Republican political fund raisers + Morristown Memorial Hospital

**513.    Defendant AHS + Defendant NJBME:**

Date range: 2006 to 2019

Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.

Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.

Substance of communication: See above. As with Defendant Christie + Defendant HUMC.

Tactics employed: See above. As with Defendant Christie + Defendant HUMC.

Location: Morristown Memorial Hospital + Office of the New Jersey Attorney General

**514.    Defendant AHS + Defendant Kanefsky:**

Date range: 2009 to 2019

Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.

Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.

Substance of communication: See above. As with Defendant Christie + Defendant HUMC.

Tactics employed: See above. As with Defendant Christie + Defendant HUMC.

Location: Morristown Memorial Hospital + Office of the New Jersey Attorney General

**515.    Defendant Garrett + Defendant Christie:**

Date range: 2009 to 2019.

Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.

Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.

Substance of communication: See above. As with Defendant Christie + Defendant HUMC.

<u>Tactics employed:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Morristown Memorial Hospital + Governor's office in Trenton + Christie/Republican political fund raisers.

**516.   Defendant Garrett + Defendant HUMC:**
<u>Date range:</u> 2006 to 2019
<u>Conduits of Communication + Bribery to Christie:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Mode of Communications:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Substance of communication:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Tactics employed:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Hackensack Medical Center + Christie/Republican political fund raisers

**517.   Defendant Garrett + Defendant AHS:**
<u>Date range:</u> 2006 to 2019
<u>Conduits of Communication + Bribery to Christie:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Mode of Communications:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Substance of communication:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Tactics employed:</u> See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Morristown Memorial Hospital + Hackensack Medical Center + Christie/Republican political fund raisers

**518.   Defendant Garrett + Defendant Hafner:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Hackensack Medical Center + Office of the New Jersey Attorney General

**519.   Defendant Garrett + Defendant Stein:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Hackensack Medical Center + Christie/Republican political fund raisers

**520.   Defendant Garrett + Defendant NJBME:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Hackensack Medical Center + Office of the New Jersey Attorney General

**521.   Defendant Garrett + Defendant Kanefsky:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Hackensack Medical Center + Office of the New Jersey Attorney General

**522.   Defendant Hafner + Defendant Christie:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General

**523.    Defendant Hafner + Defendant HUMC:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Hackensack Medical Center + Office of the New Jersey Attorney General

**524.    Defendant Hafner + Defendant AHS:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Morristown Memorial Hospital + Office of the New Jersey Attorney General

**525.    Defendant Hafner + Defendant Garrett:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Hackensack Medical Center + Office of the New Jersey Attorney General

**526.    Defendant Hafner + Defendant Stein:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Office of the New Jersey Attorney General

**527.    Defendant Hafner + Defendant NJBME:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Office of the New Jersey Attorney General

**528.    Defendant Hafner + Defendant Kanefsky:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Office of the New Jersey Attorney General

**529.    Defendant Stein + Defendant Christie:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Governor's office in Trenton + Christie/Republican political fund raisers

**530.    Defendant Stein + Defendant HUMC:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Hackensack Medical Center + Christie/Republican political fund raisers

**531.    Defendant Stein + Defendant AHS:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Morristown Memorial Hospital + Christie/Republican political fund raisers

**532.    Defendant Stein + Defendant Garrett:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Hackensack Medical Center + Christie/Republican political fund raisers

**533.    Defendant Stein + Defendant Hafner:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Office of the New Jersey Attorney General

**534.   Defendant Stein + Defendant NJBME:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Christie/Republican political fund raisers + Office of the New Jersey Attorney General

**535.   Defendant Stein + Defendant Kanefsky:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Christie/Republican political fund raisers + Office of the New Jersey Attorney General

**536.   Defendant NJBME + Defendant Christie:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General

**537.   Defendant NJBME + Defendant HUMC:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Hackensack Medical Center + Office of the New Jersey Attorney General

**538.   Defendant NJBME + Defendant AHS:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Morristown Memorial Hospital + Office of the New Jersey Attorney General

**539.   Defendant NJBME + Defendant Garrett:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Hackensack Medical Center + Office of the New Jersey Attorney General

**540.   Defendant NJBME + Defendant Hafner:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Office of the New Jersey Attorney General

**541.   Defendant NJBME + Defendant Stein:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Office of the New Jersey Attorney General

**542.   Defendant NJBME + Defendant Kanefsky:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Office of the New Jersey Attorney General

**543.   Defendant Kanefsky + Defendant Christie:**
See above. As with Defendant Christie + Defendant HUMC.
<u>Location:</u> Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General

**544.   Defendant Kanefsky + Defendant HUMC:**
See above. As with Defendant Christie + Defendant HUMC.

Location: Hackensack Medical Center + Office of the New Jersey Attorney General

**545.  Defendant Kanefsky + Defendant AHS:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Morristown Memorial Hospital + Office of the New Jersey Attorney General

**546.  Defendant Kanefsky + Defendant Garrett:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Hackensack Medical Center + Office of the New Jersey Attorney General

**547.  Defendant Kanefsky + Defendant Hafner:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Office of the New Jersey Attorney General

**548.  Defendant Kanefsky + Defendant Stein:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Christie/Republican political fund raisers + Office of the New Jersey Attorney General

**549.  Defendant Kanefsky + Defendant NJBME:**
See above. As with Defendant Christie + Defendant HUMC.
Location: Office of the New Jersey Attorney General

**550.** The CAS RICO Association-In-Fact Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:
**(a)** Mail Fraud: The CAS RICO Association-In-Fact Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent and /or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of bribes and kickbacks, to have the Plaintiff's license improperly revoked, his reputation destroyed, and impede the growth of minimally invasive spine surgery in free standing outpatient surgical centers. These ends were pursued by means of false representations and omissions.
**(b)** Wire Fraud: The CAS RICO Association-In-Fact Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be received, materials by wire for the purpose of executing the unlawful scheme to defraud the Plaintiff of the property rights of his medical license, reputation and minimally invasive spine surgery business, based on false pretenses, misrepresentations that the Plaintiff was not qualified to perform minimally invasive spine surgery, and had committed insurance and bank fraud.

**551.** The CAS RICO Association-In-Fact Defendants' use of the mails and wires include, but are not limited to: **(a)** the transmission of letters, e-mails and other materials with Defendant Hafner, regarding the scheme to eliminate the Plaintiff from the practice of medicine; **(b)** the transmission of letters, emails and other materials indicating that the CAS RICO Association-In-Fact Defendants had advised the medico-legal community not

to support the Plaintiff in any litigation; **(c)** written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; **(d)** written, telephone, or electronic communications instructing the medico-legal community not to support the Plaintiff in any litigation; **(e)** written, telephone, or electronic communications regarding discussions between the CAS RICO Association-In-Fact Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; **(f)** the use of the mails or wires to further schemes to eradicate the Plaintiff's economic standing; **(g)** the use of the mails and wires to communicate the illegal scheme with Defendants Washburn and North Jersey Media Group.

552.    The CAS RICO Association-In-Fact Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with every New Jersey hospital, surgical center, American state licensing board, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, and other healthcare related third-party entities in furtherance of the scheme, the purpose of which was to harm the Plaintiff's economic and global reputation.

553.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the competition presented by the Plaintiff and by those minimally invasive spine surgeons he had trained and planned on training.

554.    Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

555.    The CAS RICO Association-In-Fact Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CAS RICO Association-In-Fact Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CAS RICO Association-In-Fact Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct. The CAS RICO Association-In-Fact Defendants aided and abetted other in violations of the above laws.

556.    To achieve their common goals, the CAS RICO Association-In-Fact Defendants **(i)** fostered an environment in which they encouraged their staff to defame the Plaintiff; **(ii)** filed complaints with state and federal healthcare regulatory authorities; **(iii)**

instructed their members to discontinue communications with the Plaintiff and; **(iv)** encouraged the media to publish defamatory articles. The CAS RICO Association-In-Fact Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct, agreeing to conceal the fraudulent intent of the scheme, and its illegal tactics. The CAS RICO Association-In-Fact Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions made by them and would cease communicating and engaging in healthcare commerce with the Plaintiff.

557.    As described herein, the CAS RICO Association-In-Fact Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eradicating the competition, and increasing the CAS RICO Association-In-Fact Defendants revenues and executive compensation. The predicate acts also had the same or similar results, participants and methods of commission. The predicate acts were related and not isolated events.

558.    During the CAS RICO Association-In-Fact Defendants' perpetration of their scheme the true purpose of the fraudulent racket was revealed to CAS RICO Association-In-Fact Defendant Garrett. Nevertheless, in furtherance of their scheme, Defendant Garrett continued to disseminate falsehoods, that the Plaintiff had committed insurance fraud, Medicare fraud, bank fraud and was not qualified to perform minimally invasive spine surgery.

559.    By reason of, and as a result of the conduct of the CAS RICO Association-In-Fact Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of monies earned, and the loss of future earnings. The CAS RICO Association-In-Fact Defendants violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).


## COUNT FIVE
### VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
### THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ.
### (By Plaintiffs against Defendants Christie + HUMC + Washburn + NJMG)
### The CHN RICO Association-In -Fact-Enterprise

**560.** Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

**561.** Plaintiffs brings this Count against Defendants NJMG + Washburn + Christie + HUMC (inclusively, for the purposes of this Count, the "CHN RICO Association-In-Fact Defendants").

**562.** At all relevant times the CHN RICO Association-In-Fact Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

**563.** Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

**564.** As explained in detail below, the CHN RICO Association-In-Fact Defendants sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, eliminate the competition he presented to parties with whom they engaged in commerce, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing. The purpose of their scheme was to divert patients requiring minimally invasive spine surgery away from the Plaintiff's surgical center, and towards the facilities and physicians, with whom they engaged in commerce. As explained in detail below, the CHN RICO Association-In-Fact Defendants' eight-year campaign of misconduct violated sections 1962(c) and (d).

### U. Description of the CHN RICO Enterprise

**565.** RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features: **(1)** a purpose; **(2)** relationships among those associated with the enterprise; and **(3)** longevity sufficient to permit those associates to pursue the enterprise's purpose.

**566.** For many years CHN RICO Association-In-Fact Defendants Washburn and NJMG occupied a critical role in deciding what stories they published about state government actions and politicians. The CHN RICO Association-In-Fact Defendant NJMG was a privately-owned company, before it was sold to national media conglomerate, Gannet Media, in July 2016. Its business holdings extended way beyond the reporting of news, and it depended on state government permits and approvals to further these non-news

economic ends. Its news cycles also depended on sources within the state administration.

567.    CHN RICO Association-In-Fact Defendants NJMG and Washburn were not informed of the June 13, 2012 medical board hearing in Trenton, as was the Star Ledger, its competition. CHN RICO Association-In-Fact Defendants were subsequently promised access to the administration of Defendant Christie, after having agreed to publish defamatory articles about the Plaintiff, on which agents of Defendant Christie collaborated. These actions aligned the political and commercial interests of the Defendants from the CHC RICO Association-In-Fact Enterprise, the CAD RICO Association-In-Fact Enterprise, the CAS RICO Association-In-Fact Enterprise with the Defendants of the CHN RICO Association-In-Fact Enterprise, all of whom engaged directly or indirectly in conduct that furthered their commercial/political agendas.

568.    In the past five years, Defendant NJMG experienced a decrease in its annual revenues, and came under extreme financial pressure, which caused an increased reliance on advertising revenue from the CHC RICO Defendants, the CAD RICO Defendants and the CAS RICO Defendants. These Defendants used their financial leverage with the Defendant NJMG, to publish defamatory stories to eliminate the commercial competitive threat presented to them by the Plaintiff's rapidly expanding minimally invasive spine surgery practice.

569.    Discussions occurred between the CHN RICO Association-In-Fact Defendants regarding the Plaintiff, during which the parties discussed the threat to their commercial interests, because the Plaintiff's expanding outpatient minimally invasive spine surgery practice had diverted business away from the CHC, CAD and CAS RICO Association-In-Fact Defendants, whose advertising revenues permitted Defendant NJMG to remain solvent. Defendant NJMG recognized the indirect commercial advantage that would ensue from publicly attacking the Plaintiff and surgical centers generally.

570.    In order to ensure that their corporate profits were not affected by the increasing commercial success of the Plaintiff's minimally invasive spine surgery practice, and the expanding number of minimally invasive spine surgeons being trained by the Plaintiff, Defendant NJMG co-orchestrated a scheme with the other CHN RICO Association-In-Fact Defendants, to have the revocation of the Plaintiff's medical license widely publicized across the internet. As part of the scheme the CHN RICO Association-In-Fact Defendants disseminated false information within the medico-legal community that the Plaintiff had committed insurance fraud, bank fraud and was not qualified to perform minimally invasive spine surgery. This was done in order to discredit the Plaintiff and isolate him from his colleagues and patients.

571.    The scheme to maintain and increase the profits of Defendant NJMG through the destruction of the Plaintiff's reputation and elimination of his practice, benefited the other Defendants, many of whom advertised with Defendant NJMG. The scheme also

enriched its corporate executives, its non-media interests, and permitted increased monies to be funneled through the middleman to Defendant Christie.

572.   At all relevant times the CHN RICO Association-In-Fact Defendants operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that their fraudulent scheme to have the Plaintiff's license revoked was perpetrated to its conclusion. Many of the association-in-fact enterprise meetings occurred behind closed doors in Morris and Bergen County, a large percentage of which were attended by members of the Office of The New Jersey Attorney General, and most frequently by Defendant Hafner. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4).

573.   Alternatively, each of the CHN RICO Association-In-Fact Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the other Defendants conducted their pattern of racketeering activity. The CHN RICO Association-In-Fact Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the other Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CHN RICO Association-In-Fact Enterprise."

574.   At all relevant times, the CHN RICO Association-In-Fact Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the CHN RICO Association-In-Fact Defendants profit making scheme, a fraudulent scheme that involved collusion with state agencies and actors, to ensure the revocation of the Plaintiff's license, destruction of his reputation and decimation of his economic standing.

575.   The association-in-fact CHN Enterprise consisted of the following entities and individuals: **(a)** Defendant NJMG; **(b)** Defendant Washburn; **(c)** Defendant HUMC: **(d)** Defendant Christie. While each of the CHN RICO Association-In-Fact Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CHN RICO Association-In-Fact Enterprise's affairs, at all relevant times, the CHN RICO Association-In-Fact Enterprise: (a) had an existence separate and distinct from each CHN RICO Association-In-Fact Defendants; (b) was separate and distinct from the pattern of racketeering in which the CHN RICO Association-In-Fact Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CHN RICO Association-In-Fact Defendants, along with other individuals and entities, including unknown third parties.

576.   The CHN RICO Association-In-Fact Defendants and their co-conspirators, through their illegal CHN RICO Association-IN-Fact Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CHN RICO Association-In-Fact Enterprise's activities by bribing Defendant Christie to have the

Plaintiff's license revoked, and conspiring to publish defamatory stories about the Plaintiff. The purpose of the revocation and defamation was to eliminate the threat that his work presented to the Defendants who advertised with Defendant NJMG.

**577.**    The CHN RICO Association-In-Fact Defendants were provided with improper access to state agencies (Defendant NJBME + OAL) resources and personnel (Defendant Solomon + Defendant Hafner) that were involved in the revocation of the Plaintiff's license, in return for bribing Defendant Christie with monies disguised as 'campaign donations'. The monies were part of a quid pro quo scheme, not protected under Noerr Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license. Defendant NJMG was given preferential access to the state government information, in return for the publication of slanderous stories about the Plaintiff. In furtherance of the scheme, the CMS RICO Association-In-Fact Defendant NJMG and Defendant HUMC affirmatively misrepresented or concealed from their corporate board members, the existence of bribes, quid pro quo schemes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. The Defendants understood that if the board members became aware of the scheme, they would have opposed it, realizing the liability it would incur. Specifically, CHN RICO Association-In-Fact Defendant NJMG mischaracterized the nature of Kaul v Christie, when it was sold to Gannett Media in July 2016.

## ✗. The CHN RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

**578.**    Each CHN RICO Association-In-Fact Defendant benefited financially from the CHN RICO Association-In-Fact Enterprise. Defendant NJMG increased its revenues, through the expedited issuance of state permits for it non-media, real estate based commercial interests.

**579.**    As part of a quid pro quo that existed within the CHN RICO Association-In-Fact Enterprise, Defendant Christie, in return for favorable political publicity from Defendant NJMG, and bribes from Defendant HUMC, instructed his staff to provide personal and professional information about the Plaintiff to the CHN RICO Association-In-Fact Defendants.

**580.**    At all relevant times, the CHN RICO Association-In-Fact Enterprise: **(a)** had an existence separate and distinct from each CHN RICO Association-In-Fact Defendant; **(b)** was separate and distinct from the pattern of racketeering in which the CHN RICO Association-In-Fact Defendants engaged; and **(c)** was an ongoing and continuing organization consisting of legal entities, including the CHN RICO Association-In-Fact Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise. The CHN RICO Association-In-Fact Enterprise was formed for the purpose of bribing and providing favorable publicity to

Defendant Christie, in order to procure expedited and preferential state permits, and personal/professional information about the Plaintiff.

581.    The CHN RICO Association-In-Fact Defendants comprise a group of "persons" who influence public opinion, while engaging in political and commercial activities, that are contrary to independent news reporting. They and their co-conspirators engaged in a pattern of racketeering activity, which involved a revenue enhancing fraudulent conspiracy, that was part of a wider scheme to have the Plaintiff's license revoked.

582.    The CHN RICO Association-In-Fact Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the internet marketing of legal services and news reporting, the consequences of which have generated enormous profits.

583.    Within the CHN RICO Association-In-Fact Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The CHN RICO Association-In-Fact Enterprise used this common communication network for purposes of promoting false information that the Plaintiff was not qualified to perform minimally invasive spine surgery, had committed insurance fraud, Medicare fraud and bank fraud. The purpose of this propaganda campaign was to isolate the Plaintiff from the medico-legal community and any source of capital.

584.    Each participant in the CHN RICO Association-In-Fact Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CHN RICO Association-In-Fact Enterprise, the CHN RICO Association-In-Fact Defendants functioned as a continuing unit with the purpose of furthering the CHN RICO Association-In-Fact Scheme.

585.    The CHN RICO Association-In-Fact Defendants participated in the operation and management of the CHN RICO Association-In-Fact Enterprise by directing its affairs, as described herein. While the CHN RICO Association-In-Fact Defendants participated in, and are members of the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

586.    The CHN RICO Association-In-Fact Defendants exerted substantial control over the CHN RICO Association-In-Fact Enterprise, and participated in the affairs of the enterprise by: **(a)** communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Defendant Christie, and members of both state and federal governments; **(b)** procuring appointments to regulatory state agencies and the board of Defendant HUMC, which they used to further their economic agendas; **(c)** misrepresenting and/or concealing from the public the true nature of the relationship and agreements between the members of the enterprise and the scheme

to bribe Defendant Christie in order to revoke the Plaintiff's medical license; **(d)** otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; **(e)** ensuring that the other CHN RICO Association-In-Fact Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

587.    Without each CHN RICO Association-In-Fact Defendants' willing participation, the CHN RICO Association-In-Fact Scheme and common course of conduct would not have been successful.

588.    The CHN RICO Association-In-Fact Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

### W. N Predicate Acts: Mail and Wire Fraud

589.    To carry out, or attempt to carry out, the scheme to defraud, the CHN RICO Association-In-Fact Defendants, each of whom is a person associated-in-fact with the CHN RICO Association-Fact Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CHN RICO Association-In-Fact Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

590.    Specifically, the CHN RICO Association-In-Fact Defendants have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten (10) years.

591.    The multiple acts of racketeering activity which the CHN RICO Association-In-Fact Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CHN RICO Association-In-Fact Defendants' regular use of the facilities, services, distribution channels, and employees of the CHN RICO Association-In-Fact Enterprise. The CHN RICO Association-In-Fact Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

592.    The CHN RICO Association-In-Fact Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of

their scheme through virtually uniform misrepresentations, concealments, and material omissions.

593.    In devising and executing the illegal scheme, the CHN RICO Association-In-Fact Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public, the Plaintiff's patients and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud. These were and are, materially false representations. For the purpose of executing the illegal scheme, the CHN RICO Association-In-Fact Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

**From paragraph 537 to 548 Kaul has pled with particularity, fact specific to each element, of each claim, against each defendant, in a separate and distinct manner:**

594.    **Defendant Christie + Defendant HUMC:**
Date range: 2006 to 2019.
Conduits of Communication + Bribery to Christie: Public relations firm (Mercury Public Relations + Princeton Public Relations + Law Firm (Brach Eichler + Wolf Samson) + Through state government intermediary + Directly + Political campaign fundraisers + Political campaign donations.
Mode of Communications: US mail + E-mail + Voice message + SMS (text) + Face to face.
Substance of communication: Scheme to revoke Kaul's license + Scheme to destroy Kaul's reputation + Scheme to destroy Kaul's economic standing + Scheme to have Kaul ostracized - Scheme to have Kaul leave the United States.
Tactics employed: Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery + Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce Defendant NJBME and the New Jersey Attorney General to have Kaul's license revoked + Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license + Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States + Use of the US mail and wires to further scheme to have Kaul's license revoked by having Defendant Lomazow use his authority on Defendant NJBME to initiate an investigation against Kaul, in order to have his license revoked + Use of the US mail and wires to organize and further orders from Christie to revoke Kaul's license, in furtherance of quid pro quo schemes of bribery + Use of the US mail and wires to transmit letters, e-mails and other materials negotiating the horizontal agreements and market share distributions + Use of the US mails and wires to transmit letters, emails and other materials indicating that the CHN RICO Association-In-Fact Defendants had instructed

their members not to support the Plaintiff in any litigation + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation of the Plaintiff's license + Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the CHN RICO Association-In-Fact Defendants and state and federal politicians about the illegal scheme to revoke Kaul's license + Use of the US mails and wires to bill and collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine + Use of the US mails and wires to transmit information in furtherance of Christie's scheme to illegally have his attorney general and acting director of the division of consumer affairs have Defendant NJBME revoke Kaul's license + Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2') to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment
Location: Hackensack Medical Center + Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General

595.    **Defendant Christie + Defendant Washburn:**
Date range: 2009 to 2019
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Governor's office in Trenton + Christie/Republican political fund raisers + Office of Defendant NJMG.

596.    **Defendant Christie + Defendant NJMG:**
Date range: 2006 to 2019.
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC
Tactics employed: See above. As with Defendant Christie + Defendant HUMC
Location: Governor's office in Trenton + Christie/Republican political fund raisers + Office of Defendant NJMG.

597.    **Defendant HUMC + Defendant Christie:**
Date range: 2006 to 2019.
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.

Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Hackensack Medical Center + Governor's office in Trenton + Christie/Republican political fund raisers

598.    **Defendant HUMC + Defendant Washburn:**
Date range: 2006 to 2019.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Hackensack Medical Center + Christie/Republican political fund raisers.

599.    **Defendant HUMC + Defendant NJMG:**
Date range: 2006 to 2019.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC
Substance of communication: See above. As with Defendant Christie + Defendant HUMC
Tactics employed: See above. As with Defendant Christie + Defendant HUMC
Location: Hackensack Medical Center + Christie/Republican political fund raisers + Office of Defendant NJMG.

600.    **Defendant Washburn + Defendant Christie:**
Date range: 2009 to 2019.
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie + Defendant HUMC.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Christie/Republican political fund raisers.

601.    **Defendant Washburn + Defendant HUMC:**
Date range: 2006 to 2019.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Hackensack Medical Center + Christie/Republican political fund raisers.

602.    **Defendant Washburn + Defendant NJMG:**
Date range: 2006 to 2019.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Christie/Republican political fund raisers + Office of Defendant NJMG.

**603.    Defendant NJMG + Defendant Christie:**
Date range: 2006 to 2019.
Conduits of Communication + Bribery to Christie: See above. As with Defendant Christie +
Defendant HUMC.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Governor's office in Trenton + Christie/Republican political fund raisers + Office of
Defendant NJMG.

**604.    Defendant NJMG + Defendant HUMC:**
Date range: 2006 to 2019.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC.
Substance of communication: See above. As with Defendant Christie + Defendant HUMC.
Tactics employed: See above. As with Defendant Christie + Defendant HUMC.
Location: Hackensack Medical Center + Christie/Republican political fund raisers + Office of
Defendant NJMG.

**605.    Defendant NJMG + Defendant Washburn:**
Date range: 2006 to 2019.
Mode of Communications: See above. As with Defendant Christie + Defendant HUMC
Substance of communication: See above. As with Defendant Christie + Defendant HUMC
Tactics employed: See above. As with Defendant Christie + Defendant HUMC
Location: Christie/Republican political fund raisers + Office of Defendant NJMG.

606. The CHN RICO Association-In-Fact Defendants' predicate acts of racketeering (18
U.S.C. § 1961(1) include, but are not limited to:
**(a)** Mail Fraud: The CHN RICO Association-In-Fact Defendants violated 18 U.S.C. § 1341
by sending or receiving, or causing to be sent and /or received, materials via U.S. mail or
commercial interstate carriers for the purpose of executing the unlawful scheme of
bribes and kickbacks, to have the Plaintiff's license improperly revoked, his reputation
destroyed, and impede the growth of minimally invasive spine surgery in free standing
outpatient surgical centers. These ends were pursued by means of false representations
and omissions.
**(b)** Wire Fraud: The CHN RICO Association-In-Fact Defendants violated 18 U.S.C. § 1343
by transmitting and/or receiving, or by causing to be received, materials by wire for the
purpose of executing the unlawful scheme to defraud the Plaintiff of the property rights
of his medical license, reputation and minimally invasive spine surgery business, based
on false pretenses, misrepresentations that the Plaintiff was not qualified to perform
minimally invasive spine surgery, and that he had committed insurance and bank fraud.

607.    The CHN RICO Association-In-Fact Defendants' use of the mails and wires
include, but are not limited to: **(a)** the transmission of letters, e-mails and other
materials with Defendant Hafner, regarding the scheme to eliminate the Plaintiff from

the practice of medicine; **(b)** the transmission of letters, emails and other materials indicating that the CHN RICO Association-In-Fact Defendants had advised the medico-legal community not to support the Plaintiff in any litigation; **(c)** written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; **(d)** written, telephone, or electronic communications instructing the medico-legal community not to support the Plaintiff in any litigation; **(e)** written, telephone, or electronic communications regarding discussions between the CHN RICO Association-In-Fact Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; **(f)** the use of the mails or wires to further schemes to eradicate the Plaintiff's economic standing; **(g)** the use of the mails and wires to communicate the illegal scheme with unnamed third party co-conspirators.

**608.** The CHN RICO Association-In-Fact Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with New Jersey hospitals, surgical centers, American state licensing boards, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, New Jersey politicians, and other healthcare related third-party entities in furtherance of the scheme, the purpose of which was to globally harm the Plaintiff's economic and reputational standing.

**609.** The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the competition presented by the Plaintiff, and by those minimally invasive spine surgeons he had trained, and planned on training, who competed against the patrons of CHN RICO Association-In-Fact Defendants, NJMG and HUMC.

**610.** Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

**611.** The CHN RICO Association-In-Fact Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CHN RICO Association-In-Fact Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CHN RICO Association-In-Fact Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators, through the illegal scheme and common course of conduct. The CMS RICO Association-In-Fact Defendants aided and

abetted other in violation of the above laws.

612.    To achieve their common goals, the CHE RICO Association-In-Fact Defendants **(i)** fostered an environment in which they encouraged their staff to defame the Plaintiff; **(ii)** filed complaints with state and federal healthcare regulatory authorities; **(iii)** encouraged other media outlets to publish defamatory articles and **(iv)** illegally recorded the Plaintiff in violation of state and federal law. The CHN RICO Association-In-Fact Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CHN RICO Association-In-Fact Defendants and their co-conspirators had to agree to conceal the fraudulent intent of the scheme, and its illegal tactics. The CHN RICO Association-In-Fact Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions made by them and would cease communicating and engaging in healthcare commerce with the Plaintiff.

613.    As described herein, the CHN RICO Association-In-Fact Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eradicating the competition, and indirectly increasing the CMS RICO Defendants revenues and executive compensation. The predicate acts also had the same or similar results, participants and methods of commission. The predicate acts were related and not isolated events.

614.    During the CHN RICO Association-In-Fact Defendants' perpetration of their scheme the true purpose of the fraudulent racket was revealed to CHN RICO Association-In-Fact Defendant, Washburn. Nevertheless, in furtherance of their scheme, Defendant Washburn continued to disseminate falsehoods that the Plaintiff had committed insurance fraud, Medicare fraud, bank fraud and was not qualified to perform minimally invasive spine surgery.

615.    By reason of, and as a result of the conduct of the CHN RICO Association-In-Fact Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of monies earned, and the loss of future earnings.

616.    The CHN RICO Association-In-Fact Defendants violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## 12.    Antitrust Impact

**617.**    Subsequent to the downgrading of the relative value units for endoscopic discectomy in 2011, the commercial potential of the Plaintiff's practice was harmed. The scheme was engineered by a group of neurosurgeons, led by Defendant Gregory Przybylski, the 2011 President of the North American Spine Society. These neurosurgeons, because of their influential positions within their professional societies, had the codes modified on the understanding that the majority of minimally invasive spine surgeons, from interventional pain backgrounds, would be unable to perform open micro-discectomies. The neurosurgeons effectuated the change without publicizing it for comment, thus denying the Plaintiff the opportunity to object. This act was in violation of both NASS and AMA bylaws and regulations.

**618.**    These changes lowered the reimbursement rate for endoscopic discectomies, which caused a larger percentage of the insurance health fund to be diverted to the Defendant Neurosurgeons and Hospitals, who subsequently raised their fees for the same procedure. The code change, however, did not apply if the endoscopic discectomy was performed in a hospital, as the fee remained unaltered. This benefited the neurosurgeons who had hospital privileges to perform spinal procedures, and it benefitted the hospitals. It also benefitted Defendants Allstate and GEICO, whose clients had personal injury policies that most hospitals did not accept. This caused these patients to be deprived of access to minimally invasive spine surgery.

**619.**    As a consequence, the Plaintiff sustained substantial losses and damage to his business and property, because of the reduced reimbursement associated with outpatient minimally invasive spine surgery.

**620.**    The Defendant Neurosurgeons, Hospitals, Allstate and GEICO have, through the bribing of politicians, effectuated legislation and regulatory changes that harmed the Plaintiff's minimally invasive spine surgery practice. These included **(i)** a downgrading in the Relative Value Unit associated with the CPT code for endoscopic discectomy **(ii)** the veto of a bill in 2011 by Defendant Christie, that was designed to permit state licensure of one-room surgical centers and **(iii)** the refusal of the insurance carriers to reimburse surgical centers for minimally invasive spine surgery. These acts artificially and arbitrarily reduced the availability of outpatient minimally invasive spine surgery.

**621.**    The aforementioned acts resulted in an increase of the fees charged by the Defendant Neurosurgeons and Hospitals, and excluded patients with accident related injuries, most of whom have no secondary insurance, from receiving minimally invasive spine surgery. In 2012 Defendants Allstate and GEICO stopped reimbursement to surgical centers for minimally invasive spine surgery, and reduced physician fees by more than

eighty percent (80%). The majority of physicians affected were outpatient minimally invasive spine surgeons, such as the Plaintiff.

622.    The Defendant Neurosurgeons and Hospitals have monopolized the New Jersey minimally invasive spine market. The rise in opiate consumption is related to a reduction in the availability of minimally invasive spine surgery, as patients' options for pain relief became constricted. As a consequence, The Defendant Hospitals, Neurosurgeons, Allstate and GEICO reaped larger profits, at the expense of their clients and the public. These grossly elevated profits caused a four hundred percent (400%) increase in Defendant Allstate's share price but did not result in a reduction in their clients' premiums. In fact, the premiums have continued to increase.

623.    The rise in Defendant Allstate's share price, since the implementation of the aforesaid changes, is the product of nothing but bribery and legal chicanery.

624.    The Defendant Neurosurgeons and Hospitals passed on their inflated prices to private insurance companies, such as United, Aetna and Cigna, who have passed on the increased costs to their customers. Defendants Allstate and GEICO's increased profits were not shared with the New Jersey public, who have continued to incur annual increases in their auto premiums.

625.    The Defendant Neurosurgeons and Hospitals anticompetitive conduct enabled it to indirectly charge consumers and third-party payors, prices in excess of what they would otherwise would have been able to charge, absent their unlawful actions.

626.    The prices were inflated as a direct and foreseeable result of the Defendants' anticompetitive conduct individually and with the hospitals. The inflated prices the End-Payor i.e. the public and the private insurance companies are now forced to pay are traceable to, and the foreseeable result of the reduction in availability of minimally invasive spine services, and the consequent price gouging by the defendant neurosurgeons and hospitals

## 13.    Definition of market

**627.**    The market in which the so called "**Spine Turf Wars**" erupted in approximately 2000 is the American market for minimally invasive spine surgery, which includes the following procedures:

1. Cervical endoscopic discectomy; 2. Thoracic endoscopic discectomy; 3. Lumbar endoscopic discectomy; 4. Anterior cervical discectomy and fusion; 4. Interbody lumbar fusion; 5. Vertebroplasty; 6. Kyphoplasty; 7. Percutaneous pedicle screw placement; 8. Percutaneous facet screw placement; 9. Interspinous distraction; 10. Interspinous fusion; 11. Facet fusion; 12.Sacro-iliac joint fusion; 13. Cervical lateral mass screws; 14. Dorsal column stimulators; 15. Interlaminar decompression.

**628.**    These clinical services are provided to the public to treat degenerative and traumatic spinal conditions that cause pain and functional disability, and are provided by physicians with training in the following areas of medicine and surgery:

1. Interventional pain; 2. Interventional radiology; 3. Neurosurgery; 4. Orthopedics; 5. Physiatry.

**629.**    The locations in which the clinical services can be provided are hospitals and outpatient surgical centers, with the latter being associated with a lower cost and incidence of post-operative infection and complications. The defendants alleged anti-trust violations, as detailed below, have artificially reduced the availability of minimally invasive spine surgery in outpatient surgical centers, and diverted its provision to hospitals, allowing hospitals to illegally monopolize minimally invasive spine surgery. The monopoly power has permitted hospitals to price gouge, arbitrarily raise their prices and charge patients amounts far in excess of what surgical centers charged, and what the market would have permitted them to charge, but for the defendants alleged anti-trust violations.

**630.**    Similarly, the defendants anti-trust violations, as detailed below, have artificially reduced the availability of minimally invasive spine surgery by physician groups in interventional pain, interventional radiology and physiatry, and diverted its provision to neurosurgeons/orthopedic surgeons, allowing them to illegally monopolize minimally invasive spine surgery. The monopoly power has permitted neurosurgeons/orthopedic surgeons to price gouge, arbitrarily raise their prices and charge patients amounts far in excess of what IR/IP/Physiatry physicians charged, and what the market would have permitted them to charge, but for the defendants alleged anti-trust violations.

**631.**    Defendants Allstate and Geico competed with Kaul for the reservoir of capital derived from the public/patients who purchased auto insurance policies, with the understanding that if they required medical care for auto related injuries, these monies would fund such care. These defendants, in conspiracy and collusion with the defendant hospitals and physicians, bribed

Defendant Christie and other New Jersey legislators to enact laws that either prohibited the provision of minimally invasive spine surgery in outpatient surgical centers or substantially reduced the reimbursements, through the introduction of fee schedules, which effectively prevented surgical centers from providing minimally invasive spine surgery. The fee schedules did not apply to hospitals and discriminated against surgical centers.

632.     Since 2000 the above physician groups have competed within the American minimally invasive spine surgery market, for patients with degenerative/traumatic spinal conditions. Each group has provided all of the above procedures to the American public and are "reasonably interchangeable substitutes" for the relevant clinical condition. As such, they are deemed to belong to the same "**relevant product/service market**". See U.S. v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct 994, 1007 (1956). See also Queen City Pizza, Inc. v. Domino's Pizza, Inc. 124 F.3d 430, 436 (3rd Cir. 1997) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."). The defendants alleged anti-trust violations, as detailed below, caused an artificial reduction in the supply of services, an artificial rise in price and a reduction in the outer boundaries of the market, due to a reduction in the level of interchangeable services and cross-elasticity of demand.

633.     The cross elasticity and interchangeability of the clinical services rendered by the IR/IP/Physiatry group provided the public with the same service as that from the NS/OS group, within the American minimally invasive spine surgery market. From 2000 to 2012, an increasing number of patients chose to have minimally invasive spine surgery performed in outpatient surgical centers by the IR/IP/Physiatry group, and more elected not to have their degenerated spines treated in hospitals by the NS/OS group. The reasons included reduced cost and superior clinical service. Hospitals and the NS/OS group priced themselves out of the market. Kaul's 0% post-operative infection rate evidenced the superior patient outcomes that were one of the reasons for the clinical and commercial success of his practice. To Kaul's knowledge similar outcomes were achieved across the United States by other physicians within the IR/IP/Physiatry group and within the outpatient surgical center community. The illegal suspension/revocation in 2012/2014 of Kaul's license caused an anti-trust like injury to the American minimally invasive spine surgery market, which caused it to contract, one consequence of which has been the exponential rise in opiate consumption and heroin use. Patients with spinal injuries, deprived of access to the contracted and more expensive American minimally invasive spine surgery market, have resorted to increased opiate use.

### 14.    The Relevant Geographic Market:

**634.**    The relevant geographic market in which Kaul competed was the United States. From approximately 2006 onwards Kaul had been referred patients from physicians in almost every other state in the Union, this being partly a consequence of the publicity surrounding his work, and partly a consequence of his superior clinical outcomes. In attracting these patients from other states, Kaul entered into competition with physicians and hospitals in those states that provided minimally invasive spine surgery. The relevant geographic market in this case is the area in which physicians providing minimally invasive spine surgery compete with one another for patients with degenerated spines causing pain and disability. See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (U.S. 1961) ("**the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.**"). Defining the relevant market is a question of fact for the jury, unless a party's proposed markets are so unsupported by the evidence or proper antitrust economics that no reasonable jury could properly find in favor of the party on the issue. See Sportservice, Inc. v. Charles O. Finley, 676 F.2d 1291, 1299 (9th Cir., 1982). Also see:

**635.**    Defendant Kaufman: "**That motherfucker Richard Kaul is trying to take over the spine business and we are going to put a stop to it.**" (D.E. 2 Page ID 140).

**636.**    Third-Party Witness Anthony Yeung, MD: "**There is a doctor in New Jersey, Richard Kaul, who is performing fusions, but they are going to get him.**" (D.E. 53-1 Page ID 1107).

### COUNT SIX
### For Declaratory and Injunctive Relief Under Section 16 of the Clayton Act for Defendants' Violations of Sections 1 and 2 of the Sherman Act (By Plaintiffs Against Defendants Kaufman + Staats + Przybylski + CNS + Heary + Cohen + HUMC + AHS + Burdine + LMB)

**637.**    Plaintiffs incorporates by reference the preceding allegations.

**638.**    Defendants knowingly and intentionally engaged in an anticompetitive scheme designed to block the Plaintiff, his surgical center and similarly trained physicians, from incorporating minimally invasive spine surgery into their outpatient practices. This scheme included, amongst other things **(i)** obtaining through fraud a downgrading of the relative value unit associated with outpatient endoscopic discectomy; **(ii)** procuring through bribery the veto of a bill in 2009 by Governor Christie, that would have permitted one operating room surgical centers to become licensed, the licensing of which would have removed the principal reason employed by Defendants Allstate and GEICO to deny payment to outpatient facilities and physicians; **(iii)** the procuring through bribery of the introduction of a fee schedule in 2011 that denied payment for the performance of outpatient minimally invasive spine surgery in free standing surgical

centers; **(iv)** encouraging patients to initiate civil litigation and medical board complaints against the Plaintiff and similarly trained physicians; **(v)** obtaining through bribery a moratorium in 2009 that prevented the issuance of licenses for one room outpatient surgical centers, unless they were commercially partnered with a hospital; **(vi)** unlawful agreements between representatives of Defendants ASIPP and CNS, that the market for minimally invasive spine surgery would be divided in such a way, that physicians with similar training as the Plaintiff, would be limited to performing only discectomies, and not fusions and; **(vii)** otherwise engaging in an overarching scheme to unlawfully monopolize, conspire to monopolize, and/or, allocate the market for minimally invasive spine surgery.

639.     Defendants conspired to monopolize, and did wrongfully and intentionally maintain monopoly power, with respect to minimally invasive spine surgery in violation of Section 2 of the Sherman Act. As a result of this unlawful maintenance of monopoly power, Plaintiff and his surgical center were excluded from the minimally invasive spine fusion market, as were similarly trained physicians and the New Jersey surgical center community. By their agreements, Defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. As a result of this unreasonable restraint on competition, Plaintiff and his surgical center were excluded from the minimally invasive spine surgery market, as were similarly trained physicians and the New Jersey surgical center community.

**From paragraph 573 to 628 Kaul has pled with particularity, fact specific to each element, of each claim, against each defendant, in a separate and distinct manner:**

640.     **Defendant Kaufman + Defendant Staats:**
Date range: 2006 to 2012
Mode of Communications: US mail + E-mail + Voice message + SMS (text) + Face to face.
Substance of communications: Scheme to downgrade the relative value unit associated with outpatient endoscopic discectomy + Scheme to bribe Defendant Christie to veto a bill in 2009 that would have permitted one operating room surgical centers to become licensed, the licensing of which would have removed the principal reason employed by Defendants Allstate and GEICO to deny payment to outpatient facilities and physicians + Scheme to bribe Defendant Christie in order to sign into law in 2011 a fee schedule that denied or reduced payment for the performance of outpatient minimally invasive spine surgery in free standing surgical centers + Scheme to encourage patients to initiate civil litigation and medical board complaints against the Plaintiff and similarly trained physicians + Scheme to obtain through bribing Defendant Christie a moratorium in 2009 that prevented the issuance of licenses for one-room outpatient surgical centers, unless they were commercially partnered with a hospital + Scheme to engage in knowingly unlawful agreements to divide the minimally invasive spine surgery market in such a way, that physicians with similar training as Kaul, would be limited to performing only discectomies, and not fusions + Scheme to engage in an overarching conspiracy to unlawfully monopolize, conspire to monopolize, and/or, artificially allocate the market for minimally invasive spine surgery + Scheme to unlawfully conspire and combine to intentionally and

arbitrarily restrict, restrain and or prohibit Kaul's ability to trade in the American minimally invasive spine surgery market + Scheme to restrict, restrain and or exclude Kaul from participating in the American minimally invasive spine surgery market.

Tactics employed: Conspired to, and did bribe Defendant Christie as part of a series of quid pro quo schemes to have Defendant NJBME revoke Kaul's license + Conspired to, and did encourage patients to file lawsuits and complaints with Defendant NJBME against Kaul + Conspired to, and did encourage patients to file complaints with state and federal regulatory authorities + Conspired to, and did participate in sham litigation and provided knowingly false testimony that caused the revocation of Kaul's license + Conspired to, and did participate in sham litigation and provided knowingly false testimony that caused the entry of false judgments against Kaul in civil malpractice cases + Conspired to, and did participate in sham litigation against Kaul's physician employees, falsely testifying that they were not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Conspired to, and did participate in sham litigation against the medical licenses of Kaul's physician employees

Location: Morristown Memorial Hospital + Meetings/Conferences organized by Defendant ASIPP + Christie/Republican political fund raisers.

**641.    Defendant Kaufman + Defendant Przybylski:**
Date range: See above. As with Defendant Kaufman + Defendant Staats.
Mode of Communications: See above. As with Defendant Kaufman + Defendant Staats.
Substance of communications: See above. As with Defendant Kaufman + Defendant Staats.
Tactics employed: See above. As with Defendant Kaufman + Defendant Staats.
Location: Meetings/Conferences organized by Defendant ASIPP/Defendant CNS + Office of the New Jersey Attorney General + Christie/Republican political fund raisers.

**642.    Defendant Kaufman + Defendant CNS:**
Date range: See above. As with Defendant Kaufman + Defendant Staats.
Mode of Communications: See above. As with Defendant Kaufman + Defendant Staats.
Substance of communications: See above. As with Defendant Kaufman + Defendant Staats.
Tactics employed: See above. As with Defendant Kaufman + Defendant Staats.
Location: Meetings/Conferences organized by Defendant ASIPP/Defendant CNS + Morristown Memorial Hospital + Christie/Republican political fund raisers.

**643.    Defendant Kaufman + Defendant Heary:**
Date range: See above. As with Defendant Kaufman + Defendant Staats
Mode of Communications: See above. As with Defendant Kaufman + Defendant Staats
Substance of communications: See above. As with Defendant Kaufman + Defendant Staats
Tactics employed: See above. As with Defendant Kaufman + Defendant Staats
Location: Morristown Memorial Hospital + Meetings/Conferences organized by Defendant ASIPP/Defendant CNS + Christie/Republican political fund raisers.

**644.    Defendant Kaufman + Defendant Cohen:**
Date range: See above. As with Defendant Kaufman + Defendant Staats
Mode of Communications: See above. As with Defendant Kaufman + Defendant Staats

Substance of communications: See above. As with Defendant Kaufman + Defendant Staats
Tactics employed: See above. As with Defendant Kaufman + Defendant Staats
Location: Morristown Memorial Hospital + St. Clare's Hospital, Denvile + Meetings/Conferences organized by the New Jersey Spine Society + Christie/Republican political fund raisers.

645.    **Defendant Kaufman + Defendant HUMC:**
Date range: 2009 to 2014
Mode of Communications: See above. As with Defendant Kaufman + Defendant Staats.
Substance of communications: See above. As with Defendant Kaufman + Defendant Staats.
Tactics employed: See above. As with Defendant Kaufman + Defendant Staats
Location: Morristown Memorial Hospital + Hackensack Medical Center + Christie/Republican political fund raisers + Office of the New Jersey Attorney General.

646.    **Defendant Kaufman + Defendant AHS:**
Date range: 2006 to 2012
Mode of Communications: See above. As with Defendant Kaufman + Defendant Staats.
Substance of communications: See above. As with Defendant Kaufman + Defendant Staats.
Tactics employed: See above. As with Defendant Kaufman + Defendant Staats.
Location: Morristown Memorial Hospital + Christie/Republican political fund raisers.

647.    **Defendant Staats + Defendant Kaufman:**
Date range: See above. As with Defendant Kaufman + Defendant Staats.
Mode of Communications: See above. As with Defendant Kaufman + Defendant Staats.
Substance of communications: See above. As with Defendant Kaufman + Defendant Staats.
Tactics employed: See above. As with Defendant Kaufman + Defendant Staats.
Location: See above. As with Defendant Kaufman + Defendant Staats.

648.    **Defendant Staats + Defendant Przybylski:**
See above. As with Defendant Kaufman + Defendant Staats.
Location: Meetings/Conferences organized by Defendant ASIPP/Defendant CNS + Christie/Republican political fund raisers

649.    **Defendant Staats + Defendant CNS:**
See above. As with Defendant Kaufman + Defendant Staats.
Location: Meetings/Conferences organized by Defendant ASIPP/Defendant CNS + Christie/Republican political fund raisers

650.    **Defendant Staats + Defendant Heary:**
See above. As with Defendant Kaufman + Defendant Staats.
Location: Morristown Memorial Hospital + University Hospital + Meetings/Conferences organized by Defendant ASIPP/Defendant CNS + Christie/Republican political fund raisers

651.    **Defendant Staats + Defendant Cohen:**

See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers

**652.    <u>Defendant Staats + Defendant HUMC:</u>**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Hackensack Medical Center + Christie/Republican political fund raisers.

**653.    <u>Defendant Staats + Defendant AHS:</u>**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers

**654.    <u>Defendant Przybylski + Defendant Kaufman:</u>**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers + New Jersey Office of Administrative Law + Office of the New Jersey Attorney General.

**655.    <u>Defendant Przybylski + Defendant Staats:</u>**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Christie/Republican political fund raisers + Meetings/Conferences organized by Defendant ASIPP/Defendant CNS

**656.    <u>Defendant Przybylski + Defendant CNS:</u>**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Christie/Republican political fund raisers + Meetings/Conferences organized by Defendant CNS

**657.    <u>Defendant Przybylski + Defendant Heary:</u>**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Christie/Republican political fund raisers + Meetings/Conferences organized by Defendant CNS.

**658.    <u>Defendant Przybylski + Defendant Cohen:</u>**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers

**659.    <u>Defendant Przybylski + Defendant HUMC:</u>**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Hackensack Medical Center + Christie/Republican political fund raisers.

**660.    <u>Defendant Przybylski + Defendant AHS:</u>**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers.

**661.    <u>Defendant CNS + Defendant Kaufman:</u>**

See above. As with Defendant Kaufman + Defendant Staats.
Location: Morristown Memorial Hospital + Meetings/Conferences organized by Defendant ASIPP/Defendant CNS + Christie/Republican political fund raisers.

662.    Defendant CNS + Defendant Staats:
See above. As with Defendant Kaufman + Defendant Staats.
Location: Meetings/Conferences organized by Defendant ASIPP/Defendant CNS + Christie/Republican political fund raisers.

663.    Defendant CNS + Defendant Przybylski:
See above. As with Defendant Kaufman + Defendant Staats.
Location: Christie/Republican political fund raisers + Meetings/Conferences organized by Defendant ASIPP/Defendant CNS.

664.    Defendant CNS + Defendant Heary:
See above. As with Defendant Kaufman + Defendant Staats.
Location: Meetings/Conferences organized by Defendant CNS + Christie/Republican political fund raisers.

665.    Defendant CNS + Defendant Cohen:
See above. As with Defendant Kaufman + Defendant Staats.
Location: Christie/Republican political fund raisers + Morristown Memorial Hospital

666.    Defendant CNS + Defendant HUMC:
See above. As with Defendant Kaufman + Defendant Staats.
Location: Christie/Republican political fund raisers + Hackensack Medical Center.

667.    Defendant CNS + Defendant AHS:
See above. As with Defendant Kaufman + Defendant Staats.
Location: Morristown Memorial Hospital + Meetings/Conferences organized by Defendant CNS + Christie/Republican political fund raisers

668.    Defendant Heary + Defendant Kaufman:
See above. As with Defendant Kaufman + Defendant Staats.
Location: Morristown Memorial Hospital + Christie/Republican political fund raisers + Meetings/Conferences organized by Defendant ASIPP/Defendant CNS.

669.    Defendant Heary + Defendant Staats:
See above. As with Defendant Kaufman + Defendant Staats.
Location: Meetings/Conferences organized by Defendant ASIPP/Defendant CNS + Christie/Republican political fund raisers

670.    Defendant Heary + Defendant Przybylski:
See above. As with Defendant Kaufman + Defendant Staats.

<u>Location:</u> Meetings/Conferences organized by Defendant CNS + Christie/Republican political fund raisers

**671.**   **Defendant Heary + Defendant CNS:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers + Meetings/Conferences organized by Defendant CNS

**672.**   **Defendant Heary + Defendant Cohen:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers + Meetings/Conferences organized by the New Jersey Spine Society

**673.**   **Defendant Heary + Defendant HUMC :**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Hackensack Medical Center + Christie/Republican political fund raisers

**674.**   **Defendant Heary + Defendant AHS:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers.

**675.**   **Defendant Cohen + Defendant Kaufman:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers.

**676.**   **Defendant Cohen + Defendant Staats:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers

**677.**   **Defendant Cohen + Defendant Przybylski:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers.

**678.**   **Defendant Cohen + Defendant CNS:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers.

**679.**   **Defendant Cohen + Defendant Heary:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Meetings/Conferences organized by the New Jersey Spine Society + Christie/Republican political fund raisers

**680.**   **Defendant Cohen + Defendant HUMC:**

See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Hackensack Medical Center + Christie/Republican political fund raisers.

**681.    Defendant Cohen + Defendant AHS:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers.

**682.    Defendant HUMC + Defendant Kaufman:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Hackensack Medical Center + Christie/Republican political fund raisers.

**683.    Defendant HUMC + Defendant Staats:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Christie/Republican political fund raisers.

**684.    Defendant HUMC + Defendant Przybylski:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Hackensack Medical Center + Christie/Republican political fund raisers

**685.    Defendant HUMC + Defendant CNS:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Hackensack Medical Center + Christie/Republican political fund raisers

**686.    Defendant HUMC + Defendant Heary:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Hackensack Medical Center + Christie/Republican political fund raisers + Morristown Memorial Hospital

**687.    Defendant HUMC + Defendant Cohen:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Hackensack Medical Center + Christie/Republican political fund raisers

**688.    Defendant HUMC + Defendant AHS:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Hackensack Medical Center + Morristown Memorial Hospital + New Jersey Hospital Association meetings + Governor's office in Trenton + Christie/Republican political fund raisers.

**689.    Defendant AHS + Defendant Kaufman:**
See above. As with Defendant Kaufman + Defendant Staats.
<u>Location:</u> Morristown Memorial Hospital + Christie/Republican political fund raisers.

**690.    Defendant AHS + Defendant Staats:**
See above. As with Defendant Kaufman + Defendant Staats.

Location: Morristown Memorial Hospital + Christie/Republican political fund raisers.

**691.    Defendant AHS + Defendant Przybylski:**
See above. As with Defendant Kaufman + Defendant Staats.
Location: Morristown Memorial Hospital + New Jersey Office of Administrative Law + Christie/Republican political fund raisers

**692.    Defendant AHS + Defendant CNS:**
See above. As with Defendant Kaufman + Defendant Staats.
Location: Morristown Memorial Hospital + Christie/Republican political fund raisers.

**693.    Defendant AHS + Defendant Heary:**
See above. As with Defendant Kaufman + Defendant Staats.
Location: Morristown Memorial Hospital + Governor's office in Trenton + Christie/Republican political fund raisers.

**694.    Defendant AHS + Defendant Cohen:**
See above. As with Defendant Kaufman + Defendant Staats.
Location: Morristown Memorial Hospital + Governor's office in Trenton + Christie/Republican political fund raisers.

**695.    Defendant AHS + Defendant HUMC:**
See above. As with Defendant Kaufman + Defendant Staats.
Location: Morristown Memorial Hospital + Hackensack Medical Center + Christie/Republican political fund raisers.

696.    Plaintiff and his surgical center were injured in their business or property by Defendants' antitrust violations. Their injury consists of being deprived of the ability to incorporate minimally invasive spine surgery into their commercial strategy. Such an injury of "exclusion" is of the type antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful, and Plaintiff and his surgical center are the proper entities to bring a case concerning this conduct.

697.    Plaintiff continues to suffer and will continue to suffer in the future from being excluded from the minimally invasive spine surgery market, more than he would have absent the Defendants' anticompetitive conduct.

698.    Defendants' anticompetitive conduct, pursued in the context of bribery, kickbacks, obstruction of justice, fraud, and falsified legal documents, is absolutely not entitled to Noerr-Pennington protection, a shield not for those with criminal intent.

699.    Plaintiff and his surgical center, pursuant to Fed. R. Civ. P. 57 and U.S.C. §

2201(a) hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described herein violates Sections 1 and 2 of the Sherman Act.

**700.**    Plaintiff and his surgical center further seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, and other applicable law, to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anticompetitive conduct does not occur in the future.

**COUNT SEVEN**
**Deprivation of Right under Color of Law**
**(By PlaintiffS against Defendants Christie (in his official capacity) + Kaufman (in his official capacity) + Przybylski (in his official capacity) + Solomon (in his official capacity) + Hafner (in her official capacity) + Allstate + GEICO + NJBME + Mouton + LMB + CMB + MMB)**

**701.**  Plaintiffs hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth.

**702.**  The Defendants deprived the Plaintiffs of their right to due process by:

   **(a)** Forging, altering and tampering with court transcripts and Defendant Solomon's Final Opinion, issued on December 13, 2013.

   **(b)** Defendants Solomon, Przybylski and Kaufman collectively committed two hundred and seventy-eight (278) separate instances of perjury, misrepresentation, evidential omission and gross mischaracterization in the administrative law proceeding (April 9 – June 28, 2013).

   **(c)** Failure of Defendant NJBME to have an independent analysis and comparison of the state authored transcripts, the independent transcripts, the court audio recordings, and Defendant Solomon's Final Opinion.

   **(d)** Failure of Defendant NJBME to respond to Plaintiff's written pleas for an investigation of the Tampered Evidence.

   **(e)** Failure of NJBME to acknowledge the impartiality of the medical board, in adjudicating the Plaintiff's complaint of Evidence Tampering, in violation of the Plaintiff's Fourteenth Amendment right to an impartial tribunal. The Defendants acted with malicious and reckless disregard for the Plaintiff's due process rights. Defendant NJBME did this in the knowledge that the Plaintiff had, on June 7, 2012, requested that the Mercer County Court appoint a special prosecutor and ad hoc medical board. The latter request was submitted as a consequence of AG Chiesa's prejudicial comments to the media on May 9, 2012, and the illegal suspension of the Plaintiff's CDS prescribing license on May 22, 2012 by AG Chiesa's subordinate, and acting director of the Division of Consumer Affairs, Eric Kanefsky, Esq.

(f) Failure of Defendant NJBME to exclude Defendant Hafner from any involvement in the Plaintiff's application for license reinstatement in 2014, on the basis that the Plaintiff had filed an ethics complaint against Hafner, in September 2013.

(g) Failure of NJBME to suspend the legal proceedings, until DAG Hafner, had recused herself from the matter. Hafner's personal animus towards the Plaintiff, and her personal relationship with Defendant Kaufman, violated the Plaintiff's right to an impartial tribunal. This violation was magnified by the unconstitutional configuration of the mechanism of physician regulation.

(h) Denying Kaul's application in 2019 for reinstatement of his New Jersey medical license, based on a 'Fraud on the Court' i.e. the illegal revocation of Kaul's license in March 2014 and the imposition of an illegal 'fine' of $475,000.

(i) Obstructing Kaul's application in 2017/2018 for medical licensure by Defendant PMB, through the dissemination over the US mail and wires of knowingly fraudulent information, that violated Kaul's right to due process and his right to earn a livelihood, of which he has been illegally deprived since 2012.

(h) For all the reasons as stated above in section **STATEMENT OF FACT SPECIFIC TO FELDMAN, as they pertain to defendants LMB, CMB, MMB, Mouton and Burdine.**

703.    The Defendants committed and conspired to commit perjury. The Defendants knew that the Plaintiff was qualified, credentialed and licensed to perform minimally invasive spine surgery. The Defendants abused their positions of public authority to mislead the public into believing their lies, and thus violated the Plaintiff's right to substantial due process.

704.    The Defendants committed and conspired to commit a knowingly dishonest interpretation of the alternative privileges regulation. The Defendants knew the regulation was not required for the performance of minimally invasive spine surgery. In fact, during the OAL proceedings, when Defendant Hafner was unable to articulate an argument in support of her contention, Defendant Solomon interjected with his own interpretation, albeit flawed.  The Defendants committed and conspired to commit a knowingly dishonest interpretation of the rights afforded to the Plaintiff by his plenary medical license that permitted him to practice both **medicine and SURGERY.**

705.    The Defendants committed and conspired to commit a concealment of the truth of the clinical effectiveness of the Plaintiff's minimally invasive spine surgery practice, by refusing with ill intent, the Plaintiff's suggestion to have his practice independently analyzed and monitored.

**From paragraph 892 to 919 Kaul has pled with particularity, fact specific to each element, of each claim, against each defendant, in a separate and distinct manner:**

706.    Defendant Christie + Defendant Kaufman:
Date range: 2009 to 2019.

<u>Conduits of Communication + Bribery to Christie:</u> Public relations firm (Mercury Public Relations + Princeton Public Relations + Law Firm (Brach Eichler + Wolf Samson) + Through state government intermediary + Directly + Political campaign fundraisers + Political campaign donations.

<u>Mode of communications:</u> US mail + E-mail + Voice message + SMS (text) + Face to face.

<u>Substance of communications:</u> Scheme to testify that every aspect of the care Kaul delivered to his patients "**grossly deviated**" from the standard of care + Scheme to have Defendant Solomon buttress Defendant Przybylski's knowingly false testimony that every aspect of the care Kaul delivered to his patients "grossly deviated" from the standard of care + Scheme to have Defendant Hafner pervert the course of justice by buttressing Defendant Przybylski's knowingly false testimony that every aspect of the care Kaul delivered to his patients "grossly deviated" from the standard of care + Scheme to use the bankruptcy proceedings to defraud Kaul of his assets, his real estate holdings and $ 45 million owed to him by insurance companies, including defendants Allstate + Geico + Scheme to conceal from Kaul the defendants' pattern of racketeering in the United States Bankruptcy Court for the District of New Jersey + Scheme to engage in evidence tampering and perjury in the administrative board proceedings, that caused the revocation of Kaul's license, as evidenced in '<u>The Solomon Critique</u>' (K1-D.E. 225 Page ID 4940) and '<u>The Solomon Critique 2</u>' (K1-D.E. 299 Page ID 7202) + Scheme to violate Kaul's right to due process, his right to an impartial tribunal and his civil rights, through the commission of knowingly false testimony that Kaul had allegedly "grossly deviated" from the standard of care for reasons pertaining to qualifications, credentials, alternative privileges and hospital privileges. Defendants Solomon, Hafner, Przybylski and Kaufman knew that under the law the standard of care is not determined by any of these reasons, but simply by the manner in which the care is delivered, but yet in this knowledge they abused the power of public office for personal and political gain, at the expense of the public + Scheme to abuse the power of public office and quasi-judicial proceedings to perpetrate a massive fraud on the public, by willfully misrepresenting that Kaul was not qualified, credentialed or licensed to perform minimally invasive spine surgery. The defendants knew that Kaul possessed a license to practice medicine and surgery, had been credentialed by at least six state licensed surgical centers to perform minimally invasive spine surgery, did not require alternative or hospital privileges to perform minimally invasive spine surgery, had commenced his training in minimally invasive spine surgery in 2002, three years before Defendant Przybylski, a market competitor and 'expert' for Defendant NJBME + Scheme to propagate to the public, a knowingly false interpretation of the alternative privilege regulation, in the knowledge that they were abusing the power of public office for personal and political gain. The defendants knew that Kaul did not require alternative privileges to perform minimally invasive spine surgery in his outpatient surgical center + Scheme to suppress evidence of the superior clinical outcomes of Kaul's minimally invasive spine surgery practice, by refusing to have Kaul's practice independently analyzed and monitored + Scheme to engage in obstruction of justice by ignoring Kaul's written requests for an independent investigation of Kaul's claims of evidence tampering + Scheme to participate in a knowingly illegal system of physician regulation, that violated Kaul's civil rights, his

constitutionally protected right to due process and his right to an impartial tribunal, by willfully conducting proceedings through and by Defendant NJBME, the New Jersey Office of Administrative Law and the Office of the New Jersey Attorney General. These governmental agencies are all subservient to the executive branch of state government. This is an illegal configuration that violates the separation of powers principle of the United States Constitution, a principle that protects citizens due process rights when life, liberty and property are at stake + Scheme to abuse the authority of the office of the Governor of the State of New Jersey for the purposes of accepting bribes, as part of a series quid pro quo schemes purposed to have Defendant NJBME revoke Kaul's license + Scheme to violate Kaul's right to due process by failing to exclude Defendant Hafner from any further involvement in Kaul's case and or his application in 2014 for reinstatement of his medical license. This was a knowing and willful violation based on the fact that Kaul had filed an ethics complaint against Hafner in September 2013 + Scheme to deprive Kaul of his civil rights and right to due process by permitting Defendant Hafner, an individual involved in a personal relationship with Defendant Kaufman, who, like Defendant Kaufman, had demonstrated a vitriolic personal animus towards Kaul.

Tactics employed: Conspired to and did provide false knowingly that every aspect of the care Kaul delivered to his patients "**grossly deviated**" from the standard of care + Conspired to and did have Defendant Solomon buttress Defendant Przybylski's knowingly false testimony that every aspect of the care Kaul delivered to his patients "grossly deviated" from the standard of care + Conspired to and did engage in evidence tampering and perjury in the administrative board proceedings, that caused the revocation of Kaul's license, as evidenced in 'The Solomon Critique' (K1-D.E. 225 Page ID 4940) and 'The Solomon Critique 2' (K1-D.E. 299 Page ID 7202)+ Conspired to and did violate Kaul's right to due process, his right to an impartial tribunal and his civil rights, through the commission of knowingly false testimony that Kaul had allegedly "grossly deviated" from the standard of care for reasons pertaining to qualifications, credentials, alternative privileges and hospital privileges. Defendants Solomon, Hafner, Przybylski and Kaufman knew that under the law the standard of care is not determined by any of these reasons, but simply by the manner in which the care is delivered, but yet in this knowledge they abused the power of public office for personal and political gain, at the expense of the public + Conspired to and did violate abuse the power of public office and quasi-judicial proceedings to perpetrate a massive fraud on the public, by willfully misrepresenting that Kaul was not qualified, credentialed or licensed to perform minimally invasive spine surgery. The defendants knew that Kaul possessed a license to practice medicine and surgery, had been credentialed by at least six state licensed surgical centers to perform minimally invasive spine surgery, did not require alternative or hospital privileges to perform minimally invasive spine surgery, had commenced his training in minimally invasive spine surgery in 2002, three years before Defendant Przybylski, a market competitor and 'expert' for Defendant NJBME + Conspired to and did violate propagate to the public, a knowingly false interpretation of the alternative privilege regulation, in the knowledge that they were abusing the power of public office for personal and political gain. The defendants knew that Kaul did not require

alternative privileges to perform minimally invasive spine surgery in his outpatient surgical center + Conspired to and did suppress evidence of the superior clinical outcomes of Kaul's minimally invasive spine surgery practice, by refusing to have Kaul's practice independently analyzed and monitored + Conspired to and did engage in obstruction of justice by ignoring Kaul's written requests for an independent investigation of Kaul's claims of evidence tampering + Conspired to and did participate in a knowingly illegal system of physician regulation, that violated Kaul's civil rights, his constitutionally protected right to due process and his right to an impartial tribunal, by willfully conducting proceedings through and by Defendant NJBME, the New Jersey Office of Administrative Law and the Office of the New Jersey Attorney General. These governmental agencies are all subservient to the executive branch of state government. This is an illegal configuration that violates the separation of powers principle of the United States Constitution, a principle that protects citizens due process rights when life, liberty and property are at stake + Conspired to and did abuse the authority of the office of the Governor of the State of New Jersey for the purposes of accepting bribes, as part of a series quid pro quo schemes purposed to have Defendant NJBME revoke Kaul's license + Conspired to and did violate Kaul's right to due process by failing to exclude Defendant Hafner from any further involvement in Kaul's case and or his application in 2014 for reinstatement of his medical license. This was a knowing and willful violation based on the fact that Kaul had filed an ethics complaint against Hafner in September 2013 + Conspired to and did deprive Kaul of his civil rights and right to due process by permitting Defendant Hafner, an individual involved in a personal relationship with Defendant Kaufman, who, like Defendant Kaufman, had demonstrated a vitriolic personal animus towards Kaul.
Location: Governor's office in Trenton + Christie/Republican political fund raisers + Morristown Memorial Hospital + Office of the New Jersey Attorney General.

**707.    Defendant Christie + Defendant Przybylski:**
See above. As with Defendant Christie + Defendant Kaufman.
Location: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General.

**708.    Defendant Christie + Defendant Solomon:**
See above. As with Defendant Christie + Defendant Kaufman.
Location: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + New Jersey Office of Administrative Law.

**709.    Defendant Christie + Defendant Hafner:**
See above. As with Defendant Christie + Defendant Kaufman.
Location: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General.

**710.    Defendant Christie + Defendant Allstate:**
See above. As with Defendant Christie + Defendant Kaufman.

162

<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + Allstate corporate offices in Northbrook, Illinois.

711.    **Defendant Christie + Defendant GEICO:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + Geico corporate offices in Chevy Chase, Maryland.

712.    **Defendant Christie + Defendant NJBME:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General.

713.    **Defendant Kaufman + Defendant Przybylski:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Morristown Memorial Hospital + Office of the New Jersey Attorney General + Meetings/Conferences organized by Defendant ASIPP + Meetings/Conferences organized by Defendant CNS + Meetings/Conferences organized by the New Jersey Spine Society + NASS headquarters in Chicago + NASS national meetings +CNS headquarters in Chicago.

714.    **Defendant Kaufman + Defendant Solomon:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Office of the New Jersey Attorney General + New Jersey Office of Administrative Law

715.    **Defendant Kaufman + Defendant Hafner:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Morristown Memorial Hospital + Office of the New Jersey Attorney General.

716.    **Defendant Kaufman + Defendant Allstate:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Morristown Memorial Hospital + Office of the New Jersey Attorney General + Allstate corporate offices in Northbrook, Illinois.

717.    **Defendant Kaufman + Defendant Geico:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Morristown Memorial Hospital + Office of the New Jersey Attorney General + Geico corporate offices in Chevy Chase, Maryland.

718.    **Defendant Kaufman + Defendant NJBME:**
See above. As with Defendant Christie + Defendant Kaufman.

<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Morristown Memorial Hospital + Office of the New Jersey Attorney General.

**719.  Defendant Przybylski + Defendant Solomon:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + New Jersey Office of Administrative Law.

**720.  Defendant Przybylski + Defendant Hafner:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + New Jersey Office of Administrative Law

**721.  Defendant Przybylski + Defendant Allstate:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + New Jersey Office of Administrative Law + Allstate corporate offices in Northbrook, Illinois.

**722.  Defendant Przybylski + Defendant Geico:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + Geico corporate offices in Chevy Chase, Maryland.

**723.  Defendant Przybylski + Defendant NJBME:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + New Jersey Office of Administrative Law.

**724.  Defendant Solomon + Defendant Hafner:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + New Jersey Office of Administrative Law.

**725.  Defendant Solomon + Defendant Allstate:**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + Allstate corporate offices in Northbrook, Illinois + New Jersey Office of Administrative Law.

**726.  Defendant Solomon + Defendant Geico:**
See above. As with Defendant Christie + Defendant Kaufman.

<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + New Jersey Office of Administrative Law + Geico corporate offices in Chevy Chase, Maryland.

**727.    <u>Defendant Solomon + Defendant NJBME:</u>**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + New Jersey Office of Administrative Law.

**728.    <u>Defendant Hafner + Defendant Allstate:</u>**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + New Jersey Office of Administrative Law.

**729.    <u>Defendant Hafner + Defendant Geico:</u>**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + Geico corporate offices in Chevy Chase, Maryland.

**730.    <u>Defendant Hafner + Defendant NJBME:</u>**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + New Jersey Office of Administrative Law.

**731.    <u>Defendant Allstate + Defendant Geico:</u>**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + Allstate corporate offices in Northbrook, Illinois + Geico corporate offices in Chevy Chase, Maryland.

**732.    <u>Defendant Allstate + Defendant NJBME:</u>**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General +  Allstate corporate offices in Northbrook, Illinois + New Jersey Office of Administrative Law.

**733.    <u>Defendant Geico + Defendant NJBME:</u>**
See above. As with Defendant Christie + Defendant Kaufman.
<u>Location</u>: Governor's office in Trenton + Christie/Republican political fund raisers + Office of the New Jersey Attorney General + Geico corporate offices in Chevy Chase, Maryland + Geico corporate offices in Chevy Chase, Maryland.

734.    Defendants Allstate and GEICO are "persons" under 42 U.S.C. § 1983. Defendants Allstate and GEICO established and fund the Office of the Insurance Fraud Prosecutor.

Defendants Allstate and GEICO fund the Office of the Attorney General and share a common server with the Office of the Attorney General. Defendants Allstate and GEICO draft healthcare legislation for the state, a function that is governmental in nature.

**735.**  In 2009, the Seventh Circuit summarized the US Supreme Court's criteria, to determine whether the actions of private parties constituted governmental functions. The tests were (1) the symbiotic relationship test (Burton v Wilmington Parking Suth., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed2d 45 (1961), (2) the state command and encouragement test (Moose Lodge No. 107, 407 U.S. at 176-77, 92 S.Ct (1965), (3) the joint participation doctrine (Lugar v Edmonton Oil Co., 1982), (4) the public function test (Jackson v Metro Edison Co., 419 U.S. 345, 353 95 S.Ct 449, 42 L.Ed2d 477 (1974).

**736.**  The State Actor Tests that confirm that Defendants Allstate and GEICO possess 1983 "person" status are the **(i)** symbiotic test, **(ii)** joint participation doctrine, **(iii)** state command and encouragement test, **(iv)** public function test, **(v)** pervasive entwinement.

**737.**  State action is found when a private corporation or actor provides a "public function" i.e. the drafting of healthcare legislation, as in Marsh v Alabama, 326 U.S. 501 (1946). See also Terry v Adams 345 U.S. 461 (1953); Evans v Newton, 382 U.S. 296 (1966) ("That is to say, when private individuals or groups are endowed by the State with powers or function governmental in nature, they become agencies or instrumentalities of the State and subject to Constitutional limitations."). State action is found when the private corporation is heavily regulated by the state i.e. the Department of Banking and Insurance, thereby giving the state control of the corporations' acts.

**738.**  Defendants Allstate and GEICO are alleged to conduct criminal investigations outsourced from the Office of the Insurance Fraud Prosecutor. These investigations are disguised as civil matters, in order to deceive parties into believing that they do not need to take the usual legal precautions, associated with criminal investigations.

**739.**  The Plaintiff alleges, upon information and belief, that lawyers for Defendants Allstate and GEICO assisted, in the drafting of Defendant Solomon's Final Opinion, that was issued on December 13, 2013.

**740.**  The Defendants abused their official public and State Actor positions to advance their private commercial interests, at the expense of the Plaintiff's Constitutional right to due process. Defendants Przybylski, Kaufman and Solomon collectively committed two hundred and seventy-eight (278) separate instances of perjury, misrepresentation, evidential omission and mischaracterization in the MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A. KAUL, M.D. TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY (April 9, 2013 to June 28, 2013).

741.    Defendants Allstate and GEICO are alleged to have conspired with Defendant Solomon to issue a fraudulent opinion, that contains **two hundred and seventy-eight (278) separate acts of perjury and evidential omissions, misrepresentations and gross mischaracterizations.**

742.    Defendants Przybylski, Kaufman, Hafner and Solomon abused the power of their public function for personal gain. Defendants Przybylski and Kaufman in the knowledge that they were local business competitors of the Plaintiff, knew that their testimony was conflicted, but they failed to recuse themselves from the provision of 'expert' testimony. In fact, Defendant Przybylski, devoted four (4) days to providing false testimony against the Plaintiff, that was founded on a standard he knew did not exist. This was a fact he admitted on cross-examination.


## COUNT EIGHT
### Violation of Plaintiffs' due process rights pursuant to the Excessive Fines Clause of the Eight Amendment and due process Clause of the Fourteenth Amendment (Against Defendant NJBME)

743.    On March 12, 2014, Defendant NJBME entered an illegal order that unlawfully revoked Kaul's license to practice medicine and surgery in New Jersey, and fined Kaul over $475,000. On February 28, 2019, the United States Supreme Court in Timbs v. Indiana,586 U.S. 139 S.Ct. 682; 203 L.Ed. 2d 11 held that the State of Indiana, in confiscating a car worth no more than $42,000 from an individual convicted of drug dealing, had violated his constitutional rights.

744.    In May 2015 Defendant NJBME used its excessive/illegal fine of $475,000 to obstruct Kaul's application for reinstatement of his medical license, denying him the right to even present his case for reinstatement, until he had paid the illegal fine.

745.    In early 2019, Kaul submitted another application to Defendant NJBME in order to obtain his license in New Jersey. The application, with a money order for $325.00 was delivered to the offices of Defendant NJBME by Fedex in mid-March. In late May, Kaul as informed by an employee of Defendant NJBME, that his application had not been processed because it had to be submitted online through a website administered by Defendant NJBME. Kaul attempted on several occasions to initiate the process, but after having submitted his name, the website prevented him from filing his application. Kaul contacted the employee ("Maisha") at Defendant NJBME and explained that his online application had been blocked. Kaul was routed through to another employee, who communicated to Kaul that he would have to talk with an individual by the name of "Jacqueline Johnson" in order to ascertain what steps were required of him to submit his application.

**746.**   From late May to the present, Kaul has attempted to contact Jacqueline Johnson on at least eight separate occasions, and on each occasion, after having provided his name to the individual answering the phone, was transferred through to the voicemail of "Jacqueline Johnson", and on each occasion Kaul left a message with his contact information, and request that he be contacted. On the last occasion, in mid-July, Kaul spoke with an individual name "Anne", who was supposedly instructed by "Jacqueline Johnson" to write Kaul's information on a slip of paper, that Kaul was informed, would be handed to "Jacqueline Johnson".

**747.**   Defendant NJBME never returned Kaul's Fedex submitted application or money order, has not received any phone calls from **"Jacqueline Johnson"**, and the obstruction by Defendant NJBME, of Kaul's efforts to have returned the property of his illegally revoked license, constitute a **"new racketeering injury"**, the nature of which is identical to the due process violations identified in Timbs v. Indiana, and as with the denial of Kaul's application for licensure in Pennsylvania, establishes a legal basis for a new or amended complaint.

**748.**   From 2018 to 2019, upon completion of the two (2) year suspension imposed on Plaintiff Feldman in 2016, his application was reinstatement of licensure was denied, based upon an arbitrary pots-hoc imposition of a fine of $500,000, simply in order for the right to have his application adjudicated. Defendant LMB informed counsel for Plaintiff Feldman, that the $500,000 'fine' conferred no guarantee that his license would be restored, or that if it was it would be restricted to the point of nullity.

<u>COUNT NINE</u>
<u>Violation of Plaintiffs' due process right to apply for and maintain the property right of medical licensure in other states, consequent to Defendant Federation's illegal Compact Interstate Agreement and conspiracy with state medical boards</u>

**749.**   The law says: United States Constitution: Compact Clause: **"No state shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, <u>enter into any Agreement or Compact with another State</u>, or with a foreign Power, or engage in war, unless actually invaded, or in such imminent Danger as will not admit of delay."** Article 1, Section 10, Clause 3.

**750.**   Defendants Federation + LMB + MMB + CMB + NJBME, and every other state board in the United States, have all entered into such an agreement, either explicitly through becoming signatories to the written agreement, or by conducting their **business** of physician regulation, that in the eyes of contract law, equates to being an actual signatory. The defendants have knowingly participated in this illegal scheme, for the purposes of profiteering from the medical board-lawyer-industrial complex, that continues to financially 'rape' the physician community, and with an irony from the

depths of  Oscar Wilde's "De Profoundis", that fatally fails to "**protect the public**".
Villains in velvet.

### 15.                          <u>Conclusion</u>

For the evidence, facts, argument and law set forth above, Plaintiffs Kaul and Feldman move this Court to grant the requested relief in order that an end be brought to the epidemic of physician suicide, and that the interests of American justice, as conceived by the Founding fathers in the drafting of the United States Constitution, be faithfully served.

## 16.                    <u>Demand for Judgment</u>

**WHEREFORE,** Plaintiff seeks judgment against the Defendants jointly and severally, as follows:

1. Compensatory + Consequential + Punitive Damages from all Defendants in their individual capacities.

2. Declaring that the mechanism of physician regulation in New Jersey, as described herein, is unconstitutional and violated the Plaintiffs Kaul's right to due process.

3. Declaring that the Compact Interstate Agreement promulgated and perpetrated by Defendant Federation is illegal, and violates the Compact Clause of the United States Constitution.

4. Declaring that the mechanisms of physician regulation in Louisiana, Mississippi and California as described herein, are unconstitutional and violated the Plaintiff Feldman's right to due process.

5. Declaring that the revocation/suspension of the Plaintiffs' medical licenses were procured through illegal means and were illegal acts.

6. Declaring that the continued revocation/suspension of the Plaintiffs' medical license is illegal and is a consequence of fraudulent legal proceedings and an unconstitutional mechanism of physician regulation.

7. Declaring that the May 22, 2012 suspension of the Plaintiff Kaul's CDS Registration was procured illegally.

8. Ordering the immediate reinstatement of the Plaintiffs' plenary licenses to practice medicine and surgery in New Jersey. Louisiana, Mississippi and Alabama.

9. Ordering the immediate grant of a medical license to Plaintiff Kaul in the State of Pennsylvania.

10. Ordering the immediate reinstatement of the Plaintiff Kaul's CDS Registration.

11. Declaring that the conduct alleged herein is in violation of Sections 1 and 2 of the Sherman Act, of the other statutes set forth above, and of the common law of unjust enrichment under the laws of all states and jurisdictions within the United States.

12. Enjoining Defendants from continuing the illegal activities alleged herein and

declaring unconstitutional the IFPA.

13. Granting Plaintiffs equitable relief in the nature of disgorgement, restitution and the creation of a constructive trust to remedy Defendants' unjust enrichment.

14. Awarding the Plaintiff treble, multiple, punitive and any form of relief the Court deems just and equitable.

15. Awarding the Plaintiffs costs of suit, including reasonable attorneys' fees as provided by law.

16. Granting such other relief as is necessary to correct for the anti-competitive effects caused by the unlawful conduct of Defendants, and as the Court deems just.

17. Expunging the prior revocation/suspension of the Plaintiffs' medical licenses from the public record + A public apology directed to Kaul/Feldman's children + patients.

18. Declaring that the "**New Jersey Insurance Fraud Prevention Act**" - § 17:33A-1 is in violation of the New Jersey Constitution as amended in 1947 which provides that "**the right of trial by jury shall remain inviolate**."

19. Declaring that the "**New Jersey Insurance Fraud Prevention Act**" - § 17:33A-1 is in violation of the United States Constitution, and any other relief the Court deems just and equitable.

## 17.  Jury Demand

Plaintiffs demands trial by jury on all issues so triable.

## 18.   Demand for Insurance

Demand is hereby made for all insurance policies, which may cover the damages alleged in this Complaint.

We certify that the above statements are true and accurate to the best of our knowledge, and that if it is proved that we willfully and knowingly misrepresented the facts, then we are subject to punishment.

Respectfully submitted on this 27th day of September 2019

By: _____          By: _____

Richard Arjun Kaul, MD                  Arnold Erwin Feldman, MD